**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

TYLER DANCER, Representative
for the Estate of Michael Chandler
DEANN WINFIELD, Representative
for the Estate of LAPRACE STEGALL
SHAPRACE STEGALL, Next Friend for
J.W., J.W., A.D;
MIKEL LUCAS AND SHANNIKA
LUCAS, Next Friends for S.L.;
CEDRIC HUNTLEY, Next Friend for C.H.;
DEVIN PARKER, Next Friend for X.L.,
and A.L.;
ALISA WATKINS, Next Friend
for A.M.;
DURLAHN ROLSTONE SR., Next Friends
for D.R.;
BRITNEY JOHNSON, Next Friend for
B.K. and D.R.;
ANTANEISHA FOX AND TYRELL L.
LAGRONE; Next Friends for A.L. and
A.L.;
Individually, BRANDI CRAWFORD;
Individually, THOMAS W. CRAWFORD;
Individually, DEANDRE JORDAN
Individually, MELBA PARKER;
Individually, DORI WORD;
Individually, KIMBERLY BRONSON;
Individually, CHERYL BRONSON;
Individually, JENNY DOEZCEMA;
Individually, ANDRIETTA GASTON;
Individually, ERLINE FIELDS;
Individually, DEBORAH FIELDS;
Individually, GLORIA CLOPTON;

Individually, NICOLE FIELDS;
Individually, BARBARA IRIS POTTER;
Individually, MARY COLLINS;
Individually, ODIE DANCER JR.;
Individually, MICHELLE DANCER;
Individually, ODIE DANCER SR;
Individually, MARY DANCER;
Individually, REGINALD T. DOSS;
Individually, BENJAMIN WINFIELD;
Individually, PAUL J. LAMBERT;
Individually, TIMOTHY D. JOHNSON;
Individually, SAM DIXISON;
Individually, DEVAUHNTRE BATES;
Individually, NATALIE NORRIS;
Individually, DELLA NICHOLS;
Individually, BRITNEY JOHNSON;
Individually, JOE BYARS;
Individually, JASMINE DAVIES;
Individually, AJANI RODGERS;
Individually, JAMES CUMMINGS;
Individually, BARBARA CUMMINGS;
            Plaintiffs,

                                        Case No.:

                                        Honorable Chief Judge Jonker

        v.

UNITED STATES OF AMERICA;
ENVIRONMENTAL PROTECTION AGENCY
REGION 5 DIRECTOR DEBRA SHORE, In
her Official Capacity; MARTA FUOCO,
Individually and in her Official Capacity,
MICHAEL COMPHER, in his Official Capacity;
GRAPHIC PACKAGING HOLDING CO.;
GRAPHIC PACKAGING INTERNATIONAL;
TOM OLSTAD, Individually and in his Official Capacity;
PAUL W. MCCANN, in his Official Capacity;
CITY OF KALAMAZOO; MAYOR DAVID

2

ANDERSON, Individually and in his Official
Capacity; JIM RITSEMA, in his Official Capacity;
JACK URBAN, Individually and in his Official
Capacity; JAMES BAKER, Individually and in
his Official Capacity; THE STATE OF MICHIGAN;
GOVERNOR GRETCHEN WHITMER, in her
 Official Capacity; SENATOR SEAN MCCANN
in his Official Capacity; ENVIRONMENT GREAT
LAKES AND ENERGY DIRECTOR AARON KEATLEY,
Individually and in his Official Capacity; MICHIGAN
DEPARTMENT OF HUMAN HEALTH AND SERVICES,
ASSESSMENT MANAGER ANDREA KEATLEY,
in her Official Capacity; BOBBY HOPEWELL,
Individually and in his Official Capacity; and any
unknown, yet to be determined persons or entities.

      Defendants.

_____/

Attorney John R. Beason III
(D.C. Bar No.1721583)
**The J.R. Beason Firm PLLC.**
Attorney for the Plaintiffs
853 McAlister St. (Shamika Jordan Way)
Benton Harbor, MI 49022

## PLAINTIFFS' CLASS ACTION COMPLAINT AND REQUEST FOR DAMAGES

There are no other actions before the Court which arise out of the same transaction and occurrence as stated herein at this time.

### (1)

These Plaintiffs, residents of the Northside neighborhood of Kalamazoo, MI, through counsel, comes and brings this action for violations of the United States Constitution and federal law against the named Defendants, primarily: violations of

the Clean Air Act and Constitution's free exercise of religion, equal protection, and due process clauses, constituting conspiracy to violate civil rights and disparate treatment. This complaint is brought on behalf of approximately eight thousand people, all of whom have suffered injuries as a consequence of an on-going conspiracy operating within a habitual custom of racial animus established by the Federal government of the United States of America.  The Plaintiffs assert that these violations of their unalienable constitutional rights were caused by the Defendants' repugnant, deliberate misconduct, neglect of duty, and indifference to definite injuries of Black American citizens.

(2)

## **INTRODUCTION**

This is a civil action asserting claims under the Constitution and federal law alleging violations of the U.S. Constitution, the federal Clean Air Act, and Michigan's Natural Resources and Environmental Protection Act.  The Plaintiffs assert they are suffering from intentional discrimination acted out in a conspiracy to violate their civil rights, causing them to suffer wrongful deaths, irreparable bodily harm, assaults, batteries, severe emotional distress, and regular nuisances.  Due to their egregious releases of hazardous air pollutants causing adverse environmental effects, the Plaintiffs assert that these Defendants are in violation of the U.S. Const. Amend. I, U.S. Const. Amend. V, U.S. Const. amend. XIV, 42 U.S.C. § 7412, Title VI of the

Civil Rights Act of 1964, 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), 42 U.S.C. § 2000d, 40 C.F.R. § 63.4, M.C.L § 324.5512, M.C.R § 336.1602, and several other ambient air control regulations.  The Plaintiffs requests a jury trial and seeks exemplary, compensatory, and equitable relief, as well an award of reasonable attorney fees and cost pursuant to the U.S Constitution and 42 U.S.C.A. § 1983.

(3)

## JURISDICTION & VENUE

This court has jurisdiction over all causes of action set forth in this complaint pursuant to 28 U.S.C § 139, as all plaintiffs and Defendants reside and or operate in the Western District of Michigan.  Furthermore, all significant and relevant incidents giving rise to this suit took place in Kalamazoo, MI, County of Kalamazoo, within the jurisdiction of this Court.

(4)

## THE PARTIES

(5)

## THE PLAINTIFFS

Plaintiffs are citizens of the State of Michigan and residents in the City of Kalamazoo, within the County of Kalamazoo.

5

(6)

Plaintiff Deann Winfield, representative of the Estate of LaPrace Stegall, parents and concerned citizens in the City of Kalamazoo, have suffered mental and emotional anguish, loss of quality of life, and reputation as a result of the racial animus inspired actions and deliberate indifference of the Defendants.

(7)

## THE DEFENDANTS

Defendants United States of America, Region 5 EPA Director Debra Shore, Marta Fuoco, Michael Compher, Graphic Packaging Holding Company (GPH), Graphic Packaging International (GPI), Tom Olstad, Paul W. McCann, City of Kalamazoo (The City, Kalamazoo Wastewater Reclamation Plant, KWRP), Mayor David Anderson, City manager Jim Ritsema, former Commissioner Jack Urban, KWRP manager James Baker, Governor Gretchen Whitmer, Senator Sean McCann, Aaron Keatley, Andrea Keatley, and Bobby Hopewll, are private individuals, elected officials, appointed government agents, public workers, and municipal and corporate entities with active places of business and ongoing operations in the Counties of Kalamazoo and Ingham, both within the jurisdiction of this Court.

(8)

## **FACTS GIVING RISE TO COMPLAINT**

(9)

In 1855, Kalamazoo's Black community established its first Black Church on the Northside of Kalamazoo where GPI's recent expansion took place. "The first church building was a small, wood frame structure, likely a house, at the corner of Water Street and Pitcher Street." In 1861, Black American students in Kalamazoo, MI were expelled from public schools and all students aged four to twenty-one years old were made to attend the new "colored" school on the corner of Walbridge and North streets in Kalamazoo, MI. In 1863, the Dancer Family Plaintiffs moved to Kalamazoo, MI from Tupelo, MS, and settled on the Northside of Kalamazoo. The Dancers joined a burgeoning abolitionist community. A contingent of Methodist activists were funneling more and more Black Americans from the torment taking place in the Mississippi Valley at the time. Around 1867, a newer building was built across the street at 307 Water Street. Ten years later, by 1871, ninety percent of Kalamazoo's Black American residents lived on the North and East sides of Kalamazoo, adjacent to the colored school and close to the places of worship. In 1884, the city's first lumber firm was founded, followed by a sawmill, and the city began its evolution into industry. As the Black community grew with the city, the church needed to expand, and in 1913, ground for the second church was purchased

and erected at 143 E. Frank Street, near N. Edwards Street. ("*Allen Chapel A.M.E. Church — Kalamazoo Public Library*").   Due to segregation and settling their semitic places of worship in the Northeast, those sides became the "Black American" areas of Kalamazoo.  In 1923, the City of Kalamazoo established its first papermill, the "Brown Paper Mill."  Two years later, in 1925, the City of Kalamazoo codified its predominantly Black American neighborhoods "Industrial."  Allegedly, one of the City of Kalamazoo's oldest redlining zoning maps has the handwritten notation over the Northside reading: "Hazardous. Negro labor."   According to Kalamazoo's original Black American family's, the Paper mill's community racial animus towards the Black Abolitionist community grew so vehemently, that the owners relocated and founded the Portage, MI community to distance themselves from the growing Black American community, where they operated their original papermill sites.  The move made Portage, MI one of the wealthiest towns in the world with a high billionaire per capita ratio.  A decade after Kalamazoo's "redlining", of the Black community as "industrial", the Federal Housing Administration praised Kalamazoo's "zoning" of Black Americans into chemically hazardous communities, as a "model" ordinance. ("*A Brief and Incomplete History of Environmental Racism in Kalamazoo*").  By the end of the 1930s, there were fifteen paper mills in the Kalamazoo Valley area, making the County of Kalamazoo the number one paper producer in the world.  In 1942, the Kalamazoo paper mills

8

were awarded federal contracts and went on to develop and manufacture the "victory board" used during World War II.  A report by The W. E. Upjohn Institute entitled "*The Position of the Paper Industry in the Economy of Kalamazoo County Michigan in 1954*" concluded "Yet so deeply is the paper industry embedded in the Kalamazoo area that in 1954 approximately 32 percent of the combined sales of all the manufacturing, distributive, and service industries and 24 percent of total personal incomes in Kalamazoo County came directly or indirectly through its activities. Through its effectiveness in the use of the natural and human resources of the area, together with its extensive use of national and world markets the paper industry touches the lives of almost all of us."  This 1954 report clearly demonstrated how Kalamazoo's strong paper driven economy was able to dominate all areas of quality of life for historical Kalamazooans.

(10)

The Brown Paper Mill and the sawmill that preceded it were purchased by chemical conglomerate Olin Mathieson in 1955.  Kalamazoo's paper mill economy came under fire in the 1960s and 70s, as America's first environmental justice movements began to force legislation change.  The success of Kalamazoo's paper mill-golden age came with grave costs, as large swaths of the Western District of Michigan were contaminated with hazardous chemical pollutants and deemed "superfund" sites by

the federal Environmental Protection Agency.  Kalamazoo County was especially damaged by paper mill polluters, and the Kalamazoo River became a hotbed for hazardous chemicals.  In response, the paper mill corporations and their various corporate owners began a long process of buy-outs, consolidations and mergers. Notably, in 1989, Coors Packaging Company merged with Graphic Packaging Company and assumed its name.  Representatives and family members of the Adolf Coors Corp. are well known for their deep seeded racist ideologies.  "Blacks lack "intellectual capacity" and "one of the best things they slave traders did for you is to drag your ancestors over here in chains", a William K. Coors once told Black business owners in Denver, CO.  He said "if American blacks visited the African countries from which their ancestors were taken by slave traders they would be glad they were living in a country with a free-enterprise system, "a land of opportunity.""" "Protests came from the NAACP, the National Urban League, black legislators, city officials and scores of residents. Denver Council member William Roberts met with black leaders who were, he said, "moved to a condition of rage."  City Council member Hiawatha Davis told the Rocky Mountain News, "I believe that it's indicative of his view of all 800 million blacks on this planet. He has invited the outrage and hostility of a whole people by what I think is an absolute supremacist view."

(11)

In 1999, the new Coors backed Graphic Packaging Company purchased "Fort James" folding carton business, adding twelve plants, and all of its Kalamazoo County locations, including the Recycle Paperboard Mill at 1500 N.Pitcher Street, Kalamazoo, MI.  Shortly after, it was revealed that an eighty mile radius from North Kalamazoo's industrial area was a "superfund site."   The EPA's website about the site currently reads: "The Allied Paper Inc./Portage Creek/*Kalamazoo Rive*r Superfund Site is located in Allegan and Kalamazoo Counties, Michigan.  The site includes soil and sediments contaminated by a group of chemicals called polychlorinated biphenyls, or PCBs, within 80 miles of the Kalamazoo River. The area includes from Morrow Dam to Lake Michigan, paper mill properties, riverbanks and floodplains, and a 3-mile stretch of Portage Creek. EPA has broken down the site into six segments, or operable units, referred to as OUs, that require cleanup. The six OUs are as follows: OU 1: Allied Paper Property/Bryant Mill Pond Area, OU 2: Willow Boulevard and A-Site Landfill, OU 3: King Highway Landfill, OU 4: 12th Street Landfill, OU 5: Portage Creek and Kalamazoo River sediments, and OU 7: Plainwell Mill".   Left off of the EPA's list is the "Recycle Paperboard Mill" at 1500 N. Pitcher Street, notwithstanding the Graphic Packaging contacting the EPA in 2003 and confirming that the 1500 N.Pitcher plant was within the superfund concern area.

(12)

In a letter dated April 24th, 2003, to EPA Region 5 agent "Ms. Elien Furay, Esq." Graphic Packaging agent Matthew Lepore documents months of correspondence and a phone conversation the previous day regarding 1500 N. Pitcher Street being a polluter responsible for the Kalamazoo Superfund site.  They concluded that the EPA believed "certain operations" at the site between 1954 and 1989 fell within their Request for Information regarding area polluters and contributors to the Superfund site's existence.  Because Georgia Pacific purchased the Fort James company outright, the letter continued to say that "Based on our agreement Graphic has no current obligation to provide a response to the 104(e) Request.  "Darden Coors" is one of two people CC'd on the letter signed by Mr. Lepore.  The Fort James company indemnified Graphic Packaging for liabilities related to the Kalamazoo superfund site under the terms of their purchase agreement, but Graphic Packaging continued operations at the site, and the EPA failed to remediate the area and or warn the public of the present hazardous threats from the forty-five year operations period of concern, .i.e., the 1954-1989 time period spoken to in the April letter to Graphic Packaging.  Public areas on the Northside near the Kalamazoo river, like Verburg Park, have been contaminated with hazardous chemicals for decades.  Community members like the deceased Michael Chandler, frequent the river walking trail and spend ample time in the park, unbeknownst to the hazardous chemicals in the soil

12

and air all around them. After spending everyday in the park for years, Michael Chandler died of cancer while on a respiratory oxygen machine in 2015.

(13)

Despite contaminating much of Kalamazoo Valley; with over a hundred years of reliance on paper mill economics, the City of Kalamazoo did not close all of its paper mills, leaving the facility adjacent to its Northeast Black neighborhood open for business. The 1500 N. Pitcher paper mill facility and its hyperactive stacks can be seen from plaintiff Deann Winfield's Krom Ave. address. Eventually that facility would grow into a sprawling complex under Graphic Packaging International who recently merged with "International Paper." On GPI's "Who We Are" page, it states: "Graphic Packaging International's history extends more than 100 years, as numerous legacy companies have joined forces to create an ever-evolving corporation. Despite our name changes over the years, our dedication to innovation, quality, and service never changes." Those numerous legacy companies now exist as Defendant "Graphic Packaging Holding Company", Graphic Packaging International's parent and managing entity. According to an SEC filing, Graphic Packaging Holding Company also owns and manages entities in Michigan named "The Kalamazoo Valley Partnership Group" and "Graphic Packaging International Political Action Committee", along with several other GPI affiliated subsidiaries.

The Graphic Packaging Holding Company board of directors featured Adolf Coors family representative, Jeffrey H. Coors, who served as GPI CEO and Director of the GPH Board until 2016, and David Perdue, former U.S. Senator from Georgia.  From the 1970s to the 2000s, Kalamazoo's paper mill companies came under pressure from an increasingly environmentally aware legislature and continuously merged into one conglomerate entity now known as "GPI", and shortly after, began their efforts to regain and sustain their former position as the top paper sellers in the world.

(14)

For the past twenty years, Black Kalamazooans and those unfortunate enough to live with them on the North and East sides of the City, have suffered from the deteriorating and dismal life effects of neighboring a habitual hazardous polluter like GPH's Graphic Packaging International.  Citizens in Kalamazoo's North and East side neighborhoods have long suffered heightened levels of respiratory diseases, kidney diseases, cancers, birth defects, infant deaths, and other health disparities, leading to a fourteen year life expectancy gap between residents living in the disparately zoned neighborhoods of Kalamazoo, MI.  While Black Kalamazooans were suffering the consequences of living and growing up next to the last standing paper mills in the area, the federal government and Kalamazoo's "legacy"

companies were spending hundreds of millions of dollars to remediate all of the hazardous pollution they allowed in the Western District of Michigan, except for those hazards in the Black American community.

(15)

On July 20th, 1993, Graphic Packaging International and or Graphic Packaging Holding Company founded their "PAC", "Graphic Packaging International, Inc. Political Action Committee", presumably to influence legislation and policy in their favor.   About six months later, then President Bill Clinton announced "Executive Order #12898" on February 11, 1994 which was termed "*Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*"   While "Low-Income Populations" are not spoken in civil rights acts, they are directly spoken to in executive orders.   In 1994, the City of Kalamazoo granted the "Upjohn Company" at its 306 "Pitcher Street" location a $4,743,000.00 "Air Pollution Control Exemption."   In 1999, five years after Executive Order #12898 was issued, Graphic Packaging International emitted  281.03 tons of nitrogen oxide, 16.54 tons of sulfur dioxide, 12.08 tons of particulate mass, and 42.95 tons of volatile organic compounds over the majority Black American and low-income Northside neighborhood of Kalamazoo.  From 1992 to 1999, there were 1,493 birth defects recorded in Kalamazoo County.   Despite egregiously high

emissions of hazardous chemicals in the year 1999, the next year in 2000 Graphic Packaging International emitted 280.88 tons of nitrogen oxide, 430.5 tons of sulfur dioxide, 26.13 tons of particulate mass, and 38.54 tons of volatile organic compounds.  In 2001, GPI emitted 233.28 tons of nitrogen oxide, 571.73 tons of sulfur dioxide, 53.04 tons of particulate mass, and 40.22 tons of volatile organic compounds.   GPI would go on to emit extremely high amounts of hazardous chemicals, and due to the wind dynamics in Kalamazoo Valley, they blew directly over the primarily Black American and low income neighborhoods of the City of Kalamazoo.  In 2004, the legacy companies now operating as GPI emitted 229.55 tons of nitrogen oxide, 48.56 tons of particulate mass, 39.18 tons of volatile organic compounds, and 762.84 tons of sulfur dioxide over the Northside of Kalamazoo. From 2000 to 2009, birth defects in Kalamazoo County went up to 2,353, directly correlating with Graphic Packaging International's increased toxic and hazardous emissions.

(16)

In 2008, Graphic Packaging hired Collings & Assoc. Inc, t/a Colling Swift & Hynes, a political lobbyist organization, with the goal of influencing politicians, legislation, and enforcement measures to allow maximum production and expansion of the legacy company's global paper empire.  The Collings Lobbyist firm has extensive

experience in both the Senate and Congress, and presumably holds extensive sway across the country.  At the time they were contracted by the Defendants, the firm boasted at least two former elected politicians, Peter D Hoagland, U.S. Rep. Nebraska, and Allan Byron Swift, U.S. Rep. Washington.  The Collings firm also had favorable relationships with politicians in Michigan.  Lobbyist Robert D. Hines Jr. made three contributions to former U.S. Rep John Dingell from Michigan between 2001-'2005.  Allan Byron Swift, former US Rep. Washington, made 13 contributions to the US Rep. John Dingell from Michigan between 1997 and 2011. Former Representative Dingell of Michigan served from 1955 to 2015, spanning the fall and restructuring of Kalamazoo's legacy paper mill companies, and making him the longest serving U.S. Congressman in history.  Now deceased, John Dingell served on the powerful and pertinent House Energy and Commerce Committee.  He acted as the committee's Chair from 1981 to 1995, and then again from 2007 to 2009.  The aforementioned congressional committee is the oldest committee in the federal government.   Established in 1795, the committee maintains principal responsibility for legislative oversight relating to telecommunications, consumer protection, food and drug safety, public health, air quality, and environmental health, the supply and delivery of energy, and interstate and foreign commerce.  Two years after Dingell relinquished the Chair post, Michigan Rep. Fred Upton took over from 2011 to 2017.   The Collings Lobbyist firm contracted by GPI in 2008, also made

small, on-record campaign contributions to Fred Upton as well.  Representative

Upton also served as a ranking member on the "Energy and Air Quality

Subcommittee."  Graphic Packaging International reportedly paid the Collings firm

$121,074 for their lobbying services.

(17)

On September 14th, 2004, the City of Kalamazoo issued another two Air Pollution

Control Exemptions to Pitcher street facilities. GPI's 1500 N. Pitcher street was

granted two separate $366,000.00 exemptions.  Five years later in 2009, a main

juncture chamber, shared by Graphic Packaging Internationals Northside facility and

the Kalamazoo Wastewater Reclamation Plant burst, causing hazardous pollutants

and waste water to spill into the community.  The juncture chamber in question is

allegedly owned by the City of Kalamazoo, but rests within Graphic Packaging

facility property. Responsibility and accountability for the maintenance of the

chamber has allegedly been a point of contention between the two defendants since.

Later that same year, the City of Kalamazoo commenced an engineering study on the

juncture chamber in question that revealed it was leaking dangerous amounts of

hydrogen sulfide.  Hydrogen sulfide is a hazardous chemical known to cause

irreparable respiratory injuries and eye irritations with chronic exposure.  The City

of Kalamazoo did not inform citizens about the 2009 engineering studying

confirming toxic leaks and they have not removed the chamber.  Graphic Packaging International's new parking lot sits over the malfunctioned and hazardous juncture chamber.  An April 16th, 2009 report from "Odor Science & Engineering, Inc." and "NTH Consultants" of Grand Rapids, MI, states that on April 13th, 2009 that WWTP (Wastewater Treatment Plant) workers collected five samples and shipped them along with one empty bag to be filled with odorless air at their site.  The results from the Northside neighborhood sample returned the following: Sample #1, taken at 5:31 on 4/13/2009 East Harrison Street had an Odor Concentration of 115 compared to "Steven Law Constants" .70 and .72.  "Steven Law Constants" (SLCs) correlates to the level at which odors are noticeable. The smell is described in the report as "sour, sewage, sludge, rotten greens/vegetable, rotten mercaptan.  The Harrison Street sample was the only sample taken from outside the KWRP/GPI facilities.  The sample sites within the facilities were: "industrial chamber #3, "SMI Bunker", "Grit Chamber", "Junction Chamber", "Trip Blank."  The readings were the strongest in the broken "Juncture Chamber", with an odor concentration of "1,260,126" over Stevens' Law Constants of .67 and .71, with the same "sour, sewage", "rotten mercaptan."  The "Industrial Chamber" had a reading of "14,490" over SLCs of .69 and .72, while the SMI Bunker and Grit Chamber had readings slightly higher than the "115" Harrison Street sample at 137 and 126, confirming that the Northside of Kalamazoo smells like the inside of a "Grit Chamber" in a

wastewater reclamation plant at any given time.  Due to the City's mismanagement of its own properties and placing such a facility in a residential neighborhood, Northside community residents endure random debilitating odors of sewer sludge and rotting bodies  emanating from GPI's Pitcher street plant and the City's broken juncture chamber.

(18)

For the next several years, Graphic Packaging International would add the support of Senator Debbie Stabenow to its roster of influential Michigan politicians like Rep. Dingel.  From 2009 to 2012, Debbie Stabenow guided GPI through a fifty million dollar expansion in Western Michigan.  Despite the multi-million dollar investments, on August 29th, 2011, there was another hazardous spill at the Northside GPI facility.  According to an EGLE violation issued against GPI/KWRP, a "vacuum break valued closed", allowing discharge of allegedly "clarified water" to be released during pump vibration testing.  "The site closed the main valve to stop the discharge and corrective action taken by removing the vacuum break line valve." 19,000 Gallons of alleged clarified waste water was spilled into the community.

(19)

On April 18th, 2011, under the direction and leadership of Bobby J. Hopewell, approximately thirty three million dollars of tax breaks were given to Graphic

Packaging International by the City of Kalamazoo.  Commission meeting minutes read: "adoption of a RESOLUTION under P.A. 334 of 1993 to extend existing Industrial Facilities Exemption Certificate 2008-437, granted to Graphic Packaging International, for six additional years for personal property valued at $25 million and for six additional years for new real property construction valued at $8.5 million in existing Industrial Development District No. 10 located at 1421 North Pitcher Street."  While the community suffered from the continuous release of hazardous chemicals upon them, the City of Kalamazoo supported Graphic Packaging International expansion and continued chemical torture of the community.   In September of 2013, it was reported that Kalamazoo Public Safety Officers target black drivers in the city, making black residents more than twice as likely to have a police interaction. *("Kalamazoo Public Safety Officers Target Black Drivers in Traffic Stops, Racial Profiling Study Concludes").*  Also in 2013, it was reported that Kalamazoo "is a city in the midst of a health crisis defined by this statistic — from 2006 to 2010, a black infant born here was five times less likely than a white baby to make it to his or her first birthday."  Black infants born in Kalamazoo were five times less likely to live than their Caucasian counterparts.  "This is a disgusting problem," said Catherine Kothari, a senior clinical research scientist for the Western Michigan University School of Medicine. "I think it's shameful." ("*Black Infants 5 Times More Likely Than Whites to Die in Kalamazoo, and Disparity Is Growing*").

In 2022, the City of Kalamazoo filed a complaint to declare a home owned and occupied  by Black residents a "nuisance house" pursuant to its City Ordinances. The City's complaints alleged that the home was a pit-stop for mobile parade parties through the city and was the site of shootings and frequent problems.  The City of Kalamazoo also has several nuisance laws pertaining to "Factories", but has not filed any complaints against GPI to protect the same Northside neighborhood. (Krafcik).

(20)

On March 12th, 2022, the State of Michigan was given a "F" grade by the Center for Public Integrity.  An article from the Center for Public Integrity said the following: "*The campaign finance system here has more holes than I-94 after a spring thaw. Big spenders and special interests can easily shovel millions of dollars into election activities — secretly if they choose. The lobby law is so weak that it was nearly impossible to determine which companies were spending millions to oppose construction of a new bridge. And the financial disclosure system for state elected officials? Well actually, there isn't one. Welcome to Michigan, the "Trust Us" State when it comes to transparency. Reform efforts are frequently launched, sometimes debated, always shelved. Meanwhile, special interests continue to make greater use of loopholes that allow them to influence the system without leaving fingerprints on the money spent doing it. "It appears we're living with an honor system in an*

*environment where there isn't much honor," said Rich Robinson, executive director of the Michigan Campaign Finance Network, a nonpartisan watchdog group that tracks campaign spending and lobbying records.*" (Andrews).  Political corruption and the circumvention of laws and regulations in the State of Michigan is now a well known reality.  Michigan's path to becoming the most corrupt and least transparent State government in the Union coincides with the Northside's pleas for assistance.

(21)

On April 12, 2012, Senator Debbie Stabenow visited the Kalamazoo GPI Facility.  It was reported that she "wants to create a tax policy that supports what's being done at companies like Graphic Packaging."  Graphic Packaging executives publicly approved of the Senator's stellar support of their efforts to return the "legacy companies" to the dominance of yesteryear.  "She's been great," said John Caston, Vice President of Graphic Packaging's Kalamazoo operations.  Less than two weeks later on April 23rd, 2012, Graphic Packaging International Director David W. Schieble donated $2500 to Senator Debbie Stabenow.  Six months later on October 1st, 2012, then Mayor Bobby J. Hopewell led the vote for another  multi-million dollar tax abatement for Graphic Packaging International.   That evening's commission meeting minutes read: "At 7:12 p.m. Mayor Hopewell opened a public hearing to receive comments on a RESOLUTION approving a PA 198 Industrial

Facilities Tax Exemption Certificate for Graphic Packaging International, Inc. for three years for personal property valued at $11,953,932 and for six years for real property improvements valued at $1,175,898 in existing Industrial Development District No. 10 located at 1421 North Pitcher Street. At 7:14 p.m. Mayor Hopewell closed the public hearing. Commissioner Cooney, seconded by Commissioner Bell, moved to adopt a RESOLUTION approving a PA 198 Industrial Facilities Tax Exemption Certificate for Graphic Packaging International, Inc. for three years for personal property valued at $11,953,932 and for six years for real property improvements valued at $1,175,898 in existing Industrial Development District No. 10 located at 1421 North Pitcher Street. With a roll call vote this motion passed. AYES: Commissioners Anderson, Bell, Cinabro, Cooney, Miller, Mayor Hopewell NAYS: None."  In 2012, the same year that GPI received support from local and federal politicians, they pumped 52.43 tons of volatile organic compounds into the Northside Kalamazoo community.

(22)

In November of 2013, the Michigan state representatives and senators took steps to maintain secret campaign financing and lobbyist activities.  An article from the Center for Public Integrity reads: "Michigan lawmakers revealed the lengths to which they'd go to maintain the state's secret system of funding election campaign

activities. A Senate committee was meeting in the Capitol to discuss and approve a bill that would double the maximum amount that individuals could contribute to legislative, executive and judicial candidates. The senators were told that the higher limits were unnecessary because 99 percent of Michiganians never give the maximum amount. Then something puzzling happened. In a rare move, the legislators called a recess midway through the session. A lobbyist in the audience who was friendly with the committee chairman, it was later learned, received an urgent phone call warning that Secretary of State Ruth Johnson had just announced new administrative rules requiring the disclosure of campaign donors in all circumstances. When the committee reconvened, an amendment was hastily attached to the legislation, which would override Johnson's decision and preserve Michigan's "dark money" campaign practices. House and Senate approval of the bill soon followed, as did Gov. Rick Snyder's signature." ("*Michigan Gets F Grade in 2015 State Integrity Investigation*").  Under Michigan's disclosure rules, or lack thereof, the activities and contributions of actors like Graphic Packaging Holding Company, its directors, subsidiaries, their interested lobbyist, and the effects they have on society, remain obscure and unknown to the public.

(23)

On June 7th, 2014, another toxic spill occurred at the Graphic Packaging International North Pitcher street property.  In a November 17th, 2022 violation notice, the EGLE details several spills over the years at the Northside GPI facility, including a June 7th, 2014 incident.  The violation notice notes in the incident comments: "Broken reclaimed water line bubbled through ground and reached storm drain to the Kalamazoo River. Facility stopped the flow, vacuumed the line, and repaired the leak. 'No quantity reported.'"  Despite the various issues to date, the EGLE granted Graphic Packaging International a "Renewable Operating Permit" on April 15th, 2015.  The permit increased the emissions for EUK1 and EUK3 Machines and allowed for a new material use that would emit acrylamide.  The EGLE does not list facility emissions limits in any of its permits, but instead, hides those limitations by listing each facility machine's individual limit without a total calculation for any of the hazardous emissions maximum restriction.  The total limit for manufacturing machines with VOC emissions equated to 143.5 tons per year and 32.76 pounds per hour of allowable VOC discharge.  Also, the 2015 permit does not list any pollution control limits for "Particulate Matter."  The Plaintiffs assert that the permitted VOC limit was/is excessive and the lack of particulate matter regulation was unreasonable, grossly negligent, and can be construed as being intentionally fashioned to allow the chemical torture of the Northeast side Kalamazoo community. The ATSDR minimal risk levels have not been updated since 2007, yet the EGLE

presumably added 29.3 tons per year to GPI's VOC emission limit in November of 2020 on the same minimum risk level metrics.   Five months after receiving their April 2015 Renewable Operating Permit, on September 29th 2015, "there was a release of untreated wastewater due to plugged process line, released to storm sewer from a roof drain", according to an EGLE violation that was issued seven years later. Speaking seven years after the fact, the State of Michigan incident comment notes that "*No Quantity Reported*."   On multiple occassions, hazardous chemicals were spilled into the Northside community and no reports were made to the City of Kalamazoo, the EGLE, EPA by Graphic Packaging International employees and or Graphic Packaging Holding Company directors.  Plaintiffs assert that the Defendants failed to act under the National Contingency Plan for several hazardous spills in Northside Kalamazoo, MI

(24)

On April 15th, 2017, on the two-year anniversary of the EGLE granting GPI's renewable operating permit, with a combined VOC/PM-10 emissions over forty tons for consecutive years, Laprace Stegall died of an asthma attack at seventeen years old.  Laprace Stegall battled respiratory issues most of her life due to growing up on Kalamazoo's Northside.  Deann Winfield, Laprace's mother, recalled the day of her child's untimely death to news reporters, detailing: "the air smelled like peppermint.

"I'll never forget that smell," Winfield said.  Isophorone is a hazardous chemical that smells like a strong peppermint and is regularly used in the production of paper inks and dyes like those manufactured by the N. Pitcher GPI Facility.  Isophorone's peppermint smell, as well as the sweet, pungent gasoline-esque smells of 2,2,4-Trimethylpentane, Toluene, or the faint sugary odors of methyl chloride, can be masked by the rotten-egg, decaying animal smells of hydrogen sulfide.  Hydrogen sulfide was found to be leaking from Kalamazoo wastewater reclamation plant's juncture chamber in 2009, and Graphic Packaging regularly and constantly emits dangerous levels of Hydrogen Sulfide as well  Hydrogen Sulfide a loosely regulated chemical left off of the hazardous pollutants list, but conveniently mask the presence of volatile organic compound exceedances and other regulated hazardous toxic chemical emissions.  Hydrogen Sulfide masks smells and physical effects, mirroring the cognizable physical symptoms of several other chemical compounds found in North Kalamazoo, like Crystalized Calcite Dust, Formaldehyde, and Methyl Ethyl Ketone.

(25)

On April 17th, 2017, two days after Laprace's death, a Kalamazoo resident called in an odor violation.  The EGLE stated that they came out, but did not find GPI to be out of compliance.  In 2017, GPI emitted 37.92 tons of volatile organic compounds,

slightly under the unreasonably high and dangerous emissions limit granted to them by the EGLE in 2015.  GPI also released 92.9 tons of carbon monoxide into the Northside neighborhood in 2017, the year of Laprace's death. Three months later, on the dates of June 19th, 20th, and 27th of 2017, the Environment, Great Lakes, and Energy Department found Graphic Packaging International in "Non-Compliance of Odor Complaint."  Michigan's "Rule 901", the regulation that governs odor violations, also covers air pollutant chemical contacts that cause bodily injury. Despite GPI's irregular, unpredictable emissions exceedances and several pollutant spills, the EGLE has not violated GPI for causing or presenting imminent threats of hazardous chemical contacts under the National Contingency Plan or Rule 901.

(26)

On September 13th 2017, GPI reported two more previously undisclosed 901 violations in early 2017 prior to Laprace's death.  The EGLE violation states: "Company reports Rule 901 violations that occurred on January 1st, 2017 and March 16th, 2017.  Sometime after those incidents, the City of Kalamazoo's wastewater reclamation plant filed a complaint against GPI for spewing calcite dust particles on its adjacent properties.  Six years later, in 2023, these Plaintiffs have not received any relief from their complaints about suffering the same injuries.  Calcite is harmless in gaseous form, but can be dangerous to humans when crystalized into

particles or highly concentrated liquids.  If calcite is visible and noticeable in solid form as dust, direct skin and eye contact with it can cause severe irritation, and inhalation can cause damage to the respiratory tract.  While the EGLE, MDHHS, and City of Kalamazoo have begrudgingly admitted the dangerous effects of high levels of hydrogen sulfide exposure, the Defendants have completely ignored the pleas and health risk of crystalized calcite exposure.  The Plaintiffs report their community being regularly coated with crystalized calcite dust with no relief or acknowledgement from the Defendants, despite their non-discretionary duties under the governing ambient air quality laws.

(27)

The next year, in 2018**,** the City of Kalamazoo formed an "odor investigation task force" with the goal of addressing the "odor" issue.  The committee consists of Graphic Packaging International employees, "community committees", local and state agencies, and elected officials.  Despite professing to the public that they were working to solve the City's "odor" issues, the City of Kalamazoo made legal threats towards several media outlets who were seeking to publicize the imminent dangers threatening and torturing the Northside community.  According to meeting minutes: "Mr. Wright" drafted a "cease and desist letter" to be sent to media outlets and data companies seeking to alert the greater public about Kalamazoo's ambient air quality

emergency.  A motion to send the letter passed unanimously.  The meeting's minutes note that "Ms. Drzick was not aware of any recent meetings between the City and GPI regarding air quality."   Adam Data Solutions (source of air quality data), Wall Street Journal 24/7, USA Today, and WRKR Radio Station were all threatened with costly litigation solely because they attempted to do their civic duties of bringing hazardous injustices to light.  A month later, on October 8th, 2018, GPI reported to EGLE that a "plugged process line caused clarifier water" to overflow into the Kalamazoo river, causing "discoloration."  Approximately five hundred gallons of clarified reclamation water spilled.

(28)

Four months after the City of Kalamazoo sent out cease and desist letters, on February, 25th 2019, another pipe leak occurred at the wastewater treatment plant causing chemical discharges into the Kalamazoo River.   No quantity or list of pollutants spilled into the community were reported.  Two months later in April of 2019, Governor Gretchen Whitmer appointed Bobby J. Hopewell, former Kalamazoo mayor, to Michigan's Economic Development Fund.  After establishing a record of ignoring the community's pleas and covering GPI's violations for years, Bobby Hopewell was the perfect agent for the State to employ in its impending six hundred million dollar expansion of GPI facilities in Kalamazoo.  During his tenure

as Kalamazoo Mayor, Bobby J. Hopewell facilitated tens of millions of dollars in tax exemptions for GPI while they poisoned the Northside community.  Former mayor Hopewell was acutely adept and successful in maintaining and nurturing the State's relationship with the GPI conglomerate of legacy paper mill companies.  Governor Gretchen Whitmer rewarded Bobby Hopewell for his many years of service by appointing him to a state business position that would allow him to further nurture his West Michigan business relationships; he now serves as CEO of a Lansing area medical billing company.

(29)

The next month, on May 4th, 2019, there was another chemical spill at the Northside GPI facility.  Five hundred to one thousand gallons of wastewater containing unreported chemicals, spilled into a parking lot storm drain.  The spill was caused by blockage in a process drain.  Plaintiffs assert that the GPI Kalamazoo facilities have developed a custom of habitual reckless management due to its proximity to the predominantly Black American and low-income North and Eastside communities, and that their operations near predominantly Caucasian communities are properly regulated and managed disparately different from their Northside Kalamazoo operations.  Also in 2019, Graphic Packaging International and Graphic Packaging Holding Company purchased a White Pigeon, MI location, near the

Michigan-Indiana border.  Despite the sophistication and industry prominence of the legacy paper mill conglomerate now operating as Graphic Packaging International, the corporation did not discover or did not mind acquiring and operating a facility that was contaminated with hazardous toxic chemicals.  Less than two years after it was purchased, the White Pigeon facility was closed down by the State of Michigan due to the presence of hazardous chemical pollutants at the location.  "According to the state, the groundwater from 16 of the monitoring wells tested at the White Pigeon site in 2019 were found to contain PFAS at concentrations exceeding the groundwater criteria.  PFAS are a family of thousands of synthetic chemicals used in many nonstick and waterproof products and firefighting foam.  Exposure to the chemicals has been linked to health problems like cancer and autoimmune disease.  They have been nicknamed "forever chemicals" because the compounds resist breaking down in the environment." ("*Graphic Packaging International to Permanently Close White Pigeon Mill*").  GPI's purchase and operation of the White Pigeon location is another indication of its disregard for the welfare of workers, communities, and the environment.  The White Pigeon facility did not possess the abysmal performance and maintenance record of the N. Pitcher street facility, but was closed due to the definitive injuries it's operation would cause.  White Pigeon, Michigan is a small rural town of approximately one thousand and seven hundred people.  The facility employed approximately one hundred people in the ninety-five

percent Caucasian village.  While the GPI papermill operating within the Kalamazoo Superfund site is injuring four times as many people than what was plausible in White Pigeon, MI, the facility has not been cited, violated, or regulated for bodily injuries caused by its volatile organic compound exceedances, particulate matter exceedances, or the definitive injuries caused by its crystalized calcite and hydrogen sulfide emissions.  Toluene, Chloromethane, Formaldehyde, and Freon have been found in excess of minimum risk levels around various Northside Kalamazoo locations as well as within the N. Pitcher street facility.  But despite this fact and the community's allegations of slow genocide, the City of Kalamazoo, the EGLE, nor the EPA have done anything to alleviate the known chemical torturing of an entire protected class community.  "These people are really crazy and really trying to kill us Black people off," Plaintiff Deann Winfield said to news reporters, six years after smelling Isophorone's strong peppermint smell the morning her seventeen year old daughter dropped dead of an asthma attack.  ("*Stay Indoors to Avoid Polluted Air Hazard, State Says. That's No Solution, Neighbors Say*").  Black American history records the current conditions of Black communities being the consequence of premeditated, methodically executed social experiments by government actors.  The Housing Act of 1949, codified what came to be known as redlining and the building of public housing "projects" based on Dr. John Calhoun's "Rat Utopia" research "social research."

(30)

The Plaintiffs' fears of government conspiracies against their lives and rights are not hyperbole.  Aside from the federal government's now well known Tuskegee Syphilis experiments, there are several other instances of government sanctioned experimentation and chemical exposures against Blacks that are known to the insular community, but kept secret from the greater public.  Dr Harriet Washington, author of "*Medical Apartheid*", warned in her book that the dismissal of these fears is dangerous in and of itself.  She asserts that the "domestic wrongs" perpetrated against Black people underline the prevalence of medical phobias in the Black American community.  In speaking about her research, Dr. Washington detailed all of the censorship involved in retaining the evidence for her book.  According to her, if she had not been a fellow of Harvard Medical school, she would have been allowed access to records documenting centuries of secrecy and conspiracy against the health and livelihoods of Black Americans.  ("Medical Apartheid." *C-SPAN.org*, 11 June 2007).   In the 1950s, the CIA reportedly tested whooping cough dissemination methods on a Black American apartment complex in Tampa Bay, Florida.   In 1979, the Washington Post reported about the incident, stating: "Scientologists said they checked Florida state medical records and found whooping cough cases jumped 300 percent over previous years, with the highest increase recorded in July 1955. Earlier this year, Army records indicated that a biological

warfare test conducted in San Francisco in 1950 may have been responsible for the death of a hospital patient there. Brian Anderson, a spokesman for the Scientologists, said in a statement that the evidence the group has gathered indicates a need for the release of all government biological warfare test files." ("*Report Suggests CIA Involvement in Fla. Illnesses*").  Also in the 1950s, the cells of a Black woman, Henrietta Wells, were stolen from her deceased body and used by John Hopkins University scientists to develop the polio vaccine.  Despite the contribution that the decrement of her corpse granted American society, few people know her name or her story.  The legacy of disregard for the human rights of Black Americans by the State and state sanctioned actors, and anxiety it breeds, is true and authentic.

(31)

Six months ago, it was reported that "the city of Philadelphia issued an apology Thursday for the unethical medical experiments performed on mostly Black inmates at its Holmesburg Prison from the 1950s through the 1970s. The move comes after community activists and families of some of those inmates raised the need for a formal apology. It also follows a string of apologies from various U.S. cities over historically racist policies or wrongdoing in the wake of the nationwide racial reckoning after the killing of George Floyd by a Minneapolis police officer." ("*Philadelphia Apologizes for Decades of Medical Experiments on Black Inmates That Involved a Component of Agent Orange*").  Between 1951 and 1974, Dr. Albert Kligman exposed approximately seventy-five prisoners at

Holmesburg to high doses of dioxin, the contaminant responsible for Agent Orange's toxicity. Dow Chemical, another Michigan "legacy" corporation, paid Dr. Kligman $10,000 to conduct the experiments on the toxicity effects of its chemical warfare agents on Black Americans.  Speaking to how pecuniary interests have underlined various chemical exposure cover-ups perpetrated against Black Americans, Dr. Washington says clearly, "there are economic advantages to the biological beliefs about Blacks."  The inhumane disregard shown to the health and livelihoods of Northeast Kalamazoo residents by these Defendants is indicative of the customary racial animus traditionally held by government agents and corporations in America for centuries.

(32)

July 8th 2019 the EGLE and Graphic Packaging International entered into an enforcement order that merely required GPI to install hydrogen sulfide sensors.  The order was wholly inadequate to protect the community and does not rise to the substantive level of an actual enforcement of any protective statute.  A few short months later, on September 3rd, 9th, and 17th, of 2019, before the hydrogen sulfide sensors were installed, the City of Kalamazoo, Kalamazoo Township, and Kalamazoo County all passed measures approving Brownfield redevelopment plans. That same month, Michigan State Senator Sean McCann sent agents representing himself and his office to a MEDC Strategic Fund meeting that was organized to

support the approval of Graphic Packaging's expansion. In 2019, the planned six hundred million dollar expansion was scheduled to add five hundred thousand tons of new paper-production to the Northside Kalamazoo facility. The expansion move would officially return the old legacy companies, now restructured as Graphic Packaging International Inc. and Graphic Packaging Holding Company, back to the top of their industry as the world's number one paper producers. State Senator Sean McCann's brother, Paul McCann, served as GPI's government relations executive, and along with a Kalamazoo Valley bred CEO, Michael Doss, a Western Michigan graduate with extensive local ties, they proceeded to secure the massive expansion, all while being thousands of pounds in exceedance of their volatile organic compound emissions limits.

(33)

In December of 2019, the "K2" expansion of the N. Pitcher Street facility in Kalamazoo was finalized. The facility expansion was approved by the MEDC's Michigan Strategic Fund and granted twenty-one million dollars from the areas Brownfield Redevelopment funds. In early 2020, just as the expansion began to go underway, the new sensors recorded hydrogen sulfide levels in excess of 19 ppb. The minimum risk level for exposure becoming hazardous is 1.4 ppb. Shortly after, the Michigan Department of Health and Human Services agreed to conduct a "health consultation study" to confirm that the high hydrogen sulfide emissions were

presenting an imminent and definitive danger to the community, despite all the relevant information being available to make an informed health consultation about the circumstances facing the community.

(34)

In June of 2020 a private engineering report concluded that placing a cap on the clarifier that processes wastewater coming from the sprawling Graphic Packaging International factory in the city's Northside neighborhood would assist with solving the "odor" issue. But the clarifier was never capped, the company says.

(35)

The June, 2020 engineering report states, "GPI's pretreatment clarifier has peaks of H2S well above the odor threshold."  As it was purposely narrowed to solely address odor issues, the report failed to clarify that the H2S levels remained above the minimum risk levels for hazardous exposures as well. The following hazardous substances were found present at they KWRP site: Arsenic at 28,000ug/kg; Cadmium at 19,000 ug/kg; "Chromium, total" at 100,000ug/kg; Trichloroethylene at 1,200 ug/kg and 210 ug/L.   All of the chemicals were found in the soil, and Trichloroethylene was found in the groundwater on site as well.  That same month, Plaintiff Brandi Crawford and her son Thomas, moved into another home on Kalamazoo's Northside.   The Crawfords were exposed to toxic lead paint in their first Northside home and Mrs. Crawford settled her claims with the City.  Her son

Thomas, an adolescent at the time of exposure, stipulated with the City of Kalamazoo that he would reserve his right to file suit against them until he was a legal adult and time for injuries to manifest accumulated.  Now eighteen years old, and suffering from compounded symptoms of toxic lead, hydrogen sulfide, and volatile organic compound exposure, Thomas Crawford now seeks to litigate the whole of his injuries against the common defendants in this litigation before the Court.  Thomas Crawford asserts that his injuries are the direct result of a habitual custom of selective enforcement and disparate treatment by the City of Kalamazoo against residents of the Northside Kalamazoo community.

(36)

On August 5th 2020, just two months after Graphic Packaging International refused to cap its clarifiers to reduce hydrogen sulfide exposure on the Northside of Kalamazoo, Governor Gretchen Whitmer announced Executive Directive No. 2020-9, declaring racism as a public health crisis in Michigan.  The executive directive explains that "racism is a social system with multiple dimensions, including individual racism, which is internalized and interpersonal, and systemic racism, which is institutional or structural. Both institutional and systemic racism harm individuals and communities and deplete the strength of a whole society through the waste of human resources."  The systemic plausible deniability provided

by Michigan's Rule 901 has allowed Graphic Packaging International to circumvent National Contingency Plan protocols related to the irregular, unstable, continuous releases of a hazardous chemical compound and caused the constant dousing of the Northeast Kalamazoo Black Community with showers of Crystalized Calcite, Freon, Methyl Chloride, and Methyl Ethyl Ketone, equating to several tons of VOCs a year. While slight neurological, liver, kidney, and respiratory effects have been reported in chronic inhalation studies of methyl ethyl ketone in animals, little is known about its chronic effects in humans.  According to the EPA, "limited information is available on the chronic effects of methyl ethyl ketone in humans from inhalation exposure. One study reported nerve damage in individuals who sniffed a glue thinner containing methyl ethyl ketone and other chemicals."  The Plaintiffs assert that the long term effects can be deduced from the acute, short term exposure effects. According to the same EPA Methyl Ethyl Ketone hazard information sheet, "acute (short-term) inhalation exposure to methyl ethyl ketone in humans results in irritation to the eyes, nose, and throat."  These symptoms mirror those caused by chronic hydrogen sulfide exposure being used as a pretextual mask to cover the community's bodily injuries as mere "odor" nuisances.

(37)

On August 17th, 2020, Kalamazoo City Commissioner Erin Knott spoke out against the continued expansion of Graphic Packaging International and now stands out as the sole commissioner who did not vote in favor of every measure related to it.  In regards to chemical exposure complaints from the Northside Community, Commissioner Knott stated that evening: "having served on the commission for a few years, these issues have come up several times. We've been talking about this for a while. I've been told '*shhh (puts hands to mouth) this is a sensitive issue because of our relationship with GPI.*'  I'm confused as to why we would consider this resolution now when we don't have the data. I don't know where Commissioner Urban was going with his comments, but I'm in a position to say, let's pump the breaks until we have the data."  Commissioner Knott was referencing the comments of then Commissioner Jack Urban, who led the questioning of Graphic Packaging International executives during the commission hearing in a similar manner akin to how a prosecutor would lead its star witness.

(38)

Before Commissioner Knott spoke, former Commissioner Jack Urban led a discussion with Graphic Packaging executives explaining how they were regulated by the EGLE and were more adept to know about the dangers their processes posed than those complaining.  Jack Urban generally seemed to relegate Commissioner

Knott's and the community's concerns as the misinformed notions of unsophisticated speakers.  Commissioner Eric Cunningham, an associate of former Mayor Bobby Hopewell, asked GPI representatives: *"If the resolution is rejected, then what?"* to which GPI replied, *"It does have some financial implications for us going forward."* Jack Urban then guided the dialogue by inserting a supportive statement and professing a leading question: "You probably have a good idea of the emissions. Have you sampled your own stacks and generated profiles of compounds leaving your stack already?" GPI's agent responds: "We're regulated, we are required to do an annual report of our emissions and are required to do a 5-9 report."  Jack Urban chimes in that "We have to separate odorous annoyances from toxic effects, they overlap in the public mind."  He continued, "Your operation happens to be in an area that could be characterized as an example of environmental racism by some people, and the city is implicated in this, and has been implicated by this since the 1970s." "We've gotten through this before," Jack Urban added.  James Baker began speaking to explain the City of Kalamazoo's explanation for failing to remediate decades of hazardous hydrogen sulfide exposure.  James Baker confirmed two sources of odors, KWRP & GPI, yet goes on to convolute the odor source by stating that the smells also come from "organic river activity."  At no point during the Commission meeting did James Baker speak about the several chemical spills of boiler condensate,

wastewater, and other chemicals into the Kalamazoo river during his tenure leading the KWRP and working extensively with GPI site managers.

(39)

Mr. Miller of Graphic Packaging International and Commissioner Jack Urban continued their informative dialogue about the structure of emission regulations.  Mr. Miller clarified "We have to do annual reporting of our emissions and it goes to EGLE and EPA and all of our mills do that. That's the typical reporting we have to do. It requires all of the chemical constituents and emissions.  Mayor Anderson asked: "And is this monitoring done continuously?" To which Mr. Miller replied: "No?" This dialogue would lead any viewer to believe that any excesses of hazardous substances emitted would result in notices and measures taken to protect the communities threatened.  Jack Urban, James Baker, Mr. Griffin, his employers, and Mayor Anderson were aware of Graphic Packaging International's hazardous chemical exceedances and their own habitual chemical spills into the community, but instead of informing the commission board and the citizenry of the true nature of their deteriorated ambient air quality and the presence of toxic chemicals on the Northside of town, they allowed the community to believe they were being protected by the systemic regulatory structure of the State and Federal governments, when they knew that was not the truth.

(40)

At the August 17th, 2020 meeting, Commissioner Patrice Griffin stated clearly that "I'm not willing to sacrifice health for jobs."  Jim Baker continued explaining the EGLE's and EPA's role in managing toxic chemical exposures and that if there was a threat, they would know and prevent it.  At that time, Jim Baker was aware that there was a confirmed threat and that government regulators and his employers were failing to remediate them in preference of ramping up paper production in this jurisdiction.  James Baker, like Jack Urban, confirmed that these emissions issues have existed for a very long time.  When pressed about the cause of the odors, James Baker spoke to the 2009, stating "it was before my time; I have reviewed reports, there was no conclusion on that."   Jim Baker's statements that there was no conclusion on the cause of the odors and proposing the possibility of the intense rotting odors being caused by "organic" river activity were both purposeful mischaracterizations of the facts and circumstances.   James Baker intentionally spoke to mask his and his co-defendants' knowledge of imminent harms facing the Northside community.

(41)

In September of 2020, the next month, the State of Michigan hosted its Environmental Compliance Week.  The conference was attended by agents of the

City of Kalamazoo, Graphic Packaging, and the EGLE, providing ample space and opportunity for them to convene for the stated compliance and regulation purposes of the event, or for the blatant circumvention of human rights that persist to this day. That same month, a local news agency reported that "some Kalamazoo residents have been outspoken about the tax incentive, saying the plant emits dangerous pollution and has a strong unpleasant odor. There are ongoing negotiations between the State and GPI to address air quality." ("*Kalamazoo Commissioners to Discuss Extending Tax Incentive for Packaging Plant*").  Pleading for attention and some sort of regulation actions to end their sufferings, the Plaintiffs continued to file complaints with the EGLE's air quality division, repeatedly reached out to news agencies, and attempted to retain attorneys for their personal injury claims.

(42)

In October of 2020, the City of Kalamazoo completed its air quality study. Continuous hydrogen sulfide concentration monitoring was the single focus of the 2020 report; other VOCs were not monitored or analyzed.  The City of Kalamazoo purposely failed to monitor for VOCs and Particulate Mass/Matter because they were aware of GPI's habitual exceedances and their own liability in several chemical spills.  The City of Kalamazoo study did not conclude that hydrogen sulfide was

causing the odors or that chronic exposure at hazardous levels presented an imminent and irreparable health risk.

(43)

On November 15th, 2020, Plaintiff Brandi Crawford attended a zoom meeting with "environmental justice advocates" from Governor Whitmer's Administration. Mrs. Crawford had garnered this meeting by threatening to file civil rights complaints against the EGLE and any parties she could verify as being involved with allowing Graphic Packaging's continued emissions exceedances and hazardous chemical exposures. One or more of the environmental justice advocates attempted to bribe Brandi Crawford into abandoning her civil rights complaints. The "advocate" asked Mrs. Crawford: "what will it take to keep you from filing the complaint?", to which she replied, "you could give me five million dollars and I would still file the complaint." The environmental justice advocate retorted: "obviously, we're not going to do that", and abruptly ended the zoom meeting. Mrs. Crawford left the interaction feeling threatened and intimidated, shaken, taken aback, and frightened at the reality of the State's purposeful circumvention of people's right to a healthy and chemical free environment. She pondered, "what would have happened if I'd been willing to accept something reasonable? How many nuanced offers like that have been made before mines? And what is actually being covered-up here and

elsewhere?" Mrs. Crawford reports suffering from heightened anxiety, stress, and mental anguish since coming face to face with government complicity and corruption. Despite her anxiety and fears, Mrs. Crawford filed her civil rights complaint with the Michigan Department of Civil Rights and Environmental Protection Agency shortly after.

(44)

In November of 2020, Dr. David Ansell, senior vice president for community health equity at Rush University Medical Center in Chicago, called into a Kalamazoo City commission meeting at Brandi Crawford's request, to inform them about the real and imminent dangers facing the community from hydrogen sulfide. Despite being a busy professional, Dr. Ansell found the conditions in Kalamazoo, MI to be so dire that he made time to speak with the city's leaders about the gravity of their situation. Dr. Ansell's presentation detailed hydrogen sulfide's deteriorating effects on the Northside community's air quality and the correlating respiratory disease statistics in Kalamazoo's 49007 ZIP code. The specialist pointed to distinct and prevalent disparities between the predominantly zoned industrial Black American sections of town, and other residentially zoned parts of the city. Dr. Ansell confirmed that the Northside ZIP code has the most asthma prevalence in the region. He also confirmed that the section of the city also has the highest hospitalization rates for asthma in

Kalamazoo.  Furthermore, Dr. Ansell explained to the Kalamazoo Commissioners that the asthma rates in 49007 are five times higher than those seen in the nearby 49008 ZIP code.  Bronson Healthcare, a leading medical institution and healthcare provider in the Kalamazoo Valley area submitted this statement to local reporters shortly after the meeting: "*You see disparities like this in a lot of different counties, cities, urban settings, and I think it really points to kind of the decades, centuries of unequal access to opportunities — opportunities to build wealth, opportunities to really access the resources that people and families need to live healthy lives,*" Bronson HealthCare Community Health Project Manager Paige Kyle said. ("*Asthma Is Killing Kalamazoo Family Living Near a Stinking Factory. Now the State Is Studying Asthma in the Neighborhood*")  Without blatantly and out-right blaming this situation on a custom of racism, Bronson HealthCare's project manager was carefully alluding to the role of systemically racist practices, like the segregation that created the distinct communities, i,e., the redline-zoning custom that caused Black Kalamazooans to live next to polluters.  The "unequal access to opportunities" can be as simple as being able to open your window and receive a fresh, clean breeze of air, as opposed to toluene, freon, and crystalized calcite blowing into your bedroom.  Crystallized Calcite is a known PM2.5 mineral that is extremely dangerous to human health because of its ability to bond with elements around it.  "Microorganism cells and spores are the main components of PM2.5 (fine particulate matter) as well as

fine *mineral* particles. In the microscopic system, the microorganisms will affect the minerals through attachment…as one of the PM2.5 *common minerals*, calcite fine particles were taken as the research object to explore the influence of microbial cells and extracellular polymers on its surface properties." ("*Surface Properties of PM2.5 Calcite Fine Particulate Matter in the Presence of Same Size Bacterial Cells and Exocellular Polymeric Substances (EPS) of Bacillus Mucitaginosus - PubMed*").

(45)

In the local news article detailing Dr. Ansell's appearance before the Kalamazoo City Commision, it reported that "In the past, city officials also discussed the odor issue during meetings that included commissioners but did not allow public attendance. Those "small group" meetings have since been disbanded and replaced with public committee of the whole meetings." Graphic Packaging proffered the following statement: *The state evaluated the potential for health impacts when it issued our air permit, and concluded that there would not be a health concern. We are below the limits of our permit and are confident that we do not have emissions that pose a health threat,"* the company said. The Defendant's statement was a purposeful falsehood, spoken for the sole purpose of deceiving whoever comes upon it. At the time of the statement, Graphic Packaging's Kalamazoo facility had been in excess of its volatile organic compound limits and proceeded to be in excess by thousands of

pounds in 2021.  The EGLE did not publish Graphic Packaging's 2022 emissions results, but the Plaintiffs assert their PM10 exceedances have continuously increased while also experiencing irregular and unpredictable upward jolts and spikes at unreasonably high levels.  On May 26th, 2023 for instance, Plaintiffs reported hydrogen sulfide sensors showing substance levels of over 80 ppb, 159 ppb, and 765 ppb, all in the same day.  The following day though, Plaintiffs complained to the EGLE, who's agents reported only finding levels of 1 ppb, while Plaintiffs watched the sensors read levels of over 15 ppb as they communicated.  The irregular and unbalanced, and unpredictable nature of excessive chemical emissions from the North Kalamazoo GPI facility is understandably frightening to the community, and caused mental anguish and severe anxiety for years.

(46)

On November 24th, 2020, the Environment, Great Lakes, and Energy department, under the direction of Governor Whitmer, granted Graphic Packaging a new permit to install.  The new permit presumably added 29.3 tons per year to Graphic Packaging's volatile organic compound emissions limit, bringing the presumed amount of VOC allowed to at least 172.8 tons per year or 39.45 pounds of VOC emissions per hour.  The new 2020 permit to install regulates "particulate mass" on one new machine, limiting "FGBoiliers10-11" at "0.004lb/MMbtu per hour"

pursuant to MCR 336.1331 and 40 CFR 52.21 (c) and (d).   According to the information available in the 2015 and 2020 permits, the facility's yearly limit of particulate mass equates to 35.04 pounds per year.  According to the EPA,  "the best measure in the NEI of actual total PM is *PM10-PRI*, since it includes PM25-PRI and PM-PRI is not complete." ("*How Do the Different Parts of Particulate Matter (PM) Fit Together? | US EPA*").   At the end of 2020, Graphic Packaging is recorded as emitting 2.15 lb per hour of particulate matter into the Northside community, well above its .004 hourly rate listed in its 2020 Permit to Install.  In 2021, Graphic Packaging's particulate matter emissions worsened to 2.28 lbs per hour, again far beyond its 0.004 lb per hour limit. Since being granted its last permit to install, Graphic Packaging has remained thousands of pounds over its particulate matter emissions limits.  Without a full list of all machines with emissions capabilities and a list of all Machines being regulated at N. Pitcher street facility, Plaintiffs are not fully aware of what the Defendants emissions limits are as they structurally kept secret by the construction of the permits.  For transparency purposes, permits could list each "major source" facility's total emissions caps per hazardous substance present.  In 2020 and 2021, Graphic Packaging emitted at least 242.57 and 214.73 pounds of VOCs per day into the Kalamazoo community, in excess of six thousand pounds of hazardous chemical pollutants a month.  GPI also emitted at least 51.7 and 54.7 pounds of particulate matter per day into Kalamazoo's Northeast side

community during 2020 and 2021.   The actual levels of hydrogen sulfide, boiler condensate, and wastewater discharged into the community is unknown.   Despite these continuous releases of dangerous, hazardous pollutants in excess of health risk levels, no significant actions have been taken to protect the ailing Northside community.   To the contrary, the Defendants, in their various roles and capacities, have all worked to cover and convolute the true facts and circumstances facing Kalamazoo residents.

(47)

On December 21st, 2020, Dr. Daniel Tessier, an Environmental Protection Agency affiliate, completed an Air Quality Report after being contacted by the Plaintiffs. The introduction of his report reads: "This toxicological review was commissioned by Brandi Crawford, a resident of Kalamazoo. Ms. Crawford and her family have experienced a range of health issues, most of which are respiratory in nature, while residing in Kalamazoo. Ms. Crawford also reports a decades-long history of respiratory issues and odor complaints by neighborhood residents. Ms. Crawford has provided the air quality monitoring reports and related documentation on which this review is based."   Brandi Crawford only possessed the readily available information published by the Defendants at the time.   The report confirms as much by stating: "There is a history of odor complaints from Kalamazoo fenceline communities that

attributes nuisance odors to KWRP and GPI. In response, two air quality monitoring efforts were initiated by the City of Kalamazoo, one in 2009 and one in 2020. The reported results of those efforts are the source of the chemicals described in this toxicological review."  Tessier goes on to explain that: "The 2020 monitoring study is documented in the report, "City of Kalamazoo, MI, Industrial Influent Odor Study," and was prepared by Jones & Henry Engineers, Ltd. of Kalamazoo, Michigan. The report provides results of a follow-up investigation amidst continuing complaints of foul odors in the fenceline communities neighboring KWRP and GPI. In this study, hydrogen sulfide monitoring devices were deployed at four locations, two at GPI, one at KWRP, and one at the fenceline between the two properties. Continuous air monitoring was conducted for four multi-day periods during the months of September and October, 2020. Continuous hydrogen sulfide concentration monitoring was the single focus of the 2020 report; other VOCs were not monitored or analyzed."  The Plaintiffs assert that the City of Kalamazoo and GPI intentionally selected VOCs it knew to be emitting in low quantities, and failed to monitor for VOCs it regularly emits by the hundreds of pounds per day according to EGLE records.  The City's previous reports focused primarily on hydrogen sulfide.  After reviewing the City's old air data, Dr. Tessier concluded: "The levels of hydrogen sulfide detected on Harrison St could be considered a potential hazard to human

health. The levels detected within certain wastewater handling structures within the KWRP could also be considered a hazard to human health.

(48)

Dr. Tessier's report also states that: "the 2009 and 2020 odor investigation reports focused on hydrogen sulfide as a proxy for a range of odiferous sulfide compounds. The 2009 report also included analysis of volatile organic compounds using EPA method TO-15. The toxicological review presented here is therefore focused on each compound that was reported above its respective method detection limits. These include acetone, acetonitrile, carbon disulfide, carbonyl sulfide, dimethyl disulfide, dimethyl sulfide, hydrogen sulfide, methylene chloride, methyl mercaptan, octamethylcyclotetrasiloxane, phenol, and toluene." After reviewing the City's two studies, Dr. Tessier had the following assessment: The 2009 odor investigation represents only a modest effort to establish the source and extent of volatile emissions from KWRP. The 2020 odor investigation represents a more sustained effort to assess diurnal patterns of hydrogen sulfide emissions, but did not consider other chemical emissions. Both studies therefore were focused on nuisance odors and not the presence or monitoring of toxic air emissions from either facility. Environmental justice is a concept that addresses the fair and equitable distribution of environmental benefits and burdens among communities. EJSCREEN is a

mapping and screening tool developed by the EPA to generate environmental justice indices based on the combination of demographic factors and environmental data. EJSCREEN results for the fenceline community close to KWRP and GPI indicate that for a range of air pollutant criteria and respiratory hazard, the area is among the worst in Michigan, the Upper Midwest, and the United States as a whole."

(49)

Also on December 21st, 2020, the same day that Dr. Tessier finished his review of the City of Kalamazoo air studies and verified imminent health hazards, Governor Gretchen Whitmer's administration announced one hundred, eighty six million dollars in tax abatements and incentives for Graphic Packaging International.   Less than a month later, in January of 2021, Plaintiff Deandre Jordan was found unresponsive after suffering an asthma attack on Kalamzoo's Northside.  He would not wake up from the coma he fell into until five months later.  On February 15th, 2021, John Curran, Chief of Staff for Senator Sean McCann, Monica Brothers (EGLE Air Quality Enforcement); Rich Townley, Donald Krug, Tom Olstad, Greg Lanternier (GPI); Aaron Davenport and Alexis Kontorousis (Jones and Henry Engineers); and Jim Cornell, Ryan Staughton, Ron Jannsen, Steve Helmer, and Mike Buzzo, attended a closed-door "Odor Task Force" meeting about a "Nuisance Plan" submitted to the EGLE in December of 2020.   Attendees also spoke to how GPI

began their "Odor Reduction System" scrubbing operations within the N. Pitcher plant that month.   On February 19th, 2021, Plaintiff Brandi Crawford was contacted by the EPA's environmental justice committee who cited the Tessier Report she sent to them, the EGLE, and City of Kalamazoo officials.

(50)

On March 25th, 2021, the Defendants held another closed-door Odor Task Force meeting.  The same attendees were present, save for Senator Sean McCann's agents, who were replaced by agents for Senator Gary Peters and Aaron Wright of the "Environmental Concerns Committee" participated as well.  Also in late March of 2021, the EPA sent agents to Kalamazoo to complete air sampling, monitoring, analysis in the Northside community.   The EPA's GMAP report, signed and confirmed by Marta Fuoco and Michael Compher, states in its conclusive "General Findings" that VOCs were not found to be in exceedances of risk levels, but on the June 10th, 2021 lab analysis charts, several VOC exceedances are recorded at various North Kalamazoo air sampling sites.   2,2,4-Trimethylpentane was detected at 1.90 ug/m3, greater than the listed risk level of 1.40 ug/m3.   Chronic 2,2,4-Trimethylpentane exposure causes confusion, dizziness, headache, nausea, vomiting.  Chloromethane, also known as Methyl Chloride, was detected around the Northside at levels of 0.96 ug/m3, 0.79 ug/m3, 0.74 ug/m3, and 0.69 ug/m3, all in

excess of the listed risk level of 0.61 ug/m3.  Long-term chronic exposure to chloromethane can interfere with brain function, causing clumsiness, headache, dizziness, poor judgment and memory, slurred speech, sleep disturbances and personality changes like depression, irritability.  Dichlorodifluoromethane, also known as "Freon" was found at levels of 2.3 ug/m3, 2.2 ug/m3, both above the listed risk level of 1.5 ug/m3.  Chronic exposure to freon can cause eye irritation, eye pain, breathing, sore throat, and nasal tracts.  2-Butanone also known as Methyl Ethyl Ketone, was found at 1.5 ug/m3, 1.3 ug/m3 above, and just below the listed risk level of 1.4 ug/m3.  Toluene was detected at 2.4 ug/m3, 2.2 ug/m3, and 1.1 ug/m3, more than two times above the listed risk level at two locations, "E. Patterson Rd-1" and "Verburg Park 4".  It was found exactly at the risk level  of 1.1 ug/m3 at the "Verburg Park 3." Chronic toluene exposure causes eye and nose irritation, tiredness, confusion, euphoria, dizziness, headache, dilated pupils, tears, anxiety, muscle fatigue, insomnia, nerve damage, inflammation of the skin, and liver and kidney damage.

(51)

The June 10th, 2021 EPA lab analysis charts contradict the "General Findings" which state: "Background levels of CH4 were detected above the MDL and RL. Values below the RL and MDL were detected for H2S, C6H6, C7H8, and C8H10."

The short, chemistry-coded final analysis would lead a common citizen to believe the federal government did not find dangerous "volatile" pollutants in their community.  "CH4" is Methane, which was not listed as a detected compound at any location in and of itself.  C6H6 is Benzene, which was detected at levels of 0.49 ug/m3 and 0.77 ug/m3, below the listed risk level of 0.94 ug/m3.  C7H8 can refer to at least five different chemicals, but Toluene is one of them.  Toluene is listed as being detected at twice the minimum risk levels in two locations. C8H10 refers to Xylenes. M&P Xylenes were detected at 1.2 ug/m3, just below the 1.3 ug/m3 risk level at the Verburg Park 4 location.  Trimethylpentane, Benzene, and Chloroform were all detected below risk levels at that particular location, but methyl ethyl ketone, toluene, chloromethane, and Dichlorodifluoromethane, were all found to be in exceedance of their listed risk levels.  The general findings listed at the beginning of the report are in complete contradiction from the June 10th, 2021 site-sample analysis charts listed towards the end of the document.  Furthermore, it is unreasonable to believe that EPA agents confused "CH4" Methane with  "CH3Cl" and  "CCl2F2" which are chloro-'methane' and  Dichlorodifluoro-'methane' respectively, were the only chemicals that can plausibly be misconstrued with "methane" and actually detected above risk levels, according to the EPA lab analysis.   If  the  EPA  agents  were  referring  to  chloromethane  and

dichlorodifluoromethane exceedances, they failed to adequately warn the public of the presence of those hazardous dangerous chemicals.

(52)

On May 27th, 2021, the Defendants held another closed-door meeting which was exclusively attended by persons who do not have to endure the conditions being met about. This meeting's attendees were: Shawn Deverell, Constituent Relations Director at the Office of Senator Sean McCann; Donald Krug, Tom Olstad, Greg Lanternier, and Steven Smock (GPI); Aaron Davenport and Alexis Kontorousis (Jones and Henry Engineers); and Jim Cornell, Ryan Staughton, Ron Jannsen, Steve Helmer, and Mike Buzzo presumably of the City of Kalamazoo KWRP. At this meeting, Tom Olstad spoke to GPI's new odor management systems which were up and running. Olstad stated that he believed they found the "sweet spot". Two of four new scrubbers were up at the time. Approximately, two months later, on July 6th, 2021, Jack Urban announced that he would not pursue another term as City Commissioner. The next month, on August 7th, 2021, another spill occurred on Kalamazoo's Northside at the GPI facility. A manual valve was left open causing five hundred gallons of "wastewater" to be released. The exact chemical composition of the hundreds of gallons released into the community were not

published, public notifications were not disseminated, and no actions were taken under the federal national contingency plan, or any other hazard prevention statute.

(53)

In October of 2021, a MDHHS employee speaking with Brandi Crawford confirmed that the agency completed its health consultation, but was unwilling to release their findings to the public. Several months later, on May 25th of 2022, another unattended open valve caused twenty four thousand gallons of boiler condensate mixed with city wastewater was released into a storm drain. No chemical composition of discharge was made public, and again, no public notifications were disseminated, and no actions were taken under the federal national contingency plan. That same month of May 2022, the EGLE conducted air sampling around the Northside Kalamazoo GPI facilities which revealed the presence of high levels of formaldehyde.  A local news agency reported that "A drone flown by the state of Michigan detected toxins in the air over the city's wastewater treatment plant at levels potentially dangerous to anyone exposed, and further investigation is planned. The drone, equipped with multiple sensors to detect chemicals, flew patterns over the treatment plant on May 23-24. Data from Michigan's Department of Environment, Great Lakes, and Energy that MLive/Kalamazoo Gazette received through a Freedom of Information Act request to the city of Kalamazoo states that

volatile organic compound hotspots were found in the air."  It was reported that Kalamazoo Public Services Director James Baker told MLive/Kalamazoo Gazette that formaldehyde was measured in amounts as high as "0.864 parts per million." The articles states: "the Minimal Risk Levels for formaldehyde inhalation are "0.04" ppm for acute (short) exposure (about 1 to 14 days); "0.03" ppm for intermediate exposure (from 15 to 364 days), and 0.008 ppm for chronic exposure (one year or more).  While the highest readings were on May 23, the data also shows several readings exceeding all Minimal Risk Levels on the next day.  According to the Centers for Disease Control's Agency for Toxic Substances and Disease Registry, nasal and eye irritation, neurological effects, and increased risk of asthma and/or allergy have been observed in humans breathing 0.1 to 0.5 parts per million of formaldehyde. Eczema and changes in lung function have been observed at 0.6 to 1.9 parts per million, the agency's toxicity fact sheet states. ("*Drone Sniffs Out Toxic Chemicals Above Kalamazoo Wastewater Treatment Plant*").  Again, no public notifications were disseminated, and no actions were taken under the federal national contingency plan, despite the confirmed hazardous nature of GPI's continuous pollutant emissions.

(54)

Less than two weeks after the twenty-four thousand gallon spill, on June 8th, 2022, GPI's N. Pitcher street facility was cited for particulate mass and nitrogen oxide exceedances. The EGLE violation notice reads: "**EUK BOILER #10** PM10/2.5–Stack test report from testing that occurred on June 8, 2022 showed noncompliance with 0.004 lb/MMBtu emission limit for PM10/2.5. Based on the test report, the PM10/2.5 emission rate for EUBOILER#10 was 0.0046 lb/MMBTU." The violation notice continues to detail a number of regulation violations at the facility, addressing each one in like manner, reading: "**EUK BOILER #9**: Records showed 37 hours of noncompliance with the 13.6 pph NOx limit and two non-compliance periods for the 0.06 lb/MMBTU NOx limit (24-hour average) during the period of August 20, 2022 to August 21, 2022. During this time period, reported emissions ranged from 14.2 pph to 26.6 pph and 0.074 lb/MMBTU to 0.126 MMBTU. Records also showed non-compliance with the 0.06 lb/MMBTU NOx limit (24- hour average) for July 15, 2021. Records show that on July 15, 2021, the 24-hour average lb/MMBTU for NOx was 0.08 lb/MMBTU. The July 15, 2021 exceedance was also not reported in an Excess Emissions Report or an ROP Certification Report. PTI No. 133-19A, Special Conditions I.1 and I.2 **EUK 1 & 3 MACHINES**: Records were insufficient to demonstrate compliance with this material usage limitation. MI-ROP-B1678- 2015, Special Condition II.1 **EUCALENDARHEAT1:** Facility installed EUCALENDARHEAT1 with a

maximum heat capacity of 5.46 MMBtu/hr, which exceeds the limit of 2.8 MMBtu/hr. PTI No. 133-19A, Special Condition IV.1. **EUK2COOLINGTW1:** Facility installed three stacks for EUCOOLINGTW1 with a maximum exhaust diameter over the 144-inch limit. PTI No. 133-19A, Special Condition VIII.1,2,3.

(55)

According to the EGLE, the GPI facility installed and removed "EUCALENDARHEAT1" with a maximum heat capacity of 5.46 MMBtu/hr, which exceeds the limit of 2.8 MMBtu/hr by almost twice as much as it permitted.  When speaking to reporters, EGLE spokeswoman Jill Greenberg stated, "At the time of the inspection, Graphic Packaging was determined to be compliant with all their volatile organic compounds and hazardous air pollutants permit emission limits."  This statement seems to be in contradiction with the detection rates found beyond minimum risk levels around Kalamazoo in 2021.  The Plaintiffs assert that *if* GPI is within its permitted VOC emission limits, it is only because those limits were purposely set unreasonably and dangerously high.  Jill Greenberg did not speak to GPI's PM-10 PRI levels, which were 9.99 tons (19,980 pounds) in 2021.  The EGLE failed to list GPI's 2022 PM-10 PRI levels.

(56)

On September 7, 2022, EPA Region 6 issued a Consent Decree and Final Order under its authority pursuant to the CAA to Graphic Packaging International, LLC (GPI) located in Queen City, Texas. The CAFO was issued in response to the following violations: 1.Failure to control HAP emissions from the digesters in violation of 40 C.F.R. § 63.443(c) (NESHAPs Subpart S).   2. Failure to visually inspect all components within the closed vent system for evidence of defects in violation of 40 C.F.R. § 63.453(k)(2) (NESHAPs Subpart S).  3. Failure to include the instances of CMS downtime in violation of 40 C.F.R. § 63.867(c)(1)(viii) (NESHAPs Subpart MM).  4. Failure to include the exceedance of LK1s established parameters in August 2018 in violation of 40 C.F.R. § 63.867(c)(1)(vii) (NESHAPs Subpart MM).   GPI was issued a $192,000.00 fine.   Queens City, TX, like White Pigeon, MI, is a small rural village of roughly fifteen hundred Caucasian people. The Plaintiffs assert that GPI's Queens City, TX facility does not have the same performance issues as the Kalamazoo facility, but their community was swiftly protected, despite presenting far less people to exposure.  Despite years of emissions violations and decades of spills, the Kalamazoo GPI facility has not been fined by the EPA.

(57)

The next month, on October 20th, 2022, another spill at the Kalamazoo facility caused three to five thousand gallons of wastewater to drain into the facilities "storm water system", its "north limits drain", and into the Kalamazoo River.  The EGLE violation notice confirmed that at least one thousand, five hundred gallons of wastewater containing undisclosed chemicals were drained into the Kalamazoo River.  Four months later, on February 1st of 2023, the EGLE and Graphic Packaging finalized the consent order to resolve the numerous violations at the Northside Kalamazoo GPI facility. The EGLE announcement details that "the consent order will require the company to pay a monetary fine of $109,270 and abide by a compliance plan.  Changes were made to the originally proposed consent order in response to comments from the public.  These changes include: Addition of timeline for Envirosuite data sharing. Graphic Packaging is required to post Envirosuite monitoring network data no later than 90 days after the effective date of the Consent Order. Addition of the December 19, 2022, Violation Notice with a $10,000.00 increase to the monetary fine."  The proposed consent order, at its strictest, would only amount to a nominal, de minimis fine that is approximately eighty thousand dollars less than the fine issued against GPI in Queens City, TX. These Plaintiffs assert that these measures, in light of the facts and imminent hazardous circumstances, do not rise to the level of adequate enforcement of the Clean Air Act or the regulations prescribed under it.

(58)

In February of 2023 the EPA took actions under the national contingency plan to provide relief to American citizens suffering from chemical exposures in Palestine, OH.   On April 12th, 2023, the EPA granted the State of Michigan's EGLE department which was announced at the State's first MI Healthy Climate Conference where Governor Gretchen Whitmer highlighted the three million dollar planning grant.   A couple of weeks later, President Joe Biden issued Executive Order 14096, similar to President Bill Clinton's 1994 Executive Order, Biden's order directs the federal government's organs to take immediate steps towards "Revitalizing Our Nation's Commitment to Environmental Justice for All."   Four days after President Biden issued his pertinent executive order, former Michigan House Speaker Rick Johnson pleaded guilty in federal court to accepting more than $110,000 in bribes when he chaired a state board that granted the state's first medical marijuana business licenses.   The bribes were made in exchange for approving the license applications of at least two businesses.   Two lobbyists have also signed agreements to plead guilty in connection to the same incidents.

(59)

Corruption and collusion between state officials, lobbyists, and private entities is not a rare occurrence in the State of Michigan.  In 2019, it was reported that "Every state

has about one corruption case each year", U.S. Attorney Matthew Schneider said, "while larger districts like New York City, Los Angeles, and Miami, usually see around four. In Michigan there were about 18 per year for the last five years" he continued.  "Our statistics show we lead the nation in corruption cases, by far", "We definitely have a more significant corruption issue here in the Michigan region," U.S. Attorney Schneider said. (*US Attorney: "Michigan Is the Nation's Most Corrupt State" Detroit Metro Times).*

(60)

On May 13th, 2022, the GPI H2S sensors went offline.  A commission meeting to address the "Public Health Emergency" was held two days later on May 15th, 2022. At that meeting, Commissioner Hoffman stated: "I did not need a report to inform me of the issues…I've been living on the Northside of Kalamazoo since 2018, and I have personal experience with the physical effects since I bought my home."  Vice Mayor Cooney added, "People are regularly, almost continuously subjected to this punishing odor and whatever else it does to their system" Mayor Anderson simply stated: "Odor has been talked about for years."  Aware of the actual accuracy and veracity of the experiences of Kalamazoo citizens like Commissioner Hoffman, Mayor Anderson remained resolute in his refusal to acknowledge the sufferings of his citizens.

(61)

In April of 2023, Plaintiff Brandi Crawford contacted The J.R. Beason Firm PLLC. to retain counsel to pursue civil rights and personal injuries claims.  The next month, In May of 2023, the Michigan Department of Health and Human Services released its long-awaited "Health Consultation Study", which after years circumvention, finally confirmed that the foul odors and large chemical plumes coming from the GPI facility contained hazardous chemicals and was causing their respiratory, eye irritations, and other injuries.  The Health Consultation was managed by EGLE director Aaron Keatly and his wife, MDHHS assessment manager Andrea Keatley.  The Keatleys instructed their agents to inform the public that the study was necessary and delayed.  Despite the necessary information being present at the time the study commenced, the Keatleys took three years to complete the study and coordinated their respective powers to provide GPI cover time to get its emissions levels under control.  Shortly after the MDHHS study was released, Kalamazoo City Commissioner Jeanne Hess reportedly informed citizens that she was "duped" by GPI when they told her that "it was only steam" being emitted from their stacks.  That same month, on May 3rd, 2023, GPI announced that it would be closing its Tama, IA recycled paperboard mill.  Tama Iowa Mayor, Doug Ray said that GPI had purchased the facility with the intention of eventually closing it.  Tama residents said the mill provided water to an adjacent pond where residents fished and feared what

would happen to the community wetland when the plant was closed, confirming paper mills can be managed in a safe and productive manner. (*Thompson*). On May 30th, it was reported that GPI would be closing its Auburn, Indiana paper mill as well. (*Ronimous*). Tama, Iowa, and Auburn, Indiana, are predominantly Caucasian communities.

(62)

On May 25th, 2023, Monica Brothers replied to Deann Winfield's odor complaint via email stating: "I received your PEAS complaint this morning and arrived at your address at about 9:20 am to conduct an odor investigation. Upon arrival, I detected some odors that I would attribute to GPI at about a level 1 on the 0-5 odor scale. I stayed in the area for about 30 minutes and notices that the odors came and went depending on the variations in the wind. During this time, I detected odors from 0-2 on the odor scale, however, the odors were not strong or persistent enough to be considered a violation of Rule 901. I also had a Jerome H2S monitor while I was there, the reading was 0.00ppm. In her statement to counsel, Deann Winfield states that her breathing issues usually occur late at night, and early in the mornings, when Monica Brothers and the EGLE are not available to monitor smells in the community. The very next day, on May 26th, 2023, GPI monitoring sensors showed chemical torture. Hydrogen sulfide levels were reported at levels of 89 ppb, 159

ppb, and 765 ppb, at various times through that day.   Plaintiffs have reported experiencing severe eye irritations, wheezing, coughing spasms, shortness of breath, respiratory failures, asthma attacks, skin rashes, chronic headaches, COPD, kidney damage, nervous system adversity, seizures, cancers, loss of sleep, anxiety attacks, chronic nasal leaking, and several other injuries.   The Plaintiffs have endured debilitating odors and constant coatings of crystalized calcite across the community.

(63)

## SPECIFIC ALLEGATIONS AGAINST EACH DEFENDANT

The United States of America, as a defendant, established a customary practice of racial animus when it conducted several experimental chemical exposures on Black Americans citizens for research and pecuniary purposes without recognition.   The Federal government further established a custom of racial animus in this nation when it disposed of bio-chemical research records and classified others without truth, reconciliation, compensation, or reparative measures for the Black American citizenry and other targeted communities.   The federal government further displayed its custom of racial animus when it failed to remediate minority residential areas within the Kalamazoo Superfund site and also failed regulate the Northside Kalamazoo GPI facility with the same protective intentions as it did in Queens City, TX, a primarily Caucasian community.   Despite multiple executive orders directing federal organs, agencies, and the States to enforce federal laws and regulations to

protect minority and low-income communities from environmental hazards, the executive, legislative, and judicial branches of the federal government have failed to act under the national contingency plan to protect minority and low-income citizens in Kalamazoo, MI.  Despite continuous, abnormal releases of hydrogen sulfide as high as 765.0 ppb, and years of PM-10 emissions exceedances, the U.S. EPA has failed to protect its constituents in this jurisdiction.  The federal government's willful neglect of duty and circumvention of its own laws in Kalamazoo, MI has not occurred in a vacuum.  For years, the federal government has been aware of corruption issues in the State of Michigan, and multiple Black American communities have suffered significantly long-lasting, wide-spread, State-caused and concealed chemical exposures.   The pattern of majority Black American communities being repeatedly exposed to concealed hazardous pollutants has become a reoccurring, habitual problem despite the applicability of the federal Constitution, environmental protection acts, civil rights laws, and multiple executive orders.  The United State's Government has established federal air regulations unfit for the purposes of their enactment.  For instance, Michigan's testing and sampling statute "R 336.1213(3)(b)(ii)" only requires stationary sources of pollutant emitters to retain test sample records "on file" for five years.  The EPA has also validated Michigan's convoluted "Rule 901", that covers both "odor nuisance" and bodily injury, allowing the EGLE to mask the injuries of these Plaintiffs as odor issues.  In

addition to allowing that statute, the EPA has failed to assess and collect noncompliance penalties for PM-10 exceedances from GPH/GPI under 42 U.S.C. § 7420 (2)(A) for several years, creating a custom of deregulation and selective enforcement that emboldened the polluters and injured the protected-class, minority community now before the Court.

(64)

Region 5 Director Debra Shore directed agents Marta Fuoco, Michael Compher, and others to travel into Michigan and produce a false and misleading GMAP Report. Marta Fuoco and Michael Compher intentionally validated the "general findings" that they knew to be misleading, dangerous, extending, and hiding hazardous chemical exposures in this jurisdiction.  Defendant Debra Shore failed to correct the false conclusions in the GMAP report and ignored complaints and pleas for relief from chemical torture being inflicted in Kalamazoo, MI for her entire tenure, despite possessing non-discretionary duties to ensure adequate warnings and protective measures under the national contingency plan and Clean Air Act.  Under Debra Shore's direction, the EPA has cited GPH/GPI for less dangerous plant management in majority Caucasian communities, but has failed to regulate or fine GPH/GPI for its hazardous pollutant exceedances and unreported chemical spills within an already designated superfund site adjacent to a minority community.

(65)

Defendant Graphic Packaging Holding Company and its directors methodically groomed and employed Kalamazoo Valley area natives and community members like Michael Doss and Paul McCann to exploit their relationships in furtherance of the holding company's pecuniary interests, which mandated continuing and expanding their hazardous pollutant customs in Kalamazoo County, despite causing and remaining within a superfund site.  GPH also manages the Kalamazoo Valley Partnership Group, an entity presumably created to enact undue influence in the Kalamazoo Valley community.  GPH and its directors are believed to be affiliated with and acting out the "Coors ideological" racial animus and customary beliefs shared by the traditional legacy paper mill companies in Kalamazoo.  GPH has enacted the Coors ideology through Coors family agents like Darden Coors, who was CC'd on the EPA Superfund site communications with GPI related to its N.Pitcher street paper mill in Kalamazoo.  Graphic Packaging Holding Company is inseparable from GPI and acts as the "mind" of the conglomerate, it guides the legacy papermill companies' business direction, collects and redistributes GPI's revenues, and validates the subsidiary company's performance standards and culture. Graphic Packaging Holding Company directors selected and directed GPI executives to hire lobbyists to assist with restructuring and or mitigating Michigan's regulation enforcement customs, and enlisted local politicians like former Mayor Bobby J.Hopewell, former City Commissioner Jack Urban, and current Mayor David

Anderson to facilitate their Kalamazoo expansions while being aware that the facility was habitually out of compliance with PM-10, VOC, and other emission limits while operating within a superfund site.

(66)

Defendant Graphic Packaging International Inc. caused continuous Particulate Matter to be released in excess of their permitted limits and known health risk levels.  GPI failed to maintain material use records pursuant to regulations and failed to report the contents and quantities of several chemical and wastewater spills.  GPI showed flagrant disregard for the law when it installed an industrial heater that operated at twice the permitted capacity.   GPI also installed and removed an unapproved and regulated machine without notifying the EGLE.  GPI exemplified a custom of reckless hazardous pollutant management and disregard for human health when it purchased and operated the PFAS contaminated White Pigeon, MI facility and was fined for VOC emission violations at its Queens City, TX location.  At its N.Pitcher Kalamazoo location, GPI caused and failed to report several chemical spills, totaling thousands of gallons of unreported chemicals dispersed into the Kalamazoo River superfund site.  GPI failed to report these spills in violation of the requirements of the national contingency plan and state regulations.

(67)

Tom Olstad, while speaking at a May 16th, 2023 town hall meeting, said that he was

there to "learn" about the people's circumstances.   Tom Olstad, despite  his assertions, was fully aware of the issues facing the community through his knowledge of the City of Kalamazoo's 2009 and 2020 studies, Dr. Ansell's commission presentation, and the Tessier Report that was forwarded to him and his employers.   At the time of his statement, Tom Olstad was one of the few people acutely aware of the actual chemical contents of several secret spills that occurred at the N. Pitcher facility.   Tom Olstad was the facility manager for several of GPI's unreported and undocumented spills, as well as for their years of VOC/PM-10 emission exceedances.   Tom Olstad showed his capacity for, and comfortability with stating falsehoods when he stated to the community that he was there "to learn", when he was actually aware of the thousands of gallons and pounds of undocumented wastewater chemicals and VOCs released into the Northside community.   If Tom Olstad genuinely needed to hear the community's experiences to learn the health effects of the chemicals released into the community from his facility, that evidences his lack of competency and his professional inaptitude.   Any facility manager in a similar position as Tom Olstad would be aware of the human health effects of chemical exposures stemming from his facility's material use operations.   The Plaintiffs allege that Tom Olstad did not need to learn of their sufferings and has been aware and complicit in them for years.

(68)

Paul W. McCann collaborated with his brother Sean McCann to persuade other government officials and city representatives to support the expansion of Graphic Packaging's Kalamazoo facility.   The McCann brothers also worked to develop light, hands-off regulation and enforcement standards while being aware of the residents injuries, GPI's habitual emissions exceedances, and their numerous hazardous spills in the Kalamazoo River superfund site.  The McCann brothers were compensated by GPH & GPI through back-channel, off-book methods.   In his official capacity as a State Senator, and in support of his brother, Sean McCann sent agents to several MEDC strategic fund meetings to ensure GPH/GPI received multi-million dollar tax breaks and that his brother performed well in his professional capacity as GPI's government relations executive.  While doing so,  In return, Paul McCann, GPI, and its parent company Graphic Packaging Holding company, ensured that Sean McCann received political support through their lobbyists and decades-old State political connections and networks.

(69)

The City of Kalamazoo, as an entity, has received various federal grants for healthcare, environmental remediations, and other issues.  The City has also been aware of its environmental discrimination issues since the 1970s or earlier.  The City of Kalamazoo confirmed in 2009, and again eleven years later in 2020, that hazardous chemical pollutants were causing imminent and definitive injuries to

North and East side residents.   The City of Kalamazoo was complicit and responsible for several chemical spills while failing to remedy pollutant leaks and exceedances for decades.   While being aware of GPI's horrific chemical emissions and spill record, the City of Kalamazoo failed to confirm, warn, or alleviate its residents' continuous health complications.   The City of Kalamazoo collaborated with Graphic Packaging, its subsidiaries, State agencies, and federal agents to conceal Kalamazoo's deteriorating air quality when it sent out cease and desist letters to several media outlets who were seeking to publicize the imminent dangers threatening and injuring the Northeast citizens.   In fourteen years, the City failed to acknowledge hydrogen sulfide hazards emitting from the KWRP and Northside Kalamazoo GPI facilities.   The City of Kalamazoo has been aware of crystalized calcite threats long before GPI spewed the substance over the KWRP properties, but failed to acknowledge the health risk to its community and or warn them about it. The City of Kalamazoo worked to mask personal injury threats behind odor nuisance violations by refusing to remediate Particulate Matter and hydrogen sulfide hazards for several decades.   For decades, the City dismissed bodily injury complaints as odor nuisance violations at worst, and refused to investigate chemical hazards, despite multiple professional presentations verifying their need to take protective measures for their citizens.   While being aware of its many chemical wastewater spills into the Northside community, the City of Kalamazoo attempted to

dismiss its residents' concerns and persuade them into believing their instincts were misplaced when it continuously denied the presence of hazardous chemicals and the plausibility of them injuring residents in the minority and low-income communities of Kalamazoo.

(70)

Mayor David Anderson has been aware of the imminent threats emanating from the Northside KWRP and GPI facilities his entire tenure, but purposely failed to disclose those threats. Mayor Anderson worked to keep the chemical threats concealed from the public by denying his knowledge of hazardous chemicals emanating into the North and East side communities City facilities.  Mayor Anderson was present or aware of Dr. Ansell's presentation information regarding injuries in Northeast Kalamazoo, and he is in possession of the Tessier Report reviewing the 2009 and 2020 studies within his possession, but refused to acknowledge or remediate health risk caused by facilities within a superfund site. Mayor David Anderson instructed Commissioner Erin Knott and others to keep quiet about GPI's performance problems in order to protect the City and State's relationship with its home grown, international corporation.  Like his predecessor, Mayor Anderson restricted GPI emission discussion to closed room, off record meetings for years, while dismissing the communities allegations of personal injury and irreparable conditions.

(71)

City manager James Ritsema failed to inform the City commission, Mayor Anderson, and others of the City's non-discretionary requirements to report GPI and themselves to federal authorities after wastewater and chemical spills, pursuant to the national contingency plan's hazardous spill requirements. James Ritsema failed to ensure the proper reporting and documentation of wastewater spills and hydrogen sulfide leaks.  As the City's manager, Jim Ritsema knew or should have known that the City's concealment efforts were detrimental to the community's interests, unconstitutional, and in violation of several laws.

(72)

Former Commissioner Jack Urban intentionally stated untruths to the commission board when he made them believe that the EPA and EGLE were efficiently monitoring and regulating GPI for hazardous chemical releases, when as a senior member of the board who served multiple terms, he was aware of GPI's spills and excessive emissions records.   As a long time Kalamazoo Valley community member, Jack Urban was aware of the areas environmental justice issues and purposely misled the city commission board to believe that the community was solely suffering from odor nuisance issues and not personal injuries, when he was aware of GPI's habitual releases of pollen-like coatings of crystalized calcite across the Northside community, several boiler condensate leaks, and wastewater spills.

(73)

KWRP manager James Baker intentionally misled the Kalamazoo commission board when he told them there were no conclusive findings in regards to what was causing the odors and whether or not the odors were simultaneously presenting bodily injury dangers.   James Baker failed to report several chemical spills at the KWRP's shared properties with GPI.   While being aware of excessive hydrogen sulfide leaks and excessive emissions, in addition to the several wastewater and chemical spills into the Kalamazoo River, James Baker convinced the city commissioners and others that the offensive smells radiating through the community could be caused by "organic" river activity, and not caused by all of the undisclosed chemical spills and excessive emissions in and around the Kalamazoo River which occurred during his tenure.   James Baker was aware that formaldehyde was present in North Kalamazoo in exceedance of air quality minimum risk limits and failed to report the cause to the proper federal and state authorities.

(74)

Governor Whitmer's administration has received millions of dollars in federal funding to address environmental and climate issues.   Despite those facts, Governor Whitmer collaborated with Sean McCann and GPI to appoint long-time GPH colleague and former Kalamazoo Mayor, Bobby J. Hopewell to her MEDC and strategic fund committees.  Governor Whitmer worked with GPI/GPH by appointing

EGLE Director Aaron Keatley and his wife, MDHHS Assessment manager Andrea Keatley to prolong the unnecessary MDHHS Health Consultation Study for three years.  Governor Whitmer also directed or allowed EGLE Director Aaron Keatley to avoid enforcing regulations measures against GPI's Kalamazoo facilities and restricted enforcement options to odor violations so as to protect the State's relationship with Graphic Packaging Holding Company and its subsidiaries. Governor Whitmer facilitated and or validated millions of dollars of tax breaks for GPI to expand its operations in Kalamazoo, MI by 500,000 tons, after the facility was previously thousands of pounds over its particulate matter permit limits for consecutive years.   During her tenure as the chief executive of the State of Michigan, Governor Whitmer and her appointed agents have micromanaged the concealment of multiple long-term chemical exposures of Black Communities in the Western District of Michigan.  Whitmer Administration agents attempted to bribe a Brandi Crawford into abandoning her civil rights complaints of environmental racial injustice, and the Plaintiffs assert that these conspiratorial circumvention tactics are a habitual custom in the Michigan State government.

(75)

Aaron Keatley failed to take protective measures under the national contingency plans or any other similar state authority in his powers to adequately warn the Kalamazoo public of imminent dangers from VOCs, particulate matter, and excess

hydrogen sulfide emissions for several years.  Aaron Keatly served under former EGLE Director Liesl Clark where he habitually avoided enforcing air quality regulations against GPI.  After being appointed by Governor Whitmer to replace Liesl Clark, Aaron Keatly worked with his Andrea Keatly initiate and prolong an unnecessary and pretextual "health consultation study" as a ploy to create more time for GPI to remediate its excessive emissions issues, which it failed to do.  Aaron Keatley purposely withheld GPI's 2022 emissions records in an attempt to hide their emission exceedances and to protect GPI/GPH's paper production capacity and outputs.  Aaron Keatly directed enforcement subordinates to ignore odor violations and dismiss bodily injury concerns under Michigan's "Rule 901" as fleeting odor nuisances.  After his department found formaldehyde, excessive hydrogen sulfide, and VOC hotspots in Kalamazoo's ambient air, he failed to announce any public health warnings or to take protective measures in the community.  Under Aaron Keatley's leadership, news agencies and citizens in this district were forced to file freedom of information act requests to gain information that was supposed to be made readily available to them under the Clean Air Act.  Environment Justice Advocates, presumably affiliated with the EGLE and the Governor's office, attempted to bribe and intimidate Plaintiff Brandi Crawford into abandoning her environmental injustice campaign to alleviate suffering in Kalamazoo.

(76)

Andrea Keatly, the MDHHS manager assigned to manage the pretextual health consultation study, worked with her husband to delay the release of the results, which were discernible at the commencement of the study.  Andrea Keatly ignored the Tessier and Ansell presentation and reports, while dismissing the communities personal injury and health complication complaints as odor issues.  Andrea Keatly and her agents completed the Health Consultation in October of 2021, but delayed its publishing until May of 2023.  Andrea Keatly ordered agents under her control to deny health implications of the various debilitating odors and to dissuade residents from filing more complaints with horizontal state agencies like the Michigan Department of Civil Rights.

(77)

Bobby J. Hopewell accepted professional favors and appointments in exchange for concealing GPH/GPI's custom of polluting the North-Eastside neighborhoods and the Kalamazoo River.  Bobby J. Hopewell assisted GPH/GPI in circumventing regulations and public warnings by conducting closed door, off record meetings to discuss chemical odor issues.   In those secret meetings, Bobby J. Hopewell instructed commissioners and community members to conceal the city's pollution issues in order to protect property values, the City's reputation, and the State's relationship with GPH/GPI.  Bobby J. Hopewell accepted appointments to local foundations and State committees to facilitate GPH/GPI's expansion activities while

knowing of the bodily injuries they habitually cause.  Bobby J. Hopewell used his appointments and positions to further the interest of GPH/GPI and to extend the concealment of their hazardous pollution incidents and continuous release exceedances.

(78)

## THE PLAINTIFFS' ALLEGATIONS

## COUNT I.

## INTENTIONAL DISCRIMINATION: 42 U.S.C § 2000d
## (USA, State of Michigan, City of Kalamazoo)

The Plaintiffs reallege paragraphs 1-78.

(79)

The Defendants acted with intentional discrimination when they refused to adequately confirm the presence of hazardous VOC pollutant exceedances like freon and methyl chloride found at sampling sites in the predominantly low-income, minority Northeast Kalamazoo community.   The Defendants further showed intentional discrimination when they refused to provide notice of potential health consequences after confirming excessive emissions of PM-10, hydrogen sulfide, formaldehyde, and others after permitting excessive emissions of VOCs within an already designated superfund site that would foreseeably cause bodily injury to adjacent residential communities.   Also, the Defendants showed intentional

discrimination when they failed to access, collect, and enforce emission regulations while being aware of habitual and consistent exceedances of PM-10 emission levels and several unreported chemical waste spills in a predominantly Black American community.   Ultimately, the Defendants showed intentional discrimination when they failed to act under the national contingency plan to remedy verified hydrogen sulfide and particulate matter hazards in Northeast Kalamazoo, and threatened media outlets seeking to publicize the deteriorating ambient air in North Kalamazoo as environmental racism against Black American residents.

(80)

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

(81)

Title VI prohibits discrimination "on the ground of race, color, or national origin" in "any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. A Title VI claim requires a plaintiff to allege intentional discrimination. *Alexander v. Sandoval,* 532 U.S. 275, 281, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). "[T]o avoid summary judgment on a claim under § 2000d, a plaintiff must create a genuine issue of material fact that the defendant intended to discriminate on the basis of race."

*Buchanan v. City of Bolivar, Tenn.,* 99 F.3d 1352, 1356 (6th Cir.1996).  To establish a discrimination claim under Title VI, Plaintiff must show either direct evidence of racial discrimination or establish a prima facie showing of discrimination. *Ross v. Mich. State Univ. Bd. of Regents*, 837 F. Supp. 2d 712, 716 (W.D. Mich. 2011).

(82)

The Defendants acted with intentional discrimination, violating 42 U.S.C. § 2000d, when they protected the Caucasian communities of White Pigeon, MI and Queens City, TX by shutting hazardous facilities and collecting penalties for VOC exceedances, but failing to take similar measures to protect these Plaintiffs.  The Defendants intentionally discriminated against these Plaintiffs when they concealed the presence of PM-10, VOCs, and excessive hydrogen sulfide emissions by purposely mischaracterizing the general findings of the 2021 GMAP sampling analysis results, concealing the cause and effects of various different chemical odors, by failing to take any remediation actions in North Kalamazoo as within the Kalamazoo Superfund site, and failing to remedy the excessive emission exceedances by taking actions under the national contingency plan to protect the Northside Kalamazoo community.   The Defendants discrimination caused irreparable injuries like COPD, nervous system damage to these Plaintiffs, and wrongful death to these Plaintiffs.

(83)

## COUNT II.

## FIRST AMENDMENT SUPPRESSION OF RELIGION: 42 U.S.C § 1983

## (USA, State of Michigan, City of Kalamazoo)

The Plaintiffs reallege paragraphs 1-83.

(84)

The Defendants violated the fourth amendment of the Michigan State Constitution and the first amendment of the Federal Constitution when they allowed the ambient air quality in Northeast Kalamazoo to deteriorate to an extent that makes traveling outside dangerous for respiratory health.  The Defendants obstructed the Plaintiffs from practicing their religion according to the dictates of their own minds and prohibited the free exercise of their religions when they forced them to refrain from attending congregational worship in order to avoid further exposure to excessive PM-10, VOCs, crystalized calcite dust, and hydrogen sulfide pollution.

(85)

"Every person shall be at liberty to worship God according to the dictates of his own conscience." Mich. Comp. Laws § 4.  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof" U.S. Const. amend. I.  "An essential element to a claim under the free exercise clause is some form of governmental coercion of actions which are contrary to religious belief."

*Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Board of Education v. Allen,* 392 U.S. 236, 248-249, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968).   The Defendants habitual failures to enforce ambient air regulations for several years created a custom that operates with the force of law.  The Defendants' compliance with their custom of allowing excessive chemical exposures in Northeast Kalamazoo, MI caused a public emergency that prohibits the plaintiffs ability to freely congregate and worship according to their own dictates, like residents on Kalamazoo's far southside, where hydrogen sulfide is not excessively present in their ambient air.

(86)

Congregational prayer is a semitic requirement for all monotheistic worshipers. Traditional Black American communities, like the one before this Court, were organized and developed around congregational worship and places of learning. Christians, for instance,  have practiced congregational prayer since the church first began.   In Acts 2:42, the Bible describes early church members praying together: "They devoted themselves to the apostles' teaching and to fellowship, to the breaking of bread and to prayer."   In Black American communities, Fridays through Sundays are normally filled with religious gatherings across various monotheistic faiths and denominations.   Because the Defendants allowed the ambient air quality

in Northeast Kalamazoo Michigan to deteriorate to an extent that prompted MDHHS to advise citizens to avoid going outside, those residents suffering from years of excessive PM-10, VOC, and hydrogen sulfide exposure are unable to participate in the religious requirement of congregational prayer and breaking bread as a monotheistic community.  Black Churches often exchange choirs and travel in and out of various cities to worship and break bread with fellow worshippers. Due to the ambient air concerns, Black Churches in Kalamazoo will likely refrain from accepting out of town worshippers into the Northeast for health reasons.  With GPI being allowed to irregularly pump hydrogen sulfide into the community at rates as high as 765 ppb, it is unreasonable for worshippers on the Northeast side to venture outside or accept others into their community.  "A person or a family may have a spiritual stake in First Amendment values sufficient to give standing to raise issues concerning the Establishment Clause and the Free Exercise Clause." *Data Processing Service v. Camp*, 397 U.S. 150, 154 (1970).

(86)

The Defendants obstructed and suppressed the Plaintiffs' right to practicing their religion according to the dictates of their own minds and prohibited the free exercise of their religions when they forced them to avoid the constant and abnormal pollutant exceedances from GPI's N. Pitcher Street facility and allowed the ambient

air quality on the Northeast communities of Kalamazoo to require abstention from going outside.

(87)

## COUNT III.

## VIOLATIONS OF THE CLEAN AIR ACT: NOTICE REQUIREMENTS – (42 U.S.C. § 7427)

**(Defendants: GPH, GPI, City of Kalamazoo, Aaron Keatly, EGLE, USA)**

Plaintiffs reallege paragraph 1-87.

(88)

The Defendants violated the Clean Air Act (CAA) when they avoided their duty to notify the Plaintiff class of substantial and significant deterioration in their ambient air quality, failed to attain levels of air quality mandated to protect public health and welfare under the CAA's NAAQS requirements, exceeded prohibited emissions limits for Particulate Matter-10 PRI, and emitted dangerous amounts VOCs without warning the public.

(89)

"No air pollutant to which a standard under this subsection applies may be emitted from any stationary source in violation of such standard." 42 U.S.C. § 7412(f)(4). "Each State plan shall contain measures which will be effective to notify the public during any calendar on a regular basis of instances or areas in which any national

primary ambient air quality standard is exceeded or was exceeded during any portion of the preceding calendar year to advise the public of the health hazards associated with such pollution, and to enhance public awareness of the measures which can be taken to prevent such standards from being exceeded and the ways in which the public can participate in regulatory and other efforts to improve air quality. Such measures may include the posting of warning signs on interstate highway access points to metropolitan areas or television, radio, or press notices or information. 42 U.S.C. § 7427.

(90)

The Defendants violated 42 U.S.C. § 7427 by failing to possess or act according to a state plan that warned the Plaintiffs about the deteriorated quality of their ambient air.  Plaintiffs were left to their own devices to discover and confirm the true hazardous nature of their ambient air quality and instead of being adequately warned, their complaints were gaslighted and ignored.  The Defendants exceeded their permitted PM-10 emissions level for several years, emitted hazardous levels of hydrogen sulfide, and spewed crystalized calcite across the community without enacting warning measures pursuant to the CAA.  The Defendants' violations caused irreparable injuries like COPD, nervous system damage, and wrongful death to these Plaintiffs.

(91)

## COUNT IV.

## VIOLATION OF THE CLEAN AIR ACT: STANDARDS OF

## PERFORMANCE – (42 U.S.C. § 7411)

### (Defendants: GPH, GPI, Tom Olstad, City of Kalamazoo)

The Plaintiffs reallege paragraphs 1-91.

(92)

The Defendants violated the Standards of Performance prescribed under 42 U.S.C. § 7411 when they failed to properly and effectively install and operate emission reduction systems to prevent the continuous and excessive releases of hydrogen sulfide, particulate matter, VOCs, and other pollutants.

(93)

"After the effective date of standards of performance promulgated under this section, it shall be unlawful for any owner or operator of any new source to operate such source in violation of any standard of performance applicable to such source." 42 U.S.C. § 7411(e).  "The term "standard of performance" means a requirement of continuous emission reduction, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction." 42 U.S.C. § 7602.  "The term "means of emission limitation" means a system of continuous

emission reduction (including the use of specific technology or fuels with specified pollution characteristics)." 42 U.S.C. § 7602

(94)

Despite consistent communication with the EGLE and City of Kalamazoo leading to the establishment of an emissions reduction plan, the Defendants failed to remediate hazardous and dangerous emissions of hydrogen sulfide, formaldehyde, crystallized calcite particulate matter, and other pollutants.  The Defendants' failures caused irreparable injuries like COPD and nervous system damage to these Plaintiffs.

(95)

## COUNT V.

## VIOLATIONS OF THE CLEAN AIR ACT: MODIFICATIONS – (42 U.S.C. § 7412(g)

## (Defendants: EPA Region 5 Dir. Debra Shore, Governor Whitmer, EGLE, GPI, GPH, Tom Olstad)

The Plaintiffs reallege paragraphs 1-95.

(96)

The Defendants violated the modification restrictions for stationary sources of air pollutants when they approved the expansion of GPI's N.Pitcher paper plant when they were in possession of information making them aware of the substantial and

imminent health hazards the plant expansion would cause to adjacent communities. The Corporate Defendants violated the CAA when they secretly added several regulated machines without the prerequisite EGLE or EPA approval.

(97)

"The Administrator shall, and a State may, take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent the construction or modification of a major emitting facility which does not conform to the requirements of this part, or which is proposed to be constructed in any area designated pursuant to section 7407(d) of this title as attainment or unclassifiable and which is not subject to an implementation plan which meets the requirements of this part." 42 U.S.C. § 7477.  "After the effective date of a permit program under subchapter V in any State, no person may modify a major source of hazardous air pollutants in such State, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for existing sources will be met. Such determination shall be made on a case-by-case basis where no applicable emissions limitations have been established by the Administrator." 42 U.S.C. § 7412(g)

(98)

Defendant Debra Shore violated her non-discretionary duty to prevent or remediate the verified health dangers caused by the six hundred million dollar expansion of GPI's N.Pitcher paper plant and increases in its excessive hydrogen sulfide/crystalized calcite dispersions.  Defendants violated the CAA modification statute when GPI/GPH purposely installed an industrial heater and extra "stacks" without EGLE or EPA approval.  GPI further violated the CAA when they installed and removed a regulated machine, leaving noticeable traces, without reporting their activities and without proper approval.  The Defendants' failure contributed to irreparable injuries like asthma, COPD, and nervous system damage to these Plaintiffs.

(99)

## COUNT VI.

## VIOLATION OF THE CLEAN AIR ACT: M.C.R 336.1213(3)(b)(ii) –

## RENEWABLE OPERATING PERMITS, RECORD RETENTION

### (Defendant: GPI/GPH, Tom Olstad)

Plaintiffs reallege paragraphs 1-99.

(100)

The Defendants violated the Clean Air Act when they exceeded the emissions levels restrictions on the face of their permit, failed to report several spills, and failed to retain material use records pursuant to their renewable operating permit.

(101)

"(1) Each renewable operating permit shall include all of the following general provisions: (a) A person shall comply with all conditions of the renewable operating permit. Any permit noncompliance constitutes a violation of the act and is grounds for enforcement action, for permit revocation or revision, or for denial of the renewal of a renewable operating permit. All terms and conditions of a renewable operating permit that are designated in the permit as federally enforceable pursuant to subrule (5) of this rule, are enforceable by the administrator of the United States environmental protection agency and by citizens under the provisions of the clean air act. Mich. Admin. Code R. 336.1213(1)(a).

(102)

"With respect to recordkeeping, each renewable operating permit shall contain terms and conditions necessary to ensure compliance with the recordkeeping requirements specified in the applicable requirements. Each renewable operating permit shall also contain terms and conditions that require, where appropriate, both of the following: (i) Records of any periodic emission or parametric monitoring that include all of the following information: (A) The date, location, time, and method of sampling or measurements. (B) The dates analyses of the samples were performed. (C) The company or entity that performed the analyses of the samples. (D) The analytical

techniques or methods used. (E) The results of the analyses. (F) The related operating conditions or parameters that existed at the time of sampling or measurement. (ii) Retention of records of all required monitoring data and support information for a period of not less than 5 years from the date of the monitoring sample, measurement, report, or application. Support information includes all calibration and maintenance records and all original strip-chart recordings, or other original data records, for continuous monitoring instrumentation and copies of all reports required by the renewable operating permit. Mich. Admin. Code R. 336.1213(3)(b)(ii).

(103)

The Defendants violated the Renewable Operating Permit requirements of the CAA when they installed and removed regulated facility machinery without the proper request and permissions, failed to retain required records and test samples, as well as when they exceeded their particulate matter emissions limits for several years.  The Defendants violations caused irreparable injuries like COPD,  nervous system damage, and wrongful death to these Plaintiffs.

(104)

**COUNT VII.**

**VIOLATION OF THE CLEAN AIR ACT: STACK HEIGHTS – (42 U.S.C. § 7423)**

**(Defendants: GPI/GPH, Tom Olstad)**

Plaintiffs reallege paragraphs 1-104

(105)

The Defendants violated the CAA when they installed several stacks beyond their permitted height limits and in circumvention of their Renewable Operating Permit.

(106)

"(a) Heights in excess of good engineering practice; other dispersion techniques: The degree of emission limitation required for control of any air pollutant under an applicable implementation plan under this subchapter shall not be affected in any manner by- (1) so much of the stack height of any source as exceeds good engineering practice (as determined under regulations promulgated by the Administrator), or(2) any other dispersion technique. (b) Dispersion technique:  For the purpose of this section, the term "dispersion technique" includes any intermittent or supplemental control of air pollutants varying with atmospheric conditions. 42 U.S.C. § 7423.

(107)

The Defendants violated the CAA by failing to maintain good engineering  practices and dispersion techniques when the installed stacks beyond their permitted limits and emitted hydrogen sulfide into the community at rates as high 765 ppb, sadistically above the minimum risk level limit.  The Defendants CAA violations of failing to maintain good engineering practices caused irreparable injuries like COPD and nervous system damage to these Plaintiffs.

(108)

## COUNT VIII.

## VIOLATION OF THE CLEAN AIR ACT: FAILURE TO ACCESS AND COLLECT FINES – (42 U.S.C. § 7420)

**(Defendants: USA, EPA Region 5 Dir. Debra Shore, EGLE Aaron Keatly, City of Kalamazoo, David Anderson)**

Plaintiffs reallege paragraphs 1-108.

(109)

The Defendants violated the CAA when they failed to access and collect fines against GPI/GPH for years of particulate matter exceedances, failures to report regulated hazardous chemical spills, and unsanctioned stationary source modifications.

(110)

"Except as provided in subparagraph (B) or (C) of this paragraph, the State or the Administrator shall assess and collect a noncompliance penalty against every person who owns or operates-(i) a major stationary source (other than a primary nonferrous smelter which has received a primary nonferrous smelter order under section 7419 of this title), which is not in compliance with any emission limitation, emission standard or compliance schedule under any applicable implementation plan (whether or not such source is subject to a Federal or State consent decree), or(ii) a stationary source which is not in compliance with an emission limitation, emission standard, standard of performance, or other requirement established under section 7411, 7477, 7603, or 7412 of this title, or(iii) a stationary source which is not in compliance with any requirement of subchapter IV-A, V, or VI of this chapter, or(iv) any source referred to in clause (i), (ii), or (iii) (for which an extension, order, or suspension referred to in subparagraph." 42 U.S.C. § 7420.

(111)

The Defendants violated the 42 U.S.C. § 7420 when they avoided accessing and collecting fines against GPI/GPH to protect their pecuniary interest and intimate relationships with them, despite GPI's years of dangerous hazardous exceedances, unreported spills, and evidence of rule circumvention in their adding and removing

machinery without permission. The Defendants' refusal to adequately access and collect fines from GPI caused irreparable injuries like COPD and nervous system damage to these Plaintiffs.

(112)

## COUNT IX.

## VIOLATION OF THE CLEAN AIR ACT: CIRCUMVENTION AND FAILURE TO RETAIN RECORDS – (40 C.F.R. § 63.4)

### (Defendants: GPI/GPH, Tom Olstad)

The Plaintiffs reallege paragraphs 1-112.

(113)

The Defendants violated the CAA when they circumvented hazardous pollutant regulations by adding an industrial heater that operated at twice the permitted capacity without EGLE or EPA permission, installed and removed industrial machinery without prerequisite permissions, and failed to retain testing and sampling records related to their material uses of several hazardous chemical pollutants in contravention of their permits.

(114)

"(a) *Prohibited activities*. (1) No owner or operator subject to the provisions of this part must operate any affected source in violation of the requirements of this part. (2) No owner or operator subject to the provisions of this part shall fail to keep records, notify, report, or revise reports as required under this part.(3) -(5) [Reserved] (b) **_Circumvention_**. No owner or operator subject to the provisions of this part shall build, erect, install, or use any article, machine, equipment, or process to conceal an emission that would otherwise constitute noncompliance with a relevant standard. Such concealment includes, but is not limited to-(1) The use of diluents to achieve compliance with a relevant standard based on the concentration of a pollutant in the effluent discharged to the atmosphere;(2) The use of gaseous diluents to achieve compliance with a relevant standard for visible emissions" 40 C.F.R. § 63.4.

(115)

The Defendants violated the CAA when they took actions to circumvent inspections by removing unsanctioned machinery before it could be discovered, stacking their machines beyond their permitted limits, failing to report several hazardous chemical spills, and failing to retain hazardous pollutant material use records.  The Defendants circumvention of inspection requirements contributed to irreparable injuries like severe asthma, COPD, and nervous system damage to these Plaintiffs.

(116)

# COUNT X.

## VIOLATION OF THE CLEAN AIR ACT: ENFORCEMENT– (42 U.S.C. § 7477)

## (Defendants: USA, Region 5 Director Debra Shore; EGLE Dir. Aaron Keatly, City of Kalamazoo, Mayor Anderson)

Plaintiffs reallege paragraphs 1-116.

(117)

The Defendants violated the CAA when they failed to take measures to prevent the expansion and production ramp-up at GPI's N.Pitcher facility, despite it being within a Superfund site and violating its permits several times while presenting verifiable injuries in the Northeast Kalamazoo community.

(118)

"The Administrator shall, and a State may, take such measures, including issuance of an order, or seeking injunctive relief, as necessary to prevent the construction or modification of a major emitting facility which does not conform to the requirements of this part, or which is proposed to be constructed in any area designated pursuant to section 7407(d) of this title as attainment or unclassifiable and which is not

subject to an implementation plan which meets the requirements of this part." 42 U.S.C. § 7477.

(119)

The Defendants violated their enforcement duties under the CAA when they allowed a habitual permit violator to expand and increase production while emitting excessive levels of several VOCs, particulate matter, and debilitating hydrogen sulfide. The Defendants enforcement failures under the CAA caused irreparable injuries like COPD and nervous system damage to these Plaintiffs.

(120)

## COUNT XI.

## VIOLATION OF THE CLEAN AIR ACT: INADEQUATE IMPLEMENTATION PLAN & EMISSIONS LIMITATIONS– (42 U.S.C. § 7471)

## (Defendants: USA, Region 5 Director Debra Shore, State of Michigan, EGLE Dir. Aaron Keatly)

Plaintiffs reallege paragraphs 1-120.

(121)

The Defendants violated the State Implementation Plan requirements under the CAA when they failed to promulgate effective measures to attain national ambient air quality standards (NAAQS) or to effectively warn and protect citizens from the imminent dangers of substantial ambient air deterioration.

(122)

"In accordance with the policy of section 7401(b)(1) of this title, each applicable implementation plan shall contain emission limitations and such other measures as may be necessary, as determined under regulations promulgated under this part, to prevent significant deterioration of air quality in each region (or portion thereof) designated pursuant to section 7407 of this title as attainment or unclassifiable." 42 U.S.C. § 7471.

(123)

The Defendants violated the State Implementation Plan requirements under the CAA when they permitted GPI to emit over one hundred and seventy tons of VOCs into a designated superfund site and failing to take any reasonable measures to prevent ambient air quality deterioration, leading to regular crystalline-calcite, particulate-matter coatings over the community, causing irreparable physical injuries to these Plaintiffs.

(124)

## COUNT XII.

## VIOLATION OF CODES OF FEDERAL REGULATIONS: FAILURE TO REPAIR LEAKS & RETAIN LEAK REPAIR RECORDS– (40 C.F.R. § 65.105)

### (Defendants: City of Kalamazoo, James Baker; GPI/GPH, Tom Olstad)

Plaintiffs reallege paragraphs 1-124.

(125)

The Defendants violated 40 C.F.R. § 65.105 when they failed to repair or remove the juncture chamber leaking egregious amounts of hydrogen sulfide into the Kalamazoo superfund site and the Northeast Kalamazoo Community.

(126)

"(a) *Leak repair schedule.* The owner or operator shall repair each leak detected as soon as practical but not later than 15 calendar days after it is detected except as provided in paragraph (d) or (e) of this section. A first attempt at repair as defined in subpart A of this part shall be made no later than 5 calendar days after the leak is detected. First attempt at repair for pumps includes, but is not limited to, tightening the packing gland nuts and/or ensuring that the seal flush is operating at design

pressure and temperature. First attempt at repair for valves includes, but is not limited to, tightening the bonnet bolts, and/or replacing the bonnet bolts, and/or tightening the packing gland nuts, and/or injecting lubricant into the lubricated packing…**(f)** *Leak repair records.* For each leak detected, the information specified in paragraphs (f)(1) through (5) of this section shall be recorded and kept pursuant to § 65.4(a). **(1)** The date of first attempt to repair the leak. **(2)** The date of successful repair of the leak. **(3)** Maximum instrument reading measured by Method 21 of appendix A of 40 CFR part 60 at the time the leak is successfully repaired or determined to be nonrepairable." 40 C.F.R. § 65.105.

(127)

The Plaintiffs assert that the Defendants failed to remediate juncture chamber and other leaks within the required time limits of  40 C.F.R. § 65.105 and records, if retained, will verify that fact, which will further evidence their habitual custom of reckless management at 1500 N. Pitcher street.  The Defendants failures caused irreparable injuries like chronic headaches, asthma, COPD and nervous system damage to these Plaintiffs.

(128)

## COUNT XIII.

**VIOLATION OF THE COMPREHENSIVE ENVIRONMENTAL RESPONSE,**

**COMPENSATION, AND LIABILITY ACT OF 1980: RIGHTS TO KNOW –**

**(40 C.F.R. § 300.125)**

**(Defendants: USA, Debra Shore; EGLE, City of Kalamazoo, GPI/GPH)**

Plaintiffs reallege paragraphs 1-128.

(129)

The Defendants violated the Plaintiffs rights to know about the hazardous qualities of their ambient air, pursuant to the CERCLA, when they failed to report several thousands of gallons of regulated chemicals, failing to retain quantity amounts of spill contents, and failing to issue warnings to the public of hazardous chemical dangers for several years after sending cease and desist letters to journalists and investigators seeking to publicize their dangerous secrets.

(130)

"(a) This subpart establishes methods and criteria for determining the appropriate extent of response authorized by CERCLA and CWA section 311(c): **(1)** When there is a release of a hazardous substance into the environment; or **(2)** When there is a release into the environment of any pollutant or contaminant that may present an imminent and substantial danger to the public health or welfare of the United States.

40 C.F.R. § 300.400. "(c) Notice of an oil discharge or release of a hazardous substance in an amount equal to or greater than the reportable quantity must be made immediately in accordance with 33 CFR part 153, subpart B, and 40 CFR part 302, respectively. Notification shall be made to the NRC Duty Officer, HQ USCG, Washington, DC, telephone (800) 424-8802 or (202) 267-2675. All notices of discharges or releases received at the NRC will be relayed immediately by telephone to the OSC." 40 C.F.R. § 300.125.

(131)

The Defendants violated the CERCLA when they failed to report the several hazardous chemical spills of toxic pollutants or their quantities to the proper authorities, creating a habitual custom of regulation circumvention. The Defendants violations of the CERCLA contributed to irreparable injuries like asthma, chronic coughing, wheezing, COPD and nervous system damage to these Plaintiffs.

(132)

<strong>COUNT XIV.</strong>

<strong>VIOLATION OF THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT OF 1980: HAZARDOUS RELEASE OF WASTEWATER SLUDGE– (40 C.F.R. § 302.4)</strong>

**(Defendants: City of Kalamazoo, James Baker, GPI/GPH, Tom Olstad)**

Plaintiffs reallege paragraphs 1-132.

(133)

The Defendants violated the CERCLA when they caused several wastewater sludge spills and other hazardous chemicals without reporting them to the proper authorities.

(134)

"(a) *Listed hazardous substances.* The elements and compounds and hazardous wastes appearing in table 302.4 are designated as hazardous substances under section 102(a) of the Act. (b) *Unlisted hazardous substances.* A solid waste, as defined in 40 CFR 261.2 , which is not excluded from regulation as a hazardous waste under 40 CFR 261.4(b) , is a hazardous substance under section 101(14) of the Act if it exhibits any of the characteristics identified in 40 CFR 261.20 through 261.24 . Note I to Table 302.4." 40 C.F.R. § 302.4.   "K004 - *Wastewater treatment sludge* from the production of zinc yellow pigments 4K00410 (4.54) K005 - Wastewater treatment sludge from the production of chrome green pigments 4K00510 (4.54) K006 - Wastewater treatment sludge from the production of chrome oxide green pigments (anhydrous and hydrated) 4K00610 (4.54)K007 - Wastewater

treatment sludge from the production of iron blue pigments 4K00710 (4.54) K008 - Oven residue from the production of chrome oxide green pigments 4K00810 (4.54) K009 - Distillation bottoms from the production of acetaldehyde from ethylene 4K00910 (4.54) K010 - Distillation side cuts from the production of acetaldehyde from ethylene 4K01010 (4.54)K011 - Bottom stream from the wastewater stripper in the production of acrylonitrile 4K01110 (4.54) K013 - Bottom stream from the acetonitrile column in the production of acrylonitrile 4K01310 (4.54)." 40 C.F.R. § 302.4.

(135)

The Defendants violated hazardous release regulations when they caused thousands of gallons of wastewater sludge to be spilled into the Kalamazoo River, an already designated superfund site, adjacent to this Plaintiff class's industrial zoned, residential community. The Defendants violations caused irreparable injuries like chronic coughing, respiratory disease, and nervous system damage to these Plaintiffs.

(136)

**COUNT XV.**

**VIOLATION OF THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT OF 1980: FAILURE TO REPORT RELEASE DISCOVERY– (40 C.F.R. § 300.405)**

**(Defendants: EGLE, Aaron Keatley, City of Kalamazoo, James Baker; GPI, GPH, Tom Olstad)**

Plaintiffs reallege paragraphs 1-136.

(137)

The Defendants violated 40 C.F.R. § 300.405 when they circumvented and avoided reporting severe hazardous chemical spills of thousands of gallons of wastewater treatment sludge and other unknown, unreported chemicals into the Kalamazoo River superfund site without notifying the national resource center or other authorities pursuant to federal regulations.

(138)

"(a) A release may be discovered through:(1) A report submitted in accordance with section 103(a) of CERCLA, *i.e.* , reportable quantities codified at 40 CFR part 302; (2) A report submitted to EPA in accordance with section 103(c) of CERCLA;(3) Investigation by government authorities conducted in accordance with section 104(e) of CERCLA or other statutory authority ;(4) Notification of a release by a federal or state permit holder

when required by its permit; (5) Inventory or survey efforts or random or incidental observation reported by government agencies or the public ;(6) Submission of a citizen petition to EPA or the appropriate federal facility requesting a preliminary assessment, in accordance with section 105(d) of CERCLA; (7) A report submitted in accordance with section 311(b)(5) of the CWA; and (8) Other sources. (b) Any person in charge of a vessel or a facility shall report releases as described in paragraph (a)(1) of this section to the National Response Center (NRC). If direct reporting to the NRC is not practicable, reports may be made to the United States Coast Guard (USCG) on-scene coordinator (OSC) for the geographic area where the release occurs. The EPA predesignated OSC may also be contacted through the regional 24-hour emergency response telephone number. All such reports shall be promptly relayed to the NRC. If it is not possible to notify the NRC or predesignated OSC immediately, reports may be made immediately to the nearest USCG unit. In any event, such person in charge of the vessel or facility shall notify the NRC as soon as possible.(c) All other reports of releases described under paragraph (a) of this section, except releases reported under paragraphs (a)(2) and (6) of this section, shall, as appropriate, be made to the NRC." 40 C.F.R. § 300.405.

(139)

The Defendants violated the CERCLA when they failed to report thousands of gallons of hazardous chemical spills into the Kalamazoo superfund site, leading to irreparable injuries like COPD and nervous system damage to these Plaintiffs.

(140)

## COUNT XVI.

## VIOLATION OF THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT OF 1980: CONTINUOUS RELEASES – (40 C.F.R. § 302.8)

### (Defendants: EGLE, Aaron Keatley; City of Kalamazoo, James Baker; GPI, Tom Olstad)

Plaintiff's reallege paragraphs 1-140.

(141)

The Defendants violated 40 C.F.R. § 302.8 of the CERCLA when they failed to provide notice of their continuous, abnormal, excessive releases of hazardous chemical pollutants in the Kalamazoo Superfund site to the proper authorities.

(142)

(a) Except as provided in paragraph (c) of this section, no notification is required for any release of a hazardous substance that is, pursuant to the definitions in paragraph (b) of this section, continuous and stable in quantity and rate. (b) *Definitions.* The following definitions apply to notification of continuous releases: *Continuous.* A continuous release is a release that occurs without interruption or abatement or that is routine, anticipated, and intermittent and incidental to normal operations or treatment processes. *Normal range.* The normal range of a release is all releases (in pounds or kilograms) of a hazardous substance reported or occurring over any 24-hour period under normal operating conditions during the preceding year. Only releases that are both continuous and stable in quantity and rate may be included in the normal range. *Routine.* A routine release is a release that occurs during normal operating procedures or processes. *Stable in quantity and rate.* A release that is stable in quantity and rate is a release that is predictable and regular in amount and rate of emission. *Statistically significant increase.* A statistically significant increase in a release is an increase in the quantity of the hazardous substance released above the upper bound of the reported normal range of the release. 40 C.F.R. § 302.8.

(143)

Because the Defendants were causing and acutely aware of continuous abnormal, unstable releases of hydrogen sulfide and excessive particulate matter, they were

required to report their releases to federal authorities under the CERCLA.  The defendants failure to comply with the CERCLA caused irreparable injuries to the respiratory systems of these Plaintiffs, manifesting as COPD, asthma, and nervous system deterioration.

(144)

## COUNT XVII.

## VIOLATION OF THE TOXIC SUBSTANCES CONTROL ACT: RECORDS RETENTION – (15 U.S.C. § 2614)

## (Defendants: City of Kalamazoo, James Baker; GPI, Tom Olstad)

Plaintiff's reallege paragraphs 1-144.

(145)

The Defendants violated the Toxic Substance Control Act when they disposed of or otherwise failed to retain hazardous pollutant material use records for regulatory State inspections.

(146)

"It shall be unlawful for any person to-...(3) fail or refuse to (A) establish or maintain records, (B) submit reports, notices, or other information, or (C) permit

access to or copying of records, as required by this chapter or a rule thereunder" 15
U.S.C. § 2614.

(147)

The Defendants violated the Toxic Substances Control Act when they failed to retain
hazardous chemical use records and failed to report or provide notice of several
chemical waste spills into the Kalamazoo Superfund site. The Defendants violations
constitute and evidence a custom of habitual recklessness that contributed to the
irreparable injuries of these Plaintiffs.

(148)

<strong>COUNT XVIII.</strong>

<strong>VIOLATION OF THE NATIONAL RESOURCES AND ENVIRONMENTAL
PROTECTION ACT: VOC MATERIAL USE – (Mich. Admin. Code R.
336.1610)</strong>

<strong>(Defendants: GPI, Tom Olstad)</strong>

Plaintiff's reallege paragraphs 1-148

(149)

The Defendant violated the State of Michigan's NREPA when they caused excessive amounts of VOC to be used and emitted beyond the statutory and permitted limits.

(150)

(2) A person shall not cause or allow the emission of volatile organic compounds from the coating of any of the following, from an existing coating line, in excess of the applicable emission rates shown in column A of table 63 or the equivalent emission rates in column B of table 63. (7) The provisions of this rule, with the exception of the provisions in subrule (4) of this rule, do not apply to coating lines that are within a stationary source and that have a combined actual emission rate of volatile organic compounds of less than 100 pounds per day or 2,000 pounds per month as of the effective date of this amendatory rule. If the combined actual emission rate equals or is more than 100 pounds per day for a subsequent day or 2,000 pounds per month for a subsequent month, then this rule shall permanently apply to the coating lines. Mich. Admin. Code R. 336.1610.  For GPI's coating of paper, they are allowed "2.9 pounds of volatile organic compounds emitted per gallon of coating, minus water applied."  Mich. Admin. Code R. 336.1610.

(151)

The Defendant violated the NREPA Paper Coating, VOC Material Use statute when they emitted in excess of six thousand pounds of VOCs per month and two hundred

pounds per day for consecutive years within a designated Superfund site.  For consecutive years, the Defendant dispersed eight to ten pounds of VOCs per hour into the Northeast Kalamazoo community. The Defendant's violations caused irreparable injuries like nervous system dysfunction, asthma, COPD, and wrongful deaths.

(152)

## COUNT XIX.

## VIOLATION OF THE NATIONAL RESOURCES AND ENVIRONMENTAL PROTECTION ACT:  INJURIOUS EFFECTS TO HUMAN HEALTH –

## (Mich. Admin. Code R. 336.1901(a))

**(Defendants: City of Kalamazoo, James Baker; GPI, Tom Olstad)**

Plaintiffs reallege paragraphs 1-152.

(153)

The Defendants violated Rule 901(a) of the NREPA when they emitted dangerous amounts of hydrogen sulfide, particulate matter, and VOCs into the Kalamazoo Superfund site and Northeast Kalamazoo community, causing severe asthma, skin rashes, COPD, nervous system deterioration, cancers, and other ailments.

(154)

"Rule 901. Notwithstanding the provisions of any other rule, a person shall not cause or permit the emission of an air contaminant or water vapor in quantities that cause, alone or in reaction with other air contaminants, either of the following: (a) Injurious effects to human health or safety, animal life, plant life of significant economic value, or property." Mich. Admin. Code R. 336.1901.

(155)

The Defendants violated Michigan's Rule 901, also in violation of the CAA, when they caused egregious amounts of hydrogen sulfide to be emitted at levels as high as 765 ppb and regularly above the minimum risk level, causing various injuries, including severe eye irritations, asthma, COPD, nervous system deterioration, and wrongful death.  The Defendants further violated Rule 901 when they caused several thousands of gallons of boiler water condensate, wastewater, and other unknown, unreported chemicals into the Kalamazoo community and Superfund site.  The Defendants consistent, regular, and habitual Rule 901 violations amount to the chemical torture of this Plaintiff class.  The Plaintiffs violations caused the Plaintiffs to endure constant eye irritations, itchy skin, asthma, chronic coughing, nervous system dysfunction, and other irreparable injuries.

(156)

## COUNT XX.

## VIOLATION OF THE NATIONAL RESOURCES AND ENVIRONMENTAL PROTECTION ACT: EMISSION STANDARDS FOR PUBLICLY OWNED TREATMENT WORKS – (Mich. Admin. Code R. 336.1945)

## (Defendants: City of Kalamazoo, David Anderson, James Baker)

Plaintiffs reallege paragraphs 1-156.

(157)

The Defendant violated Rule 945 of the NREPA when they failed to maintain and manage the Kalamazoo Wastewater Reclamation Plant, as a publicly owned treatment works facility, in a manner consistent with safety and good air pollution practices.

(158)

"The owner or operator of a facility subject to the provisions of "National Emission Standards for Hazardous Air Pollutants: Publicly Owned Treatment Works," 40 C.F.R. Part 63, Subpart VVV, shall comply with those provisions." Mich. Admin. Code R. 336.1945. "At all times, the POTW must operate and maintain any affected source, including associated air pollution control equipment and monitoring

equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions." 40 C.F.R. § 63.1583.

(159)

The Defendant violated Rule 945 of the NERPA when they failed to remediate their contributions to excessive emissions of hydrogen sulfide from its juncture chamber and other locations on site into the Northeast Kalamazoo community.   The Defendant further violated the NERPA when they caused wastewater spills into the Kalamazoo river superfund site, causing irreparable injuries to these Plaintiffs, such as COPD, skin rashes, chronic nasal discharge, and other ailments.

(160)

## COUNT XXI.

## VIOLATION OF THE NATIONAL RESOURCES AND ENVIRONMENTAL PROTECTION ACT: DILUTION AND CONCEALMENT OF EMISSIONS –

### (Mich. Admin. Code R. 336.1906)

### (Defendants: GPH, GPI, Tom Olstad)

Plaintiffs reallege paragraphs 1-160.

(161)

The Defendants violated Rule 906 of the NREPA when they built and or installed an industrial machine(s) or other contrivance to conceal or dilute their excessive emissions of VOCs, Particulate Matter, Hydrogen Sulfide, and other hazardous pollutants without actually reducing their emission rates.

(162)

"Unless prior written approval is obtained from the department, a person shall not build, erect, install, or use any article, machine, equipment, or other contrivance if the sole purpose of the article, machine, equipment, or other contrivance is to dilute or conceal an emission without resulting in a reduction in the total release of air contaminants into the atmosphere. This rule does not apply to the control of odors." Mich. Admin. Code R. 336.1906.

(163)

The Defendants violated Rule 906 of the NREPA when they installed an industrial machine for the purposes of concealing or diluting their emissions and removing the machine before inspectors to analyze and verify its use for concealment. The Defendants violations caused irreparable injuries to these Plaintiffs, manifested in COPD, asthma, severe eye irritations, and other injuries.

(164)

## COUNT XXII.

## VIOLATION OF THE NATIONAL RESOURCES AND ENVIRONMENTAL PROTECTION ACT: CONCENTRATION OF POLLUTANTS – (Mich. Admin. Code R. 336.2804)

### (Defendants: City of Kalamazoo, James Baker, GPI, Tom Olstad)

Plaintiffs reallege paragraphs 1-164.

(165)

The Defendants violated Michigan's Rule 1804 of the NREPA when they caused excessive levels of VOCs, hydrogen sulfide, and particulate matter to be emitted beyond the regulation ceilings.

(166)

"The concentration of a pollutant shall not exceed either of the following:(a) The concentration permitted under the national secondary ambient air quality standard.(b) The concentration permitted under the national primary ambient air quality standard, whichever concentration is lowest for the pollutant for a period of exposure." Mich. Admin. Code R. 336.2804.

(167)

The Defendants violated Michigan's Rule 1804 of the NREPA pursuant to the CAA when they caused excessive tons of particulate matter, hydrogen sulfide, formaldehyde, and other VOCs beyond the ambient air quality standards, and took actions to conceal those facts from the public, despite the imminent threats to health they present.

(168)

## COUNT XXIII.

## VIOLATION OF THE NATIONAL RESOURCES AND ENVIRONMENTAL PROTECTION ACT: COLLECTED AIR CONTAMINANTS – (Mich. Admin. Code R. 336.1370)

## (Defendants: City of Kalamazoo, James Baker, GPI, Tom Olstad)

Plaintiffs reallege paragraphs 1-168.

(169)

The Plaintiffs violated Rule 336.1370 of the NREPA when they failed to collect air contaminants in the manner prescribed, or so as to minimize the the exposure of collected contaminants to the outer air by causing spills of contaminants and emitting several hazardous chemicals beyond their ambient air ceilings.

(170)

"Collected air contaminants shall be removed as necessary to maintain the equipment at the required operating efficiency. The collection and disposal of air contaminants shall be performed in a manner so as to minimize the introduction of contaminants to the outer air." Mich. Admin. Code R. 336.1370 .

(171)

The Defendants failed to collect their air contaminants and maintain equipment at the required operating efficiency, evidenced by several undocumented contaminant spills and constant ambient air emission ceiling exceedances.

(172)

**COUNT XXIV.**

**VIOLATION OF THE NATIONAL RESOURCES AND ENVIRONMENTAL PROTECTION ACT: EMISSION OF PARTICULATE MATTER – (Mich. Admin. Code R. 336.1331)**

**(Defendants: GPH, GPI, Tom Olstad)**

Plaintiffs reallege paragraphs 1-172.

(173)

The Defendants violated Rule 331 of the NREPA when they caused excessive tons of particulate matter to be emitted into the Northeast Kalamazoo community and Kalamazoo River Superfund site.

(174)

"(1) It is unlawful for a person to cause or allow the emission of particulate matter from any process or process equipment in excess of any of the following limits: (a) The maximum allowable emission rate listed in table 31. (b) The maximum allowable emission rate listed by the department on its own initiative or by application. A new listed value shall be based upon the control results achievable with the application of the best technically feasible, practical equipment available. This applies only to processes and process equipment not assigned a specific emission limit in table 31.(c) The maximum allowable emission rate specified as a condition of a permit to install or a permit to operate. Mich. Admin. Code R. 336.1331.

(175)

The Defendants violated Rule 331 of the NREPA under the CAA when they emitted thousands of pounds of particulate matter in excess of their maximum allowable emission rate specified in their permit to install, by causing approximately nineteen

thousand pounds of excess particulate matter to be dispersed over the Northeast Kalamazoo Community and Kalamazoo River Superfund site.

(176)

## COUNT XXV.

## GROSS NEGLIGENCE– ("VIOLATIONS" Standard: Mich. Comp. Laws § 324.5531)

## (Defendants: City of Kalamazoo, David Anderson, James Baker; GPI, Tom Olstad, Paul McCann)

Plaintiffs reallege paragraphs 1-176.

(177)

The Defendants acted out gross negligence when they violated several rules under the NREPA.

(178)

"Gross negligence" is conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." McLain v. Lansing Fire Dep't, 309 Mich. App. 335, 869 N.W.2d 645 (2015).  "Under Michigan law, "gross negligence" is an almost willful disregard of precautions or measures to attend to safety and a singular

disregard for substantial risks." Mich. Comp. Laws Ann. § 691.1407. 194 F.Supp.3d 658.

(179)

The Defendants acted out reckless conduct demonstrating their indifference to whether injuries resulted when they caused and failed to report several chemical spills, installed and removed equipment in violation of their permit conditions, emitted dangerous levels of hydrogen sulfide for several years, continuing to disperse VOCs and particulate matter across Northeast Kalamazoo and the Kalamazoo superfund site, and failing to remediate all of those egregious actions for several years despite the complaints and allegations of the Plaintiffs.   The Defendants' varying reckless and habitual environmental protection rule violations caused irreparable injuries like nervous system deterioration and dysfunction, severe eye irritation, skin rashes, COPD, asthma, chronic nasal discharge, asthma attacks, and wrongful deaths.

(180)

## COUNT XXVI.

## VIOLATIONS OF BODILY INTEGRITY – (U.S. CONST. AMEND. XIV; 42 § U.S.C. SEC.1983)

**(Defendants: State of Michigan, City of Kalamazoo, James Baker, David**

**Anderson, GPI, Tom Olstad)**

Plaintiffs reallege paragraphs 1-180.

(181)

The Defendants violated the Plaintiff Class' right to equal protection under the Fourteenth Amendment of the U.S. Constitution, the CAA, and NREPA when they caused hazardous pollutants to come in contact with and enter their bodies, causing irreparable injuries the Plaintiffs health.

(182)

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. Const. amend. XIV, § 1-Privileges. "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1-Due Proc.  "The Fourteenth Amendment's Due Process Clause significantly restricts government action; its core is preventing the government from abusing its power, or employing it as an instrument of oppression." Guertin v. State, 912 F.3d 907 (6th Cir. 2019), cert. denied sub nom. City of Flint, Michigan v. Guertin, 140 S. Ct. 933, 205 L. Ed. 2d 522 (2020), and cert. denied sub nom. Busch v. Guertin, 140 S. Ct. 933, 205 L. Ed.

2d 522 (2020).   "The substantive due process aspect of the Fourteenth Amendment protects against conscience-shocking deprivations of liberty." In re Flint Water Cases, 960 F.3d 303 (6th Cir. 2020).   "The sanctity, and individual privacy, of the human body is obviously fundamental to liberty. "Every violation of a person's bodily integrity is an invasion of his or her liberty." " *Cruzan ex rel. Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 342 (1990).   "Violating a person's bodily integrity is a grave deprivation of their liberty, against which deprivation substantive due process provides protection." In re Flint Water Cases, 960 F.3d 303 (6th Cir. 2020).

(183)

"By its own terminology, § 1983 grants a cause of action to the party injured and, accordingly, a § 1983 action for deprivation of civil rights is an action personal to the injured party." 42 U.S.C.A. § 1983. Blair v. Harris, 993 F. Supp. 2d 721 (E.D. Mich. 2014).   "The state-created danger doctrine allows plaintiffs to bring due process claims under § 1983 for harms caused by private actors—an anomaly because neither the Fourteenth Amendment nor § 1983 regulates private actors." *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.* , 542 F.3d 529, 534 (6th Cir. 2008) ; *Barber v. Overton* , 496 F.3d 449, 458 (6th Cir. 2007). *Estate of Romain v. City of Grosse Pointe Farms*, 935 F.3d 485, 491 (6th Cir. 2019).

(184)

The State of Michigan's EGLE department violated the Plaintiffs right to equal protection to be free from intrusions of bodily integrity when they created a state of emergency by failing to regulate the City of Kalamazoo and GPI under the NREPA's Rule 901(a), access and collect fines against them under the CAA, and collaborated in concealing the dangers of their excessive emissions by delaying the publication of their unnecessary "health consultation study", while knowing that the ambient air quality was substantially deteriorated and causing irreparable injuries to citizens. The Defendants City of Kalamazoo and GPI violated the Plaintiffs rights to freedom of bodily integrity when they emitted particulate matter, VOCs, hydrogen sulfide, and industrial wastewater chemicals to be spilled into the Northeast Kalamazoo community and Kalamazoo River Superfund site, causing asthma, chronic coughing, COPD, severe eye irritation, chronic skin rashes, damaged neurological systems, wrongful deaths, and other irreparable injuries.

(185)

## COUNT XXVII.

## CONSPIRACY TO VIOLATE CIVIL RIGHTS – (U.S. CONST. AMEND. V; U.S. CONST. AMEND. XIV; 42 § U.S.C. SEC.1983)

**(Defendants: ALL)**

Plaintiffs reallege paragraphs 1-185.

(186)

The Defendants perpetrated a civil conspiracy to violate the civil rights of these Plaintiffs to due process and equal protection under the laws of this nation when they took concerted efforts to avoid their non-discretionary duties by continuously emitting dangerous levels of hazardous pollutants into the Northeast Kalamazoo community, deteriorating the ambient air quality, and acting to keep the dangerous deterioration of Kalamazoo's ambient air quality a concealed secret.

(187)

A civil conspiracy under Section 1983 is "an agreement between two or more persons to injure another by unlawful action." *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)). The plaintiff must show the existence of a single plan, that the alleged coconspirator shared in the general conspiratorial objective to deprive the plaintiff of a federal right, and that an overt action committed in furtherance of the conspiracy caused an injury to the plaintiff. *Maxwell v. Bailey*, 1:23-cv-439, at *18 (W.D. Mich. May 23, 2023).

(188)

The Defants possessed a single plan to conceal the cause and deterioration of Northeast Kalamazoo's ambient air quality and enlarge GPI's paper production, evidenced by their by their closed-door meetings, employing relatives with Kalamazoo Valley ties to facilitate the expansion, installing and removing industrial machinery without permissions, failing to maintain VOC material use records, shutting off hydrogen sulfide sensors, sending cease and desists letters to journalists reporting on Kalamazoo's ambient air, sending government agents to support GPI's expanding while being aware of their habitual spills and hazardous emissions, and refusing to announce the results the MDHHS health study confirming bodily injuries for close to two years after it was completed.  The Defendants GPI, Tom Olstad, and others purposely and intentionally released egregiously high levels of hydrogen sulfide, particulate matter, and other chemicals late at night and in the very early mornings so as to conceal their reckless and dangerous activities from the public. Governor Whitmer acted to conceal the presence of hazardous chemical exceedances by directing the EGLE and MDHHS to work together in delaying the publishing of the Health Consultation Study.  To that end, she appointed the Keatley's couple, a spouse from each department, to micromanage the delay of public notice.  The State of Michigan, under Governor Whitmer's administration, also attempted to bribe a

Plaintiff into abandoning her civil rights complaints and attempted to placate her with several positions in state initiatives.

(189)

## COUNT XXVIII.

## VIOLATIONS OF DUE PROCESS AND EQUAL PROTECTION – DISPARATE IMPACT (U.S. CONST. AMEND. V; U.S. CONST. AMEND. XIV; 42 § U.S.C. SEC.1983)

### (Defendants: EPA, EGLE, City of Kalamazoo)

Plaintiffs reallege paragraphs 1-189.

(190)

The Defendants caused disparate impacts against these Plaintiffs in violation of their Fifth and Fourteenth Amendment constitutional rights, as well as in violation of 42 U.S.C.2000d, when their discriminatory regulation enforcement caused a fourteen year life expectancy gap between the predominantly minority, industrial zoned communities and the predominantly Caucasian, residentially zoned neighborhoods in Kalamazoo.

(191)

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d

(192)

"Proof of these gross disparities was in itself sufficient to make out a prima facie case of discrimination. See *Teamsters* v. *United States*, 431 U.S. 324, 339; *Castaneda* v. *Partida*, 430 U.S. 482, 494-498." *Hazelwood School District v. United States*, 433 U.S. 299, 316 (1977).  "In cases where intentional discrimination has been shown, there can be no question as to what the recipient's obligation under the program was and no question that the recipient was aware of that obligation. In such situations, it may be that the victim of the intentional discrimination should be entitled to a compensatory award, as well as to prospective relief in the event the State continues with the program." *Guardians Assn. v. Civil Service Comm'n, N.Y. C*, 463 U.S. 582, 597 (1983). The prima facie case of disparate impact established by a showing of a significant statistical disparity is notably different. *Watson v. Fort Worth Bank Tr.*, 487 U.S. 977, 1004 (1988).

(193)

The Defendants caused disparate impacts injuring these Plaintiffs when their custom of hazardous chemical spills, exceedances, abnormal dispersions, and failure to enforce Michigan's Rule 901(a) caused a fourteen year life expectancy gap between along racial lines in Kalamazoo. Furthermore, the Defendants showed intentional discrimination when they took concerted efforts to conceal the hazardous nature of Northeast Kalamazoo's ambient air quality by purposely mischaracterizing the analysis results of the 2021 EPA GMAP study to hide the presence of excessively dangerous amounts of VOCs in the predominantly Black areas of Kalamazoo, failed to report several hazardous waste and chemical spills into the Kalamazoo Superfund site adjacent to the minority community, and intentionally delaying the unnecessary and pretextual MDHHS Health Consultation Study to continue the Plaintiffs ignorance of the true causes and nature of their injuries.

(194)

## COUNT XXVIII.

## VIOLATIONS OF THE CIVIL RIGHTS ACT OF 1964 – DISPARATE IMPACT (29 C.F.R. 42.104; 45 C.F.R. § 80.3)

## (Defendants: USA, State of Michigan, Aaron Keatley City of Kalamazoo, David Anderson)

Plaintiffs reallege paragraphs 1-194.

(195)

The Defendants violated the Civil Rights Act of 1964 when they effectuated disparate impacts in Kalamazoo County's ambient air quality, causing the predominantly minority communities to endure the physical effects of particulate matter exceedances, VOC exceedances, and several chemical spills into the Northeast Kalamazoo community, manifesting in a fourteen year life expectancy gap between Black American Kalamazooans and Caucasian Kalamazooans.

(196)

"A recipient to which this subpart applies may not, directly or through contractual or other arrangements, on the ground of race, color, or national origin: (ii) Provide any disposition, service, financial aid, or benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program; (iii) Subject an individual to segregation or separate treatment in any matter related to his receipt of any disposition, service, financial aid, or benefit under the program;(iv) Restrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any disposition, service, financial aid, or benefit under the program;(v) Treat an individual differently from others in determining whether he satisfies any admission, enrollment, quota, eligibility, membership, or other

requirement or condition which individuals must meet in order to be provided any disposition, service, financial aid, function or benefit provided under the program. 28 C.F.R. § 42.104 (b).

(197)

(1) A recipient under any program to which this part applies may not, directly or through contractual or other arrangements, on ground of race, color, or national origin: (i) Deny an individual any service, financial aid, or other benefit provided under the program; (ii) Provide any service, financial aid, or other benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program; (iii) Subject an individual to segregation or separate treatment in any matter related to his receipt of any service, financial aid, or other benefit under the program; (iv) Restrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid, or other benefit under the program; (v) Treat an individual differently from others in determining whether he satisfies any admission, enrollment, quota, eligibility, membership or other requirement or condition which individuals must meet in order to be provided any service, financial aid, or other benefit provided under the program. 45 C.F.R. § 80.3(b).

(198)

## COUNT XXIX.

## VIOLATIONS OF EQUAL PROTECTION – DELIBERATE INDIFFERENCE

## (U.S. CONST. AMEND. V; U.S. CONST. AMEND. XIV)

**(Defendants: USA, Marta Fuoco, State of Michigan, Sean McCann, Aaron Keately, Andrea Keatley, City of Kalamazoo, Mayor David Anderson, Jack Urban, James Baker, GPI, Tom Olstad, Paul McCann, Bobby J. Hopewell)**

Plaintiffs reallege paragraphs 1-198.

(199)

The Defendants showed deliberate indifference to the definite and verified injuries of these Plaintiffs when they colluded and collaborated to keep Northeast Kalamazoo's deteriorating ambient air quality and environmental racism issues a secret.  The Defendants further showed deliberate indifference when they took concerted efforts to expand GPI's N.Pitcher plant while being privy to their excessive, continuous dispersions of dangerous levels of hydrogen sulfide, particulate matter, several unreported spills, and regulatory circumvention efforts.

(200)

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of

life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. " nor be deprived of life, liberty, or property, without due process of law;" U.S. Const. amend. V.

(201)

"An equal protection violation is established by a demonstration of discriminatory intent and discriminatory effect. " *Phifer v. City of Grand Rapids*, 657 F. Supp. 2d 867, 874 (W.D. Mich. 2009). "The standard for government officials' deliberate indifference to an individual's substantive due process rights is subjective recklessness, and the plaintiff must show that the government officials knew of facts from which they could infer a substantial risk of serious harm, that they did infer it, and that they acted with indifference toward the individual's rights." In re Flint Water Cases, 960 F.3d 303 (6th Cir. 2020).

(202)

"Deliberate indifference" describes a state of mind more blameworthy than negligence; it requires the showing of a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Napier*, 238 F.3d at 742. To establish that defendants acted with deliberate indifference, plaintiff must show that they both knew of and disregarded an excessive risk of harm; that they were aware of facts

from which the inference could be drawn that a substantial risk of serious harm existed, and that they actually draw the inference, but consciously disregarded it. *Farmer*, 511 U.S. at 837-39. *Soles v. Ingham County*, 316 F. Supp. 2d 536, 542 (W.D. Mich. 2004).

(203)

## COUNT XXX.

## ASSAULT

## (Common Law)

## (Defendants: City of Kalamazoo, James Baker; GPI, Tom Olstad)

Plaintiffs reallege paragraphs 1-203.

(204)

The Plaintiffs committed assault when they caused the Plaintiffs to become apprehensive and anticipate coming in contact with hazardous and dangerous chemical pollutants known to cause irreparable harm to health.

(205)

"Absent lawful authority, invasion of one's body is an indignity, an assault, and a trespass prohibited at common law." <u>Guertin v. State</u>, 912 F.3d 907 (6th Cir. 2019), <u>cert. denied sub nom.</u> <u>City of Flint, Michigan v. Guertin</u>, 140 S. Ct. 933, 205 L. Ed. 2d 522 (2020), and <u>cert. denied sub nom.</u> <u>Busch v. Guertin</u>, 140 S. Ct. 933, 205 L. Ed. 2d 522 (2020).  "Under Michigan law, an "assault" is defined as an attempt to commit a battery or an unlawful act which places another person in reasonable apprehension of receiving an immediate battery." <u>Moher v. United States</u>, 875 F. Supp. 2d 739 (W.D. Mich. 2012).  To recover civil damages for assault under Michigan law, a plaintiff must show an intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact. <u>Moher v. United States</u>, 875 F. Supp. 2d 739 (W.D. Mich. 2012).

(206)

The Defendants committed assault when they caused the deterioration of Northeast Kalamazoo's air quality to worsen to an extent to that caused MDHHS to direct residents to stay inside if they are suffering from respiratory problems and emitted dangerous amounts of hydrogen sulfide, VOCs, and particulate matter, visibly coating the community with dangerous chemical dust, putting them in apprehension

of offensive and harmful contacts that would cause bodily injury and irreparable health ailments.

(207)

**COUNT XXXI.**

**BATTERY**

**(Common Law)**

**(Defendants: City of Kalamazoo, James Baker; GPI, Tom Olstad)**

Plaintiffs reallege paragraphs 1-207.

(208)

The Defendants committed consistent and habitual batteries against these Plaintiffs when they caused hazardous chemical pollutants to enter their bodies and cause them irreparable  injuries.

(209)

Under Michigan law, a "battery" is an intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person; it is not necessary that the touching cause an injury. Lakin v. Rund, 318 Mich. App. 127, 896 N.W.2d 76 (2016).

(210)

The Defendants committed batteries when they caused several dangerous and hazardous chemicals to enter the respiratory tracts of these defendants everyday for several years, at levels egregiously beyond the minimum risk levels for the known chemicals emitted.   The Defendants also committed batteries when they caused unknown combinations and concoctions of chemicals and particulate matter to bond and enter the bodies of these Plaintiffs, causing various irreparable injuries and wrongful deaths.

(211)

## COUNT XXXII.

## NUISANCE

## (Common Law)

## (Defendants: State of Michigan; City of Kalamazoo, James Baker, David Anderson; GPI, Tom Olstad)

Plaintiffs reallege paragraphs 1-211.

(212)

The Defendants caused a public and private nuisance when they allowed their deliberate       indifference,       concealment,       circumvention,       and       otherwise

unconstitutionally discriminatory misconduct to create an ambient air and volatile compound exposure crisis in Northeast Kalamazoo, MI, a predominantly minority and lower class community.

(213)

"Nuisance" is an interference with the plaintiff's use and enjoyment of his land. Morse v. Colitti, 317 Mich. App. 526, 896 N.W.2d 15 (2016).  Under Michigan law, a private nuisance is an unreasonable interference with the use or enjoyment of property that results in significant harm. Davis v. Echo Valley Condo. Ass'n, 945 F.3d 483 (6th Cir. 2019), cert. denied, 141 S. Ct. 162, 207 L. Ed. 2d 1099 (2020).  A "public nuisance" involves the unreasonable interference with a right common to all members of the general public. Sholberg v. Truman, 496 Mich. 1, 852 N.W.2d 89 (2014).  No better definition of a "public nuisance" has been suggested than that of an act or omission which obstructs or causes inconvenience or damage to the public in the exercise of rights common to all Her Majesty's subjects. Sholberg v. Truman, 496 Mich. 1, 852 N.W.2d 89 (2014).  A defendant held liable for a public nuisance must have possession or control of the land. Sholberg v. Truman, 496 Mich. 1, 852 N.W.2d 89 (2014).  Private "Nuisance is an interference with his use and enjoyment of it." Terlecki v. Stewart, 278 Mich. App. 644, 754 N.W.2d 899 (2008).

(214)

The Defendants committed public and private nuisance when their reckless actions, circumventions, and discriminatory, disparate enforcement of the State of Michigan's implementation plan under the CAA and federal regulations caused these Plaintiffs to fear going outside and inviting friends and family into their community due to the dangerous and hazardous nature of their ambient air quality.

(215)

### COUNT XXXIII.

### WRONGFUL DEATHS

### (Common Law)

### (Defendants: City of Kalamazoo, James Baker ; GPI, Tom Olstad)

Plaintiffs reallege paragraphs 1-215.

(216)

The Defendants, for numerous years, have contributed to and or directly caused deaths of would be Plaintiff Class members by wantonly and willfully causing excessive amounts of hazardous chemicals to be emitted into Northeast Kalamazoo and inhaled and ingested by the deceased persons and embryos.

(217)

"Whenever the death of a person, injuries resulting in death, or death as described in section 2922a1 shall be caused by wrongful act, neglect, or fault of another, and the act, neglect, or fault is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages, the person who or the corporation that would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured or death as described in section 2922a, and although the death was caused under circumstances that constitute a felony." Mich. Comp. Laws Ann. § 600.2922 (West). "A person who commits a wrongful or negligent act against a pregnant individual is liable for damages if the act results in a miscarriage or stillbirth by that individual, or physical injury to or the death of the embryo or fetus." Mich. Comp. Laws Ann. § 600.2922a (West). "Nature and purpose of wrongful-death action does not change because it is the death of an embryo or fetus giving rise to the wrongful-death action." Simpson v. Alex Pickens, Jr., & Assocs., MD, PC, 311 Mich. App. 127, 874 N.W.2d 359 (2015).

(218)

"Obvious purpose of the wrongful-death statute is to provide an action for wrongful death whenever, if death had not ensued, there would have been an action for damages." Simpson v. Alex Pickens, Jr., & Assocs., MD, PC, 311 Mich. App. 127, 874 N.W.2d 359 (2015). "Wrongful-death action brought on behalf of the deceased is the same legal action—with all of its statutory and common-law limitations—that

the deceased could have brought if the injuries the deceased sustained because of the wrongful act, neglect, or fault of another had not caused death."  Simpson v. Alex Pickens, Jr., & Assocs., MD, PC, 311 Mich. App. 127, 874 N.W.2d 359 (2015). Three requirements for a wrongful-death action are (1) a death; (2) that the death be caused by wrongful act, neglect, or fault of another; and (3) that the wrongful act, neglect, or fault of another be such that, if death had not ensued, a cause of action could have been filed against the responsible party and damages recovered from them.  Simpson v. Alex Pickens, Jr., & Assocs., MD, PC, 311 Mich. App. 127, 874 N.W.2d 359 (2015).

(219)

In the weeks or days before the death of Laprace Stegall in 2017, the Defendants caused excessive amounts of chemicals to be dispersed into the Northeast Kalamazoo community, including a hazardous pollutant with a strong, pungent peppermint smell, which contributed to the death of Laprace Stegall from a chemically induced and or triggered asthma attack at seventeen years old.  Through their willful neglect of non-discretionary duties and habitual regulation violations equating to a custom of reckless management, concealing the excessive emission of harmful contaminants for several years, and purposefully causing the Plaintiff Class to inhale destructive chemical pollutants, they wrongfully caused and or contributed to the deaths of hundreds of would be class Plaintiffs.  The Plaintiffs Class, through

counsel, endeavors to exhaust all expendable resources and efforts to find and notify the proper estate representatives of deceased Class Plaintiffs.

(220)

## COUNT XXXIII.

### Intentional Infliction of Emotional Distress

### (Common Law)

### (Defendants: USA, Marta Fuoco State of Michigan, Aaron Keately; City of Kalamazoo, James Baker ; GPI, Tom Olstad)

Plaintiffs reallege paragraphs 1-220.

(221)

The Defendants intentionally inflicted emotional distress upon the Plaintiffs when they caused the ambient air quality of Kalamazoo to deteriorate to a hazardous state, while adamantly denying their awareness of causes and working to conceal the true nature of Kalamazoo's ambient air quality and Superfund status by preventing journalists from raising awareness about the dangerous conditions and sufferings of their fellow Americans in this jurisdiction.

(222)

The elements of intentional infliction of emotional distress are: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. <u>Doe v. Roman Cath. Archbishop of Archdiocese of Detroit</u>, 264 Mich. App. 632, 692 N.W.2d 398 (2004).   The test for whether conduct is sufficiently extreme and outrageous to support a claim for intentional infliction of emotional distress is whether the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!". <u>Swain v. Morse</u>, 332 Mich. App. 510, 957 N.W.2d 396 (2020), <u>appeal denied,</u> 957 N.W.2d 338 (Mich. 2021).   Under Michigan law, "hedonic damages" refers to damages for the loss of the enjoyment of life as affected by physical pain and suffering, physical disability, impairment, and inconvenience affecting an individual's normal pursuits and pleasures of life. M.C.L.A. § 600.2922(6). <u>Blair v. Harris</u>, 993 F. Supp. 2d 721 (E.D. Mich. 2014).   It is for the trial court to initially determine whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery in a suit alleging intentional infliction of emotional distress. <u>Swain v. Morse</u>, 332 Mich. App. 510, 957 N.W.2d 396 (2020), <u>appeal denied,</u> 957 N.W.2d 338 (Mich. 2021).

(223)

The Defendants intentionally inflicted emotional distress upon these Plaintiffs when they denied emitting thousands of pounds of VOCs and particulate matter in excess

of their permitted limits, spilled thousands of gallons of chemical wastewater into the Kalamazoo river and Northeast community, concealed it, and denied their actions relation to the Plaintiffs' injuries, in an attempt to abandon their natural instincts and inclinations that their injuries were being caused by the visible particulate matter coatings and foul chemical odor smells emanating from the N.Pitcher GPI plant and the Kalamazoo Wastewater Reclamation plant.

(224)

## COUNT XXXIV.

## VIOLATIONS OF THE CLEAN AIR ACT: STANDARD TO PROTECT HEALTH AND ENVIRONMENT-PROHIBITION – (42 U.S.C. § 7412(f)(4); 42 U.S.C. § 7412(b)

**(Defendants: EPA Region 5 Dir. Debra Shore, Governor Whitmer, EGLE Dir. Aaron Keately, GPI, GPH)**

The Plaintiffs reallege paragraphs 1-224.

(225)

The Defendants violated the Prohibition provision of the Standard to Protect Health and Environment of the CAA when they caused and allowed the excessive emissions of several prohibited hazardous pollutants like toluene, chloromethane, and particulate matter.   The Defendants also caused and failed to report several

hazardous pollutants to spills into the Kalamazoo that flows through the Plaintiff class community.

(226)

"No air pollutant to which a standard under this subsection applies may be emitted from any stationary source in violation of such standard" 42 U.S.C. § 7412 (f)(4). The term "air pollutant" means any air pollution agent or combination of such agents, including any physical, chemical, biological, radioactive (including source material, special nuclear material, and byproduct material) substance or matter which is emitted into or otherwise enters the ambient air. Such term includes any precursors to the formation of any air pollutant, to the extent the Administrator has identified such precursor or precursors for the particular purpose for which the term "air pollutant" is used. 42 U.S.C. § 7602. *Methyl ethyl ketone (2-Butanone), Toluene, 2,2,4-Trimethylpentane, Methyl chloride,* and other air pollutant chemicals were confirmed to be exceeding minimum risk levels in various Northeast Kalamazoo locations  June of 2021. 42 U.S.C. § 7412(b).

(227)

The Defendants violated the Prohibition provision of the Standard to Protect Health and Environment of the CAA when they caused and allowed the excessive emissions of several prohibited hazardous pollutants like toluene, chloromethane, and particulate matter.   The Defendants also caused and failed to report several

hazardous pollutants to spills into the Kalamazoo that flows through the Plaintiff class community. The Defendants excessive emissions and reckless pollutant spills have caused *Methyl ethyl ketone (2-Butanone), Toluene, 2,2,4-Trimethylpentane, Methyl chloride,* and other chemicals to cause injuries like chronic seizures, COPD, asthma, nervous system dysfunction, and several other irreparable injuries. 42 U.S.C. § 7412(b)

(228)

## POLICY: FEDERAL HUMAN RIGHTS OBLIGATIONS AND RATIFIED-COVENANT COMPLIANCE

(229)

For the second time in less than five years, Black American protected class communities in the Western District of Michigan have been exposed to long-term, egregious hazardous chemical exposures in contravention of several layers of federal and state regulation.  The effectuation of civil rights acts, regulations, and statutory protections have eroded into clear and definitive human rights violations of entire communities.   The historical, traditional customary racial animus of Caucasian Americans working within the Federal and State governments is undoubtedly nullifying and prevailing over the equal enforcement of the laws of this nation, creating genocidal living conditions for these Plaintiffs and others across the country.

Human Rights are inalienable; they cannot be given nor taken away by a State government, rather it be regional or federal in nature. The Constitution of the United States grants to all persons within its jurisdiction the undeniable right to universally agreed upon human rights standards within its borders. The Government's avoidance and evading of non-discretionary duties amounts to failed governance and violations of international human rights covenants, i.e., the "Supreme Law of the Land". U.S. Const. art. VI, cl. 2. Federal District Courts bear the burden of holding this Nation-State accountable, legally liable, and bringing the Government, as a Defendant, back into the realm of constitutional and human rights compliance whenever it acts out. State and federal agents have abandoned their non-discretionary duties to the people in order to serve the pecuniary interest of corporations, leaving the citizenry of North Kalamazoo to suffer under constant hazardous chemical exposures that have caused stark and paralyzing life-expectancy discrepancies.

(230)

"In the present Convention, genocide means any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such: (b) Causing serious bodily or mental harm to members of the group; (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part; (d) Imposing measures intended to prevent

births within the group; Article III The following acts shall be punishable: (e) Complicity in genocide. Article IV: Persons committing genocide or any of the other acts enumerated in article III shall be punished, whether they are constitutionally responsible rulers, public officials or private individuals. Article V The Contracting Parties undertake to enact, in accordance with their respective Constitutions, the necessary legislation to give effect to the provisions of the present Convention, and, in particular, to provide effective penalties for persons guilty of genocide or any of the other acts enumerated in article III. Article VIII: Any Contracting Party may call upon the competent organs of the United Nations to take such action under the Charter of the United Nations as they consider appropriate for the prevention and suppression of acts of genocide or any of the other acts enumerated in article III.

*Convention on the Prevention and Punishment of the Crime of Genocide, Art.2(b)(c)(d), Art.3(e), Art.4, Art.5, Art.8, Dec.9, 1948, Ratified November 5, 1988,* (Nations, United Nations Office on Genocide Prevention and the Responsibility to Protect 2021).

(231)

"In compliance with the fundamental obligations laid down in article 2 of this Convention, States Parties undertake to prohibit and to eliminate racial discrimination in all its forms and to guarantee the right of everyone, without distinction as to race, colour, or national or ethnic origin, to equality before the law, notably in the enjoyment of the following rights: (e) Economic, social and cultural

157

rights, in particular: (iv) The right to public health, medical care, social security and social services; (v) The right to education and training; (vi) The right to equal participation in cultural activities; (f) The right of access to any place or service intended for use by the general public, such as transport hotels, restaurants, cafes, theatres and parks.  Article 6: States Parties shall assure to everyone within their jurisdiction effective protection and remedies, through the competent national tribunals and other State institutions, against any acts of racial discrimination which violate his human rights and fundamental freedoms contrary to this Convention, as well as the right to seek from such tribunals just and adequate reparation or satisfaction for any damage suffered as a result of such discrimination.  *International Convention on the Elimination of All Forms of Racial Discrimination art.5(e)(iv)(v), 6, 7, Dec.21, 1965, Ratified October 8, 1994* (OHCHR | International Convention on the Elimination of All Forms of Racial Discrimination 2021).

(232)

In the facts before this Court, government agents and officials are alleged to have colluded with private entities to preclude the effectuation of several laws designed to protect these Plaintiffs.  Despite Court's obligations under the Constitution and each individual judge's oath to enforce and uphold it, minority Plaintiffs across this nation regularly have their pursuits of justice scuttled via legally fictitious interpretations of immunity, bloated factual requirements, and other technicalities diverting adjudication on the merits.  In the administration of justice, Black American and

minority Plaintiffs are not afforded proper processes, but those tailored to divert justice. "The usual rule is that where legal rights have been invaded and a cause of action is available, a federal court may use any available remedy to afford full relief. *Bell* v. *Hood*, 327 U.S. 678, 684 (1946). The general rule nevertheless yields where necessary to carry out the intent of Congress or to avoid frustrating the purposes of the statute involved." *Guardians Assn. v. Civil Service Comm'n, N.Y. C*, 463 U.S. 582, 595 (1983). Pursuant to the Supremacy Clause of the U.S. Constitution and the well-established standards of federal district courts, these Plaintiffs seek effective protection and remedies against acts of racial discrimination and disparate impacts which violate their human rights and fundamental freedoms.

(233)

## PLAINTIFF CLASS' REQUEST FOR REMEDIES & RELIEF

Mercifully, in the pursuit of Justice and pursuant to the aforementioned body of laws, the Plaintiffs request the following relief from this Court:

1. An Order declaring the conduct of Defendants unconstitutional.

2. An Order awarding exemplary and hedonic damages of $100,000,000.00;

3. An Order awarding compensatory, economic, and non-economic damages $500,000,000.00;

4. An Order awarding actual and reasonable attorney fees and litigation expenses of $800,000;

5. An Order granting injunctive relief, mandating the closure of GPI's 1500 N. Pitcher St. Plant and or requiring production decreases to levels guaranteed to ensure the public's health.

6. An Order for all such other relief as the court deems equitable and reasonable.

Respectfully submitted,

**THE J.R. BEASON FIRM PLLC.**
By: \S\ John R. Beason III, Esq.
Attorney for the Plaintiffs
Attorney John R. Beason III
D.C. Bar No. 1721583
IBA No.: 1522438
(269) 213-1426
JRBeason3@TheJRBeasonFirm.com
www.JRBeasonLaw.com

June, 7th, 2023.

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TYLER DANCER, ET AL.

      Plaintiff,

                               Case No.:

                               Honorable Chief Judge Jonker
                               Honorable Magistrate:

         v.

UNITED STATES OF AMERICA,
 ET AL.

      Defendants.

_____/

## DEMAND FOR JURY TRIAL

    Plaintiffs respectfully demand a trial by jury as to all issues triable as a matter of right.

                               Respectfully submitted,

                               **THE J.R. BEASON FIRM PLLC.**
                               \S\ John R. Beason III, Esq._____
                                 John R. Beason III,
                                 Attorney for the Plaintiffs
                                 D.C. Bar No.: 1721583
                                 IBA Bar No.: 1522438
                                 853 McAlister St.
                                 Benton Harbor, MI 49022

June 7th, 2023.                       JRBeason3@TheJRBeasonFirm.com