UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TYLER DANCER, et al.,

      Plaintiffs,

                                   Case No. 1:23-cv-580

v.

                                   Hon. Hala Y. Jarbou

UNITED STATES OF AMERICA, et al.,

      Defendants.

_____/

## OPINION

This is a civil rights action by residents of Kalamazoo, Michigan, against a variety of state, federal, and private defendants. Before the Court are motions to dismiss by different sets of defendants (ECF Nos. 50, 71, 74, 76, 83), as well as Plaintiffs' motion for reconsideration of an order granting a motion to strike (ECF No. 103).

## I. BACKGROUND

### A. Parties

Plaintiffs consist of approximately 46 individuals suing on their own behalf or on behalf of minors or deceased individuals. Plaintiffs allege that they are residents of the "Northside neighborhood" in the City of Kalamazoo. (Compl. 3, ECF No. 1.) They contend that they have suffered injury as a result of airborne pollution, chemical discharges, and odors originating from a nearby paper mill run by Graphic Packaging International and its parent, Graphic Packaging Holding Company (collectively, "GPI"), and from the Kalamazoo Wastewater Reclamation Plant ("KWRP"), a water-processing plant operated by the City of Kalamazoo that is adjacent to GPI's mill and that processes wastewater from GPI and other sources.

In Defendants' respective motions to dismiss, they have grouped themselves as follows: (1) "Federal Defendants": the United States of America, the Environmental Protection Agency ("EPA"),[1] Region 5 EPA Director Debra Shore, and EPA agents Marta Fuoco and Michael Compher; (2) "State Defendants": the State of Michigan, Governor Gretchen Whitmer, the Michigan Department of Environment, Great Lakes, and Energy ("EGLE"), EGLE Director Aaron Keatley, the Michigan Department of Health and Human Services ("MDHHS"), MDHHS Assessment Manager Andrea Keatley, and Michigan State Senator Sean McCann; (3) "City Defendants": the City of Kalamazoo, Mayor David Anderson, former City Commissioner Jack Urban, City Manager Jim Ritsema, and Kalamazoo Public Services Director James Baker; (4) "GPI Defendants": GPI, GPI facility manager Tom Olstad, and GPI executive Paul McCann; and (5) former Kalamazoo Mayor Bobby Hopewell.

## B. Allegations

### 1. GPI Emissions and Discharges (1999 - 2020)

Plaintiffs allege that GPI has been a "habitual hazardous polluter" impacting the Northside and Eastside neighborhoods of Kalamazoo for at least twenty years, causing a variety of illnesses to residents in these neighborhoods, including "kidney diseases, cancers, birth defects, [and] infant deaths[.]" (Compl. 14.)

From 1999 to 2004, GPI allegedly emitted many tons of nitrogen oxide, sulfur dioxide, particulate matter, and volatile organic compounds ("VOCs") from its mill on 1500 North Pitcher Street in the Northside neighborhood of Kalamazoo. (*Id.* at 15.)

In 2004, the City of Kalamazoo issued "air pollution control exemptions" to several facilities on Pitcher Street, including the facility run by GPI. (*Id.* at 18.)

---

[1] The EPA is not listed as a defendant in the caption of the complaint.  However, Plaintiffs list the EPA as a defendant to Count XXVIII.  (Compl. 136.)

On August 29, 2011, there was an incident at GPI's Northside facility.  A "vacuum break val[ve] closed," allowing the discharge of 19,000 gallons of "clarified wastewater" to be "spilled into the community."  (*Id.* at 20.)

Another spill occurred at GPI's facility on June 7, 2014.  (*Id.* at 26.)  A "broken reclaimed water line bubbled through the ground and reached [a] storm drain to the Kalamazoo River."  (*Id.* at 26.)  According to a report, GPI repaired the leak.  (*Id.*)

On April 15, 2015, EGLE granted GPI a "Renewable Operating Permit" that "increased the emissions for EUK1 and EUK3 Machines and allowed for a new material use that would emit acrylamide."  (*Id.*)  According to Plaintiffs, the new limits equate to 143.5 tons per year of VOC emissions.  (*Id.*)

On September 29, 2015, GPI discharged "untreated wastewater" to the storm sewer by GPI's facility, according to an EGLE "violation" issued seven years later.  (*Id.* at 27.)  Plaintiffs allege that there were other discharges by GPI that were not reported to the City, EGLE, or the EPA. (*Id.*)

In 2017, GPI emitted a total of 38 tons of VOCs, below the "unreasonably high and dangerous" emissions limit set by EGLE in 2015.  (*Id.* at 29.)  That same year, GPI also released 93 tons of carbon monoxide into the Northside neighborhood.  (*Id.*)

On October 5, 2018, GPI reported to EGLE that a plugged process line caused 500 gallons of "clarifier water" to overflow into the Kalamazoo River, resulting in "discoloration."  (*Id.* at 31.)

On May 4, 2019, GPI's facility spilled 500 to 1,000 gallons of wastewater containing "unreported chemicals" into a parking lot storm drain.  (*Id.* at 32.)

**2. GPI Expansion (2020) & Further Emissions and Discharges (2020 - 2023)**

In April 2019, Governor Whitmer appointed former Kalamazoo Mayor Hopewell to Michigan's Economic Development Fund.  (*Id.*)  Hopewell allegedly "facilitated tens of millions of dollars in tax exemptions for GPI[.]"  (*Id.* at 32.)

In September 2019, State Senator McCann allegedly sent "agents representing himself and his office" to a "MEDC Strategic Fund meeting" that was organized to support approval of an expansion of GPI's paper production at its Northside facility.  (*Id.* at 37-38.)

GPI began implementing its planned expansion in early 2020.  Around that time, its sensors detected hydrogen sulfide in excess of 19 parts per billion ("ppb").  (*Id.*)  Plaintiffs allege that the "minimum risk level for exposure becoming hazardous" is 1.4 ppb.  (*Id.*)  Shortly thereafter, the MDHHS agreed to conduct a "health consultation study" to confirm whether the hydrogen sulfide emissions were an "imminent and definitive danger to the community."  (*Id.* at 38-39.)

At a meeting of the City Commission on August 17, 2020, regarding GPI's expansion, Mr. Miller, an employee of GPI, stated that GPI reports its emissions annually to EGLE and the EPA. (*Id.* at 44.)  Despite awareness of GPI's "hazardous chemical exceedances" and "habitual chemical spills," City Commissioner Urban and Kalamazoo Public Services Director Baker allegedly did not inform the commission of the "true nature" of the city's air quality or the "presence of toxic chemicals on the Northside of town[.]"  (*Id.*)

In September 2020, unidentified Plaintiffs "continued to file complaints with EGLE's air quality division, repeatedly reached out to news agencies, and attempted to retain attorneys for their personal injury claims."  (*Id.* at 46.)

Plaintiff Crawford attended a Zoom meeting on November 15, 2020, between herself and "'environmental justice advocates' from Governor Whitmer's Administration"; she obtained the meeting by "threatening to file civil rights complaints" against EGLE and others regarding GPI's

4

"emissions exceedances and hazardous chemical exposures." (*Id.* at 47.)  At the meeting, one of the environmental justice advocates allegedly attempted to "bribe" her into abandoning her litigation by asking, "[W]hat will it take to keep you from filing the complaint?" (*Id.*)  She responded, "[Y]ou could give me five million dollars and I would still file the complaint." (*Id.*)  The advocate said they would not do that and abruptly ended the meeting.  Crawford alleges that she suffers from "heightened anxiety, stress, and mental anguish" due to this meeting. (*Id.* at 48.)

In November 2020, Dr. David Ansell, a specialist in community health equity at Rush University Medical Center in Chicago, spoke at a meeting of the City Commission about hydrogen sulfide's "deteriorating effects" on the Northside community's air quality and "the correlating respiratory disease statistics in Kalamazoo's 49007 ZIP code." (*Id.* at 48.)  Ansell allegedly confirmed that the ZIP code for Kalamazoo's Northside neighborhood "has the most asthma prevalence in the region" and the "highest hospitalization rates for asthma" in Kalamazoo. (*Id.* at 48-49.)  After the meeting, GPI issued a statement saying that its emissions were within the limits of its permit and that GPI did not believe such emissions posed a health threat. (*Id.* at 50.)  Plaintiffs allege that this statement was false because GPI "had been in excess of its [VOC] limits and proceeded to be in excess by thousands of pounds in 2021." (*Id.* at 50-51.)

On November 24, 2020, EGLE granted GPI a new "permit to install";[2] according to Plaintiffs, this permit "presumably added 29.3 tons per year to [GPI's] [VOC] emissions limit[.]" (*Id.*)  The new permit regulates particulate matter on one new machine, limiting it to "0.004 lb/MMbtu per hour[.]"[3] (*Id.*)  At the end of 2020, however, GPI was recorded as emitting

---

[2] Rule 201 of Michigan's air pollution control rules require an entity to obtain a "permit to install" for a new or modified source of air pollution, unless exempted.  Mich. Admin. Code R. 336.1201(1).

[3] Plaintiffs' discussion of the permit mentions both VOCs and particulate matter, appearing to conflate the two.  To be clear, VOCs are gases whereas particulate matter is not.  *See* EPA, *What are volatile organic compounds (VOCs)?*, https://www.epa.gov/indoor-air-quality-iaq/what-are-volatile-organic-compounds-vocs  (accessed Feb. 7, 2024) (describing VOCs as "gases . . . emitted from certain solids or liquids").

2.15 lb per hour of particulate matter into the Northside community, which is allegedly above the limit in the permit.  (*Id.* at 52.)

In 2020, Governor Whitmer's administration approved additional "tax abatements and incentives" for GPI.  (*Id.* at 56.)

On August 7, 2021, there was another spill at GPI's Northside facility, which involved the release of 500 gallons of wastewater due to a valve that was left open.    (*Id.*)

On May 25, 2022, an unattended valve at GPI's facility allowed the release of 24,000 gallons of boiler condensate mixed with city wastewater into a storm drain.  (*Id.* at 61.)  No action was taken, and no public notice was provided.  (*Id.*)

That same month, EGLE collected air samples above GPI's Northside facility and the KWRP.  Those samples revealed high levels of formaldehyde.  (*Id.*)  Baker, Kalamazoo's Public Services Director, told a newspaper that the measurements were "as high as 0.864 parts per million"; the same newspaper reported that minimum risk levels for formaldehyde inhalation range from 0.04 parts per million ("ppm") for "acute" exposure (i.e., exposure lasting 1 to 14 days) to 0.008 ppm for "chronic" exposure (exposure for 1 year or more).  (*Id.* at 62.)  Exposure to formaldehyde can cause nasal and eye irrigation, neurological effects, increased risk of asthma, increased risk of allergy, and changes in lung function.  (*Id.*)

On June 8, 2022, EGLE cited GPI's facility for "particulate mass and nitrogen oxide exceedances."  (*Id.* at 63.)  One of GPI's machines exceeded the limit of 2.8 MMBtu/hour.  (*Id.*)  GPI removed that machine.  EGLE spokesperson Jill Greenberg stated that, at the time of its inspection, GPI was compliant with their emissions limits for VOCs and hazardous air pollutants. (*Id.* at 64.)

On September 7, 2022, the EPA entered into a consent decree with a GPI facility located in Texas regarding airborne emissions.

On October 20, 2022, a spill at GPI's Kalamazoo facility caused up to 5,000 gallons of wastewater to drain into the storm water system and the Kalamazoo River. (*Id.* at 66.)

On February 1, 2023, EGLE and GPI entered into a consent order to resolve "numerous violations" at the Northside facility. (*Id.*) The order included a fine and a compliance plan. (*Id.*)

Plaintiffs allege that GPI's "PM10 exceedances" have "continuously increased" since 2021, with "irregular and unpredictable jolts and spikes at unreasonably high levels." (*Id.* at 51.) For instance, on May 26, 2023, GPI's hydrogen sulfide sensors reported levels over 80 ppb, 159 ppb, and 765 ppb.[4] (*Id.*) Plaintiffs complained about this to EGLE. EGLE's "agents reported only finding levels of 1 ppb, while Plaintiffs watched the sensors read over 15 ppb as they communicated." (*Id.*)

### 3. KWRP Discharges (2009, 2020)

In 2009, a "main juncture chamber" "shared" by GPI and the Kalamazoo Wastewater Reclamation Plant ("KWRP") burst, causing "pollutants and wastewater" to spill into the community. (*Id.* at 18.) The City of Kalamazoo owns the chamber, but the chamber is located on GPI property. (*Id.*)

In October 2020, a pipe leak occurred at the KWRP, causing an unknown quantity of unidentified "chemical discharges" into the Kalamazoo River. (*Id.* at 31.)

At some point in time, various hazardous substances were found in the soil at the KWRP site, including arsenic, cadmium, and chromium. (*Id.* at 39.) Also, trichloroethylene was detected in the groundwater. (*Id.*)

---

[4] It is not clear why Plaintiffs reference hydrogen sulfide levels as an example of a "PM10," i.e. particulate matter, exceedance. Hydrogen sulfide is a gas, whereas particulate matter is a "mixture of air-borne particles and liquid droplets." EPA, *What is PM?*, https://www3.epa.gov/region1/airquality/pm-what-is.html (accessed Feb. 7, 2024).

### 4. Odor Issues (2009 - 2023)

One particular problem allegedly experienced by Plaintiffs as a result of emissions from GPI and the KWRP is "debilitating odors of sewer sludge and rotting bodies emanating from GPI's Pitcher Street plant and the City's broken juncture chamber." (*Id.* at 20.) After the KWRP junction chamber burst in 2009, an inspection revealed that the chamber was leaking "dangerous amounts of hydrogen sulfide," which smells like "rotten egg" and chronic exposure to which can cause respiratory injuries and eye irritation. (*Id.* at 20, 25.) Air samples taken from the Northside neighborhood that year revealed odors reported as "sour, sewage, sludge, rotten greens/vegetable, rotten mercaptan." (*Id.* at 19.) Air samples taken from inside GPI's facility contained similar odors, with the strongest concentration detected near the leaking juncture chamber. (*Id.*)

The odors apparently continued for years. In 2018, the City of Kalamazoo created an "odor investigation" task force consisting of GPI employees, community committees, government agencies, and elected officials. (*Id.* at 30.) Later that year, however, the city allegedly sent cease-and-desist letters threatening litigation against media outlets who were seeking to notify the public about Kalamazoo's "ambient air quality emergency." (*Id.*)

On July 8, 2019, EGLE and GPI entered into an "enforcement order" that required GPI to install hydrogen sulfide sensors, which were ultimately "inadequate to protect the community." (*Id.* at 37.) In early 2020, the sensors detected levels in excess of 19 ppb, allegedly above the minimum risk level for exposure. (*Id.* at 28.)

In June 2020, a private engineering firm examining odor issues confirmed the presence of hydrogen sulfide near GPI's pretreatment clarifier "well above the odor threshold." (*Id.* at 39.) The report opined that "placing a cap on the clarifier that processes wastewater" from GPI's facility would "assist with solving the 'odor' issue." (*Id.* at 39.) However, no cap was installed. (*Id.*)

At a meeting of the City Commission in 2020, Kalamazoo Public Services Director Baker "confirmed" that KWRP and GPI were "two sources of odors," but he also suggested that "organic river activity" might be another source.  (*Id.* at 43.)  Baker asserted that the junction chamber incident from 2009 occurred before his time working for the KWRP.  (*Id.* at 45.)

In October 2020, the City of Kalamazoo completed an air quality study based on continuous monitoring of hydrogen sulfide concentrations.  The study "did not conclude that hydrogen sulfide was causing the odors or that chronic exposure at hazardous levels presented an imminent and irreparable health risk."  (*Id.* at 47.)

On March 5, 2021, Senator McCann's Chief of Staff, John Curran, attended a "closed-door" meeting with representatives from EGLE and GPI to discuss a "nuisance plan" submitted to EGLE in December 2020 regarding the odor problems in Kalamazoo.  (*Id.*)  There was a similar meeting on March 25, 2021, without the "agents" for Senator McCann in attendance.  (*Id.* at 57.) Plaintiffs contend that the constituent relations director for Senator McCann met with representatives of GPI and the City for yet another closed-door meeting about the odor issues on May 27, 2021.  At that meeting, Defendant Olstad allegedly told the group that GPI had found the "sweet spot" because there were new "odor management systems" up and running.  (*Id.* at 60.)

### 5. EPA Report

In late March 2021, the EPA completed a report (hereinafter, the "GMAP Report") signed by EPA agents Fuoco and Compher, purportedly asserting that VOCs in Kalamazoo "were not found to be in exceedance[] of risk levels."  (*Id.* at 57.)  Plaintiffs contend that this assertion was false or misleading.  (*Id.* at 73.)  Plaintiffs point to "lab analysis charts" attached to the report that purport to show risk level exceedances for 2,2,4-trimethylpentane, methyl chloride (a/k/a chloromethane), dichlorodifluoromethane (a/k/a freon), 2-butanone (a/k/a methyl ethyl ketone), and toluene at "various North Kalamazoo air sampling sites."  (*Id.* at 57-58.)

9

The GMAP Report, which is attached to Federal Defendants' motion to dismiss, blatantly contradicts Plaintiffs' allegations regarding its false or misleading nature.  (*See* GMAP Report, ECF No. 86-17.)  Although Plaintiffs did not attach the report to their complaint, the Court can consider the report when assessing whether Plaintiffs' complaint states a claim because the complaint mentions the report and the report is central to Plaintiffs' claims.  *See Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).  When considering this document against the allegations of the complaint, "the document trumps the allegations" where it "utterly discredit[s]" them.  *See In re Flint Water Cases (Waid v. Snyder)*, 960 F.3d 303, 329 (6th Cir. 2020).

For instance, Plaintiffs allege that "2,2,4-Trimethylpentane was detected at 1.90 ug/m3, greater than the listed risk level of 1.40 ug/m3."  (Compl. 57.)  However, the report indicates that 1.40 ug/m3 was the "reporting limit" for 2,2,4-trimethylpentane, not the risk level.  Plaintiffs apparently interpret the acronym "RL" in the charts reporting VOC levels to mean "risk level" (*see* GMAP Report, PageID.2609-2624), but the report repeatedly defines RL to mean "reporting limit."  (*See id.*, PageID.2583, 2608.)  There is a separate acronym for risk level, i.e., "MRL," which means "minimal risk levels."  (*Id.*, PageID.2584.)  The charts *do not* indicate that 1.90 ug/m3 of 2,2,4-trimethylpentane exceeded its MRL or risk level.  The risk level is not listed.  Thus, Plaintiffs are wrong to describe the chart as asserting that the detected concentration of 2,2,4-trimethylpentane exceeded its listed risk level.

Plaintiffs make the same mistake when alleging that chloromethane, freon, 2-butanone, and toluene were detected at concentrations above their listed risk levels.  (*See* Compl. 57-59.)  The charts relied upon by Plaintiffs identify concentrations of those chemicals that are above their reporting limits.  Those charts do not list risk levels.  Thus, the report itself utterly discredits the basis for Plaintiffs' assertion that Defendants made a false or misleading statement in the GMAP

Report when they purportedly contended that VOCs were not found to exceed their listed risk levels.

### 6. MDHHS Health Consultation Study

In May 2023, the MDHHS released a "Health Consultation Study" that allegedly confirmed the existence of "foul odors" and "chemical plumes" containing "hazardous chemicals" emanating from GPI's facility. (*Id.* at 69.) According to the Health Consultation, which is attached to State Defendants' motion to dismiss,[5] the MDHHS collected data from air monitoring and sampling in the Northside neighborhood of Kalamazoo from 2019 through 2022 to "evaluate people's exposure to chemicals in the community surrounding GPI and KWRP and any potential health risks from that exposure." (MDHHS Health Consultation, ECF No. 86-8, PageID.2358.) Residents of that neighborhood had voiced concerns for over a decade about "foul odors and adverse health effects" in their community. (*Id.*) GPI's paper processing plant and the KWRP had been identified as "potential sources of odors" because paper mills and water treatment plants can use or emit "odorous" chemicals, such as hydrogen sulfide and VOCs. (*Id.*) In fact, EGLE had "cited GPI several times for odor violations dating back to 2012." (*Id.*, PageID.2365.) EGLE had also cited GPI "for violations related to GPI's plant expansions and calcite ash fallout reaching nearby communities." (*Id.*)

The Health Consultation reached the following conclusions:

Measured ambient air concentrations of $H_2S$[6] in communities adjacent to GPI and KWRP present a public health hazard. People consistently breathing in maximum measured levels of $H_2S$ for a lifetime may be at increased risk of nasal irritation that does not go away once the person stops breathing in $H_2S$.

. . .

---

[5] The Court can consider the Health Consultation because it is referenced in the complaint and is central to Plaintiffs' claims.

[6] $H_2S$ is hydrogen sulfide. (MDHHS Health Consultation, PageID.2356.)

Measured ambient air concentrations of $H_2S$ and some VOCs in the communities adjacent to GPI and KWRP are at levels that people may detect as odors.

. . .

Based on available data, asthma prevalence and asthma-related hospitalization rates in the areas surrounding GPI and KWRP are not significantly higher than comparable measures for Michigan as a whole.

. . .

In communities adjacent to GPI and KWRP, measured ambient air concentrations of sulfur compounds other than $H_2S$ present no apparent public health hazard for either short-term or long-term exposure.

. . .

Measured ambient air concentrations of non-sulfur compounds, including VOCs, in communities adjacent to GPI and KWRP present no apparent public health hazard for either short-term or long-term exposure.

(MDHHS Health Consultation, PageID.2358-2360.)

The Health Consultation recommended further action to address the "ambient air concentrations" of hydrogen sulfide in the community near GPI and the KWRP, including determining the specific amounts attributable to GPI and the KWRP and reducing levels "below those that may present a public health hazard for the community." (*Id.*, PageID.2362.) It also recommended further monitoring and sampling for VOCs such as formaldehyde in the community near GPI and the KWRP. Formaldehyde was "detected on KWRP property," but it was not "sampled" in the surrounding community. (*Id.*, PageID.2361.) Finally, the Health Consultation recommended that community members with "existing respiratory problems" or "sensitivity to odors" stay indoors and avoid outdoor exercise or physical exertion "when an environmental odor is present." (*Id.*, PageID.2362.)

Plaintiffs allege that this study was "managed" by EGLE Director Aaron Keatley and his wife, MDHHS Assessment Manager Andrea Keatley. (Compl. 69.) The Keatleys, both Defendants, allegedly "instructed their agents to inform the public that the study was necessary

and delayed." (*Id.*)  And they purportedly delayed completion of the study in order to provide GPI "cover time to get its emissions levels under control." (*Id.*)

### 7. GPI announces closure of mills in Iowa and Indiana

In 2023, GPI announced that it would be closing paperboard mills in Tama, Iowa, and Auburn, Indiana.  Plaintiffs allege that these towns are "predominantly Caucasian communities," in contrast to Northeast Kalamazoo, which is a "predominantly low-income, minority" community.  (*Id.* at 70, 85.)

### 8. Plaintiffs' Injuries

#### (a) Collective Injuries

Plaintiffs claim they "have endured debilitating odors and constant coatings of crystalized calcite across the community." (*Id.* at 71.)  Plaintiffs also claim that GPI is responsible for "irregular, unstable, continuous releases of a chemical compound [that] caused the constant dousing of the Northside Kalamazoo Black Community with showers of Crystalized Calcite, Freon, Methyl Chloride, and Methyl Ethyl Ketone, equating to several tons of VOCs a year." (*Id.* at 41.)  Plaintiffs allege that chronic exposure to 2,2,4-trimethylpentane causes confusion, dizziness, headache, nausea, and vomiting.  Chronic exposure to chloromethane causes clumsiness, headache, dizziness, poor judgment, poor memory, and personality changes.  Chronic exposure to freon can cause eye irritation, eye pain, breathing issues, and sore throat.  And chronic exposure to toluene causes eye and nose irritation, tiredness, confusion, euphoria, dizziness, headache, dilated pupils, anxiety, muscle fatigue, nerve damage, skin inflammation, insomnia, and liver and kidney damage.  Plaintiffs allege that little is known about the effects of chronic inhalation of methyl ethyl ketone, but "acute" (i.e., short-term) inhalation results in irritation to the eyes, nose, and throat.  (*Id.* at 41.)  And Plaintiffs allege that calcite "can be dangerous to humans when crystalized into particles" and visible as dust.  (*Id.* at 29-30.)  Skin and eye contact with this

13

dust can cause severe irritation and inhalation of the dust can cause damage to the respiratory tract.

(*Id.* at 30.)

Plaintiffs allege that, collectively, they have suffered the following symptoms and conditions:

> severe eye irritations, wheezing, coughing spasms, shortness of breath, respiratory failures, asthma attacks, skin rashes, chronic headaches, [chronic obstructive pulmonary disease], kidney damage, nervous system adversity, seizures, cancers, loss of sleep, anxiety attacks, chronic nasal leaking, and several other injuries.

(*Id.* at 71.)

### (b) Plaintiff-Specific Injuries

Only a few of the Plaintiffs are mentioned by name in the body of the complaint. These Plaintiffs allege a few details about their own injuries.

*Michael Chandler.* Plaintiff Tyler Dancer brings suit on behalf of the estate of Michael Chandler. Chandler allegedly frequented a park and walking trail near the Kalamazoo River that were contaminated with "hazardous chemicals in the soil and air[.]" (*Id.* at 12.) In 2015, he "died of cancer while on a respiratory oxygen machine[.]" (*Id.*)

*Laprace Stegall.* In April 2017, Plaintiff Deann Winfield's son, Laprace Stegall, died of an asthma attack. (*Id.* at 27.) That same day, Winfield noticed that the air smelled of peppermint. (*Id.* at 28.) Isophorone, a chemical used by GPI, smells like peppermint. (*Id.*) Two days later, a Kalamazoo resident reported an "odor violation." (*Id.*) EGLE investigated and "did not find GPI to be out of compliance." (*Id.*) But two months later, EGLE found GPI to be in "Non-Compliance of Odor Complaint." (*Id.* at 29.) GPI later reported that odor violations under Michigan's Rule 901 had occurred on January 1, 2017, and March 16, 2017. (*Id.*) Plaintiff Winfield asserts claims on behalf of Stegall's estate. (*Id.* at 1.)

*Deann Winfield.*  Plaintiff Winfield made an "odor complaint" to EGLE sometime before May 2023.  (*Id.* at 70.)  She contends that she has "breathing issues" that "usually occur late at night[] and early in the mornings[.]"  (*Id.*)

*Brandi Crawford.*  On December 21, 2020, Dr. Daniel Tessier completed an "Air Quality Report" and "toxicological review" regarding Plaintiff Brandi Crawford and her family.  (*Id.* at 53.)  According to Tessier, Brandi Crawford reported that she and her family have experienced "a range of health issues, most of which are respiratory in nature."  (*Id.*)  She also reported "a decades-long history of respiratory issues and odor complaints by neighborhood residents."  (*Id.*)  After reviewing hydrogen sulfide emissions reported by the KWRP and GPI, Dr. Tessier concluded that "[t]he levels of hydrogen sulfide detected on Harrison [Street][7] could be considered a potential hazard to human health.  The levels detected within certain wastewater handling structures within the KWRP could also be considered a hazard to human health."  (*Id.* at 54-55.)  He also concluded that "for a range of air pollutant criteria and respiratory hazard, the area [in the fenceline community close to the KWRP and GPI] is among the worst in Michigan, the Upper Midwest, and the United States as a whole."  (*Id.* at 56.)  Crawford apparently sent this report to the EPA, EGLE, and city officials.  (*Id.* at 57.)

*Thomas Crawford.*  Plaintiff Thomas Crawford, the son of Brandi Crawford, alleges that he suffers from the "compounded symptoms of toxic lead,[8] hydrogen sulfide, and volatile organic compound exposure[.]"  (*Id.* at 40.)

---

[7] Harrison Street is where the KWRP is located.

[8] The lead-related symptoms referenced by Crawford stem from his exposure to lead paint in his home.  (Compl. 39.) That particular injury is not at issue in this case.

*Deandre Jordan.*  In January 2021, Plaintiff Deandre Jordan was found unresponsive after suffering an asthma attack in Kalamazoo's Northside neighborhood.  (*Id.* at 56.)  He remained in a coma for five months.

### C. Claims

Plaintiffs filed suit on June 7, 2023, asserting the following claims under federal and state law:

| Count | Claim | Defendants |
|-------|-------|------------|
| I | Title VI - Discrimination<br>42 U.S.C. § 2000d | USA, State of Michigan, City of Kalamazoo |
| II | First Amendment - Suppression of Religion<br>42 U.S.C. § 1983 | USA, State of Michigan, City of Kalamazoo |
| III | CAA[9] – Notice Requirements<br>42 U.S.C. § 7427 | USA, EGLE, EGLE Dir. Keatley, City of Kalamazoo, GPI |
| IV | CAA - Standards of Performance<br>42 U.S.C. § 7411 | City of Kalamazoo, GPI, Olstad |
| V | CAA - Modifications<br>42 U.S.C. § 7412(g) | EPA Region 5 Dir. Shore, Gov. Whitmer, EGLE, GPI, Olstad |
| VI | CAA - Record Retention<br>Mich. Admin. Code R. 336.1213(3)(b)(ii). | GPI, Olstad |
| VII | CAA - Stack Heights<br>42 U.S.C. § 7423 | GPI, Olstad |
| VIII | CAA - Failure to Assess and Collect Fines<br>42 U.S.C. § 7420 | USA, EPA Region 5 Dir. Shore, EGLE Dir. Keatley, City of Kalamazoo |
| IX | CAA - Circumvention and Failure to Retain Records<br>40 C.F.R. § 63.4 | GPI, Olstad |
| X | CAA - Failure to Enforce<br>42 U.S.C. § 7477 | USA, EPA Region 5 Dir. Shore, EGLE Dir. Keatley, City of Kalamazoo |
| XI | CAA - Inadequate Implementation Plan & Emissions Limitations<br>42 U.S.C. § 7471 | USA, EPA Region 5 Dir. Shore, State of Michigan, EGLE Dir. Keatley |
| XII | CAA - Failure to Repair Leaks and Retain Leak Repair Records<br>40 C.F.R. § 65.105 | City of Kalamazoo, Kalamazoo Pub. Servs. Dir. Baker, GPI, Olstad |
| XIII | CERCLA[10] - Right to Know<br>40 C.F.R. § 300.125 | USA, EPA Region 5 Dir. Shore, City of Kalamazoo, GPI |
| XIV | CERCLA - Hazardous Release of Wastewater Sludge<br>40 C.F.R. § 302.4 | City of Kalamazoo, Kalamazoo Pub. Servs. Dir. Baker, GPI, Olstad |

---

[9] "CAA" refers to the Clean Air Act, 42 U.S.C. § 7401, et seq.

[10] "CERCLA" refers to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601, et seq.

| Count | Claim | Defendants |
|---|---|---|
| XV | CERCLA - Failure to Report<br>40 C.F.R. § 300.405 | EGLE, EGLE Dir. Keatley, City of Kalamazoo, Kalamazoo Pub. Servs. Dir. Baker, GPI, Olstad |
| XVI | CERCLA - Continuous Releases<br>40 C.F.R. § 302.8 | EGLE, EGLE Dir. Keatley, City of Kalamazoo, Kalamazoo Pub. Servs. Dir. Baker, GPI, Olstad |
| XVII | TSCA[11] - Records Retention<br>15 U.S.C. § 2614 | City of Kalamazoo, Kalamazoo Pub. Servs. Dir. Baker, GPI, Olstad |
| XVIII | NREPA[12] - VOC Material Use<br>Mich. Admin. Code R. 336.1610 | GPI, Olstad |
| XIX | NREPA – Injurious Effects to Human Health<br>Mich. Admin. Code R. 336.1901(a) | City of Kalamazoo, Kalamazoo Pub. Servs. Dir. Baker, GPI, Olstad |
| XX | NREPA - Emissions Standards for Publicly Owned Treatment Works<br>Mich. Admin. Code R. 336.1945 | City of Kalamazoo, Mayor Anderson, Kalamazoo Pub. Servs. Dir. Baker |
| XXI | NREPA - Dilution and Concealment of Emissions<br>Mich. Admin Code R. 336.1906 | GPI, Olstad |
| XXII | NREPA - Concentration of Pollutants<br>Mich. Admin. Code R. 336.2804 | City of Kalamazoo, Kalamazoo Pub. Servs. Dir. Baker, GPI, Olstad |
| XXIII | NREPA - Failure to Collect Air Contaminants<br>Mich. Admin. Code R. 336.1370 | City of Kalamazoo, Kalamazoo Pub. Servs. Dir. Baker, GPI, Olstad |
| XXIV | NREPA - Emission of Particulate Matter<br>Mich. Admin. Code R. 336.1331 | GPI, Olstad |
| XXV | Gross Negligence<br>Mich. Comp. Laws § 324.5531 | City of Kalamazoo, Mayor Anderson, Kalamazoo Pub. Servs. Dir. Baker, GPI, Olstad, Senator McCann |
| XXVI | Equal Protection, Substantive Due Process<br>42 U.S.C. § 1983 | State of Michigan, City of Kalamazoo, Kalamazoo Pub. Servs. Dir. Baker, Mayor Anderson, GPI, Olstad |
| XXVII | Conspiracy to Violate Civil Rights<br>42 U.S.C. § 1983 | All Defendants |
| XXVIII | Equal Protection, Substantive Due Process, Discriminatory Enforcement<br>42 U.S.C. §§ 1983, 2000d | EPA, EGLE, City of Kalamazoo |
| XXVIIIb[13] | Title VI (regulations)<br>28 C.F.R. § 42.104, 45 C.F.R. § 80.3 | USA, State of Michigan, EGLE Dir. Keatley, City of Kalamazoo, Mayor Anderson |
| XXIX | Equal Protection, Substantive Due Process<br>42 U.S.C. § 1983 | USA, EPA Agent Fuoco, State of Michigan, EGLE Dir. Keatley, MDHHS Assessment Manager Keatley, Senator McCann, City of Kalamazoo, Mayor Anderson, Kalamazoo Pub. Servs. Dir. Baker, former City Commissioner Urban, former Mayor Hopewell, GPI, Olstad, Paul McCann |
| XXX | Assault | City of Kalamazoo, Kalamazoo Pub. Servs. Dir. Baker, GPI, Olstad |
| XXXI | Battery | City of Kalamazoo, Kalamazoo Pub. Servs. Dir. Baker, GPI, Olstad |

---

[11] "TSCA" refers to the Toxic Substances Control Act, 15 U.S.C. § 2601, et seq.

[12] "NREPA" refers to Michigan's National Resources and Environmental Protection Act, Mich. Comp. Laws § 324.101, et seq.

[13] Plaintiffs label two counts as Count XXVIII.  The Court will refer to the second one as Count XXVIIIb.

| Count | Claim | Defendants |
|---|---|---|
| XXXII | Nuisance | State of Michigan, City of Kalamazoo, Kalamazoo Pub. Servs. Dir. Baker, Mayor Anderson, GPI, Olstad |
| XXXIII | Wrongful Death<br>Mich. Comp. Laws § 600.2922 | City of Kalamazoo, Kalamazoo Pub. Servs. Dir. Baker, GPI, Olstad |
| XXXIIIb[14] | Intentional Infliction of Emotional Distress | USA, EPA, EPA Agent Fuoco, State of Michigan, EGLE Dir. Keatley, City of Kalamazoo, Kalamazoo Pub. Servs. Dir. Baker, GPI, Olstad |
| XXXIV | CAA - Violation of Standard to Protect Health and Environment<br>42 U.S.C. §§ 7412(b), 7412(f)(4) | EPA Region 5 Dir. Shore, Gov. Whitmer, EGLE Dir. Keatley, GPI |

As relief, Plaintiffs seek the following: (1) a declaration that Defendants' conduct is or was unconstitutional; (2) damages, attorneys' fees, and costs; (3) an injunction requiring the closure of GPI's Northside facility or requiring it to decrease production.  (Compl. 159-60.)

## II. RECONSIDERATION OF ORDER TO STRIKE

After Plaintiffs filed their complaint, GPI Defendants filed a motion to strike paragraphs 29, 32, 65, and 68 of the complaint.  Rule 12(f) permits the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  One purpose of such a motion "is to 'avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with' them early in the case."  *Operating Eng'rs Loc. 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015) (quoting *Kennedy v. City of Cleveland*, 797 F.2d 297, 305 (6th Cir. 1986)).  Also, pleadings are governed by Rule 11, under which the attorney represents that, "to the best of [his] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," (1) the pleading is "not being presented for any improper purpose, such as to harass," and (2) "factual contentions have evidentiary support or, *if specifically so identified*, will likely have evidentiary support after a

---

[14] Plaintiffs label two counts as Count XXXIII.  The Court will refer to the second one as Count XXXIIIb.

18

reasonable opportunity for further investigation or discovery[.]"  Fed. R. Civ. P. 11(b)(1), (3) (emphasis added).

Here, paragraph 29 alleged a "custom" by GPI of recklessly managing its Kalamazoo facility due to its proximity to the "predominantly Black American and low-income North and Eastside communities[.]"  (Compl. 32.)

Paragraph 32 contended that Paul McCann, who was allegedly a government relations executive for GPI, is the brother of State Senator Sean McCann, and that the two of them worked together to secure GPI's expansion while GPI was "in exceedance" of its VOC emissions limits. (*Id.* at 38.)  Similarly, paragraph 68 alleged that the "McCann brothers" were "compensated by [GPI] through back-channel, off-book methods" to promote GPI's expansion.  (*Id.* at 77.)  But both Paul McCann and Sean McCann submitted affidavits averring that they are not related, that Paul McCann was never a government relations executive for GPI, and that the two of them had little or no involvement in GPI's expansion.  (ECF Nos. 80-1, 80-2.)

Paragraph 65 alleged that GPI followed a "Coors ideology" of "racial animus and customary beliefs shared by the traditional legacy paper mill companies in Kalamazoo." (Compl. 74.)  To support this assertion, Plaintiffs alleged that "Coors family agent . . . Darden Coors was CC'd on the EPA Superfund suite communications with GPI related to its . . . paper mill in Kalamazoo."  (*Id.*)

The Court held a hearing on the motion to strike.  At the hearing, Plaintiffs' counsel could not provide any factual or evidentiary support for these assertions in the complaint.  Instead, he represented that his client told him that the McCanns were brothers and he thought that he had confirmed this information somehow.  He stated that he read an article about another GPI facility that closed and said his clients believed that GPI should have closed its facility in Kalamazoo.  He also asserted that his clients believed that the Coors family has an ownership interest in GPI and

also believed that this family is racist.  Apparently, he accepted these beliefs at face value, with little or no attempt to verify them.  The Court granted the motion.

In their motion for reconsideration, Plaintiffs attempt to provide additional support for making the assertions above.  Plaintiffs' counsel explains that he generally relied upon assertions made to him by his clients, which he could not independently verify but which he trusted based on his ability to corroborate other aspects of his clients' accounts.  Counsel acknowledges that his client's assertion that the McCanns were related was based on "third-party information."  (Mot. for Reconsid. 11, ECF No. 103.)  That client now retracts her allegation.  (*Id.*)

With regard to GPI's connection to the Coors family, counsel acknowledges that the sole basis for this assertion was "a letter in the public domain from the EPA to various corporate entities related to CERCLA Kalamazoo superfund clean-up disputes."  (*Id.* at 20.)  Darden Coors was "CC'd" on the letter.  (*Id.*)  The letter, which is attached to Plaintiffs' motion, is from 2003.  (ECF No. 103-2.)  It concerns a request for information by the EPA from "Graphic Packaging Corporation," the owner of a paper mill at 1500 N. Pitcher Street in Kalamazoo.  (*Id.*, PageID.3629.)  It does not indicate the relationship, if any, between Darden Coors and GPI.

Plaintiffs also provide a copy of a book published *in 1988* which asserts that *recipients* of philanthropy from the Coors family (i.e., the family associated with the Coors brewery and the Adolph Coors Company) have "views [that] reflect not only traditional conservatism, but also nativism, xenophobia, theories of racial superiority, sexism, homophobia, authoritarianism, militarism, reaction, and in some cases outright neo-fascism."  (ECF No. 103-4, PageID.3684.)  A few news articles make similar accusations about certain Coors family members, focusing on events occurring decades ago, in the 1970s and 1980s.  (ECF Nos. 103-5, 103-6, 103-7.)  None of the accusations in these publications has any plausible connection to the specific conduct at issue in Plaintiffs' complaint.

Other documents newly presented by Plaintiffs apparently show some ownership interest in GPI or presence on its board of directors by some Coors family members as recently as 2013.[15] (SEC Documents, ECF No. 103-3.)  But none of these documents supports Plaintiffs' spurious accusations of racism or racist practices by GPI.

Tellingly, counsel acknowledges that "he was fully aware that a genuine conspiracy against citizens' rights could foreseeably spawn some false accusations . . . which could not be fully vetted" and that "[i]t was foreseeable and reasonable that Plaintiffs in the alleged position would, in some respects, manufacture erroneous theories to make sense of their actual sufferings."  (Pls.' Mot. for Reconsid. 13.)  But Rule 11 requires counsel to do more than simply parrot his client's accusations and theories.  When filing the complaint, *counsel represented to the Court* that *he* had conducted his own reasonable inquiry to ensure that the factual allegations in the complaint had some evidentiary support and were not based on mere speculation, conjecture, or manufactured theories.  *See* Fed. R. Civ. P. 11(b)(3).  Apparently, he did not conduct this inquiry before filing the complaint.

To warrant reconsideration, Plaintiffs must "not only demonstrate a palpable defect by which the court and the parties have been misled, but also show that a different disposition of the case must result from a correction thereof."  W.D. Mich. LCivR 7.4(a).  Plaintiffs have not met their burden.  The Court is not persuaded that it should vacate its prior decision.  Plaintiffs' motion and new evidence reinforces the Court's original conclusion that Plaintiffs' counsel did not conduct sufficient inquiry to verify the facts alleged in the above paragraphs, and that those paragraphs contain matter that is impertinent and immaterial to this case.

---

[15] GPI was originally the packaging division of Adolph Coors Company. (SEC Documents, ECF No. 103-3, PageID.3669.)

Furthermore, the outcome of this case would be the same whether or not the stricken allegations are part of the complaint.  Even with those allegations, Plaintiffs' complaint is subject to dismissal for reasons discussed below.  Accordingly, the Court will deny Plaintiffs' motion for reconsideration.

In their response to the motion for reconsideration, GPI Defendants ask the Court to award them their costs and attorneys' fees for the motion to strike and the motion for reconsideration.  However, the Court cannot do so without providing notice to Plaintiffs.  Nevertheless, the Court agrees that the conduct by Plaintiffs' counsel appears to have fallen short of his obligations under Rule 11.  Accordingly, the Court will require Plaintiffs' counsel to show cause why the Court should not sanction him for his failure to comply with Rule 11(b)(3) before filing a complaint containing baseless allegations of a family relationship between Paul McCann and Senator Sean McCann and secret financial dealings by them, as well as frivolous accusations of racist beliefs held by GPI and its employees.  *See* Fed. R. Civ. P. 11(c)(3) (permitting the Court to issue an order to show cause).

### III. DISMISSAL STANDARD

Defendants have filed motions to dismiss the complaint for failure to state a claim and/or for lack of jurisdiction.   Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a plaintiff to make a "short and plain statement of the claim showing that the pleader is entitled to relief." The statement must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While "[t]he plausibility standard . . . is not akin to a probability requirement . . . it asks for more than a sheer possibility" that the alleged misconduct occurred.  *Id*.  "Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."

22

*Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

When considering a motion to dismiss under Rules 12(b)(1) or 12(b)(6), courts "construe the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true." *Parrino v. Price*, 869 F.3d 392, 397 (6th Cir. 2017). The Court need not accept "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678, or "formulaic recitations of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

Courts are generally bound to consider only the complaint when resolving a motion to dismiss unless the Court converts the motion to one for summary judgment. *Wysocki v. IBM Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt*, 835 F.3d at 640 (internal citations omitted).

## IV. DISMISSAL - STANDING

City Defendants and former Mayor Hopewell argue that Plaintiffs lack standing to pursue any claims against them. The Court will address this issue first because it goes to the Court's subject matter jurisdiction. As the Court explained in another case:

> Standing is a threshold jurisdictional inquiry in every federal case that may not be waived by the parties. *See, e.g., Warth v. Seldon*, 422 U.S. 490, 498 (1975). "To satisfy the 'case' or 'controversy requirement' of Article III, which is the 'irreducible constitutional minimum' of standing, a plaintiff must, generally speaking, demonstrate that he has suffered an 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (citations omitted). A plaintiff's injury in fact must be "concrete and particularized . . . not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339

23

(2016).  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"  *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992)).  Plaintiffs bear the burden of establishing standing to sue.  *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990).

*Grant v. U.S. Env't Prot. Agency*, No. 1:22-CV-0186, 2023 WL 5016608, at \*19 (W.D. Mich. June 1, 2023), *report and recommendation adopted sub nom. Grant v. United States*, No. 1:22-CV-186, 2023 WL 6304911 (W.D. Mich. Sept. 28, 2023).

In particular, City Defendants and Hopewell contend that Plaintiffs allege no particular injury that is fairly traceable to *them* as opposed to GPI.  City Defendants and Hopewell focus on the fact that only a handful of Plaintiffs are mentioned by name in the body of the complaint, and those few plaintiffs do not specifically assert that City Defendants or Hopewell were responsible for their injuries.

City Defendants and Hopewell read the complaint too strictly and narrowly.  "[A]t the pleading stage, a plaintiff need only demonstrate a plausible entitlement to standing."  *Hile v. Michigan*, 86 F.4th 269, 274 (6th Cir. 2023).  The Court "'construe[s] the plaintiff[s'] complaint liberally[.]'"  *Id.* (quoting *Logsdon v. Hains*, 492 F.3d 334, 340 (6th Cir. 2007)).  Here, Plaintiffs allege that they are residents of the Northside neighborhood of Kalamazoo and have been exposed to pollutants and odors emitted by *both* GPI and the KWRP, which is operated by the City of Kalamazoo.  As far as the KWRP is concerned, Plaintiffs allege a 2009 incident in which the KWRP's junction chamber burst, releasing wastewater and becoming a source of detectable odor.  (Compl. 19.)  Those odors continued for years.  Plaintiffs allege that residents of their neighborhood "endure random debilitating odors of sewer sludge emanating from GPI's Pitcher street plant *and the City's broken juncture chamber*."  (*Id.* at 20 (emphasis added).)  In 2020, Defendant Baker allegedly "confirmed" that the KWRP was one source of odor.  (*Id.* at 43.)  Similarly, the Health Consultation identified the KWRP as a possible source of odors, as well as

hydrogen sulfide and formaldehyde emissions. (*See* MDHHS Health Consultation, PageID.2358-2362.) Plaintiffs allege that exposure to hydrogen sulfide and formaldehyde can have ill effects, including nasal irritation and respiratory problems. And Plaintiffs allege that City Defendants have failed to adequately address these emissions and odors or have made misleading statements about their source. Plaintiffs also allege that Defendant Hopewell "instructed commissioners and community members to conceal the city's pollution issues in order to protect property values, the City's reputation, and the State's relationship with [GPI]." (Compl. 84.)

From these allegations, it is plausible to infer that all Plaintiffs have been exposed to uncomfortable odors, possibly due to hydrogen sulfide and formaldehyde emissions emanating from a facility managed by the City, aided by efforts from Hopewell, causing an injury that is fairly traceable to City Defendants and redressable by damages or injunctive relief. Accordingly, Plaintiffs have standing to bring their claims against City Defendants and Hopewell.[16] Whether or not Plaintiffs' allegations state a viable claim is a different matter.

## V. DISMISSAL – FAILURE TO STATE A CLAIM

### A. Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (Counts I, XXVIII, XXVIIIb) (Defendants USA, EPA, State of Michigan, EGLE, EGLE Director Keatley, City of Kalamazoo, Mayor Anderson)

Plaintiffs assert violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, which provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

---

[16] The Court will address claim-specific challenges to standing as they arise.

In Count I, Plaintiffs contend that Defendants United States of America, the State of Michigan, and the City of Kalamazoo intentionally discriminated against Black American residents of Kalamazoo by failing to adequately confirm the presence of, and notify the public about, excessive VOC emissions, hydrogen sulfide hazards, particulate matter exceedances, and chemical waste spills in their community.  (Compl. 85-86.)

In Count XXVIII, Plaintiffs contend that the EPA, EGLE, and the City of Kalamazoo engaged in "discriminatory regulatory enforcement," causing "disparate impacts" on the life expectancy of "predominantly minority, industrial zoned communities" versus "predominantly Caucasian, residentially zoned neighborhoods in Kalamazoo." (*Id.* at 136.)  In addition, these defendants allegedly discriminated against Plaintiffs by concealing the "hazardous nature of Northeast Kalamazoo's ambient air quality," "purposely mischaracterizing the analysis results of the 2021 EPA GMAP study to hide the presence of excessively dangerous amounts of VOCs in the predominantly Black areas of Kalamazoo," and failing to report "hazardous waste and chemical spills into the Kalamazoo Superfund site adjacent to the minority community[.]" (*Id.* at 138.)

In Count XXVIIIb, Plaintiffs rely on regulations implementing Title VI: 28 C.F.R. § 42.104 and 45 C.F.R. § 80.3.  Plaintiffs apparently contend that Defendants violated these regulations by "effectuat[ing] disparate impacts in Kalamazoo's ambient air quality, causing the predominantly minority communities to endure the physical effects of particulate matter exceedances, VOC exceedances, and several chemical spills into the Northeast Kalamazoo community[.]" (Compl. 139.)

### 1. United States

The United States argues that it is immune from these claims.  "In general, the United States is protected by sovereign immunity and on this basis cannot be sued without its consent."

*S. Rehab. Grp., PLLC v. Sec'y of Health & Hum. Servs.*, 732 F.3d 670, 676 (6th Cir. 2013).  "Only Congress can waive immunity, but 'waivers of federal sovereign immunity must be unequivocally expressed in the statutory text.'"  *Id.* (quoting *United States v. Idaho ex rel. Dir., Idaho Dep't of Water Res.*, 508 U.S. 1, 6 (1993)).  Because the federal government's sovereign immunity implicates the Court's subject matter jurisdiction, the burden is on Plaintiffs to establish a waiver of sovereign immunity.  *Gaetano v. United States*, 994 F.3d 501, 509 (6th Cir. 2021).

Plaintiffs do not identify a waiver of the federal government's sovereign immunity for a violation of Title VI and the Court is aware of none.  Plaintiffs' reliance on the Tucker Act, 28 U.S.C. § 1491(a)(1), is misplaced because the Court of Federal Claims has *exclusive* jurisdiction to adjudicate claims under the Tucker Act that seek more than $10,000.  *See id.*; *Brott v. United States*, 858 F.3d 425, 429 (6th Cir. 2017).  Plaintiffs seek more than $10,000.  This Court is not the Court of Federal Claims.  Thus, the Tucker Act does not give this Court jurisdiction over Plaintiffs' claims against the United States.

Plaintiffs also argue that immunity is a "legal fiction" and that several international conventions[17] and an executive order issued by President Biden[18] somehow waive the federal government's immunity.  (Pls.' Resp. to Fed. Defs.' Mot. to Dismiss 9-10, ECF No. 96.)  Neither of those arguments is persuasive.  Sovereign immunity is not a fiction, and Plaintiffs identify no authority supporting the notion that international conventions or an executive order waive the federal government's immunity.  Indeed, Plaintiffs point to nothing in those documents that unequivocally waives the federal government's immunity for any of the claims in the complaint.  Accordingly, the Court will dismiss the Title VI claims against the United States.

---

[17] Plaintiffs cite the International Convention on the Elimination of All Forms of Racial Discrimination, as well as the Convention on the Prevention and Punishment of the Crime of Genocide.

[18] Plaintiffs refer to Executive Order 14096, titled, "Revitalizing Our Nation's Commitment to Environmental Justice for All."

### 2. EPA

Like the United States, the EPA also possesses sovereign immunity because it is a federal agency.  *See FDIC v. Meyer*, 510 U.S. 471, 474 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government *and its agencies* from suit." (emphasis added)).  Nothing in Title VI waives the EPA's immunity from suit.  Indeed, Title VI does not apply to the federal government.  *See Halim v. Donovan*, 951 F. Supp. 2d 201, 207 (D.D.C. 2013) ("[A]s courts consistently hold, Title VI does not apply to programs conducted directly by federal agencies." (quotation marks omitted)).  Accordingly, the Court will dismiss the Title VI claims against the EPA.

### 3. State of Michigan

State Defendants argue that Plaintiffs do not state a Title VI claim against the State of Michigan because Plaintiffs do not identify a program or activity receiving federal assistance.  Nor do Plaintiffs plausibly allege that they were subjected to discrimination under, or denied the benefits of, such a program or activity due to their race.  Plaintiffs contend that Defendants discriminated when they "failed to act under a national contingency plan to remedy verified hydrogen sulfide and particulate matter hazards in Northeast Kalamazoo[.]" (Compl. 86.)  As support for this assertion, Plaintiffs allege that Defendants "protected Caucasian communities of White Pigeon, MI and Queens City, TX by shutting hazardous facilities and collecting penalties for VOC exceedances, but failing to take similar measures to protect these Plaintiffs."  (*Id.* at 87.)  However, Plaintiffs do not plausibly allege that the State of Michigan's enforcement decisions are programs or activities receiving federal assistance.

Moreover, Plaintiffs allege no facts that would plausibly suggest that the State of Michigan played any role in closing the Texas facility, or that its allegedly differential treatment of the White Pigeon facility was due to race.  Absent direct evidence of discrimination, which is not alleged

here, a Title VI claim generally requires allegations of "worse treatment than that of similarly situated [individuals] not in the protected class." *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 921 (6th Cir. 2007). "'Similarly situated' is a term of art—a comparator . . . must be similar in 'all relevant respects.'" *Paterek v. Vill. of Armada*, 801 F.3d 630, 650 (6th Cir. 2015) (quoting *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011)); *Johnson v. City of Clarksville*, 186 F. App'x 592, 595 (6th Cir. 2006). "Otherwise, a factor other than racial animus could explain the difference in treatment." *Stanford v. Northmont City Sch. Dist.*, No. 23-3203, 2023 WL 6389624, at *4 (6th Cir. Oct. 2, 2023).

According to Plaintiffs, the State of Michigan closed the White Pigeon facility because its groundwater was contaminated by PFAS.  (*Id.* at 33.)  Plaintiffs do not allege facts suggesting that GPI's Kalamazoo facility had the same issue or posed a similar risk of harm to nearby individuals. In other words, the White Pigeon facility and the Kalamazoo facility were not similarly situated. Thus, Plaintiffs fail to state a plausible Title VI claim against the State of Michigan.

### 4. EGLE & EGLE Director Keatley

Plaintiffs fail to state a Title VI claim against EGLE and EGLE Director Keatley for similar reasons.  Plaintiffs do not identify the program receiving federal assistance that forms the basis for their claim.  Moreover, Plaintiffs' assertion that EGLE intentionally concealed or mischaracterized the results of the 2021 EPA GMAP study, and did so for racially discriminatory reasons, is wholly conclusory.  Indeed, when Plaintiffs make allegations about preparation of the report, they allege involvement by federal officials only.  (*See* Compl. 57, 73.)  Plaintiffs allege no facts indicating concealment or mischaracterization of the report by EGLE or Keatley.  Thus, the Court will dismiss the Title VI claims against EGLE and Director Keatley.

### 5. City of Kalamazoo & Mayor Anderson

Plaintiffs assert that the City of Kalamazoo intentionally discriminated against them when it "threatened media outlets seeking to publicize the deteriorating ambient air in North Kalamazoo as environmental racism against Black American residents." (Compl. 86.) Threatening media outlets has no connection to a federal program or activity, and it does not count as discrimination against Plaintiffs.

Plaintiffs also allege that the city "has several nuisance laws pertaining to 'Factories,' but has not filed any complaints against GPI to protect the same Northside neighborhood." (Compl. 22.) The city's failure to enforce its nuisance laws against GPI does not in any way suggest racial discrimination against Plaintiffs, let alone discrimination in connection with a federal program or activity.

Plaintiffs contend that the city took efforts to "conceal the hazardous nature of Northeast Kalamazoo's ambient air quality" by mischaracterizing the results of the GMAP Report. (Compl. 138.) This assertion is conclusory. It is not supported by any facts suggesting involvement by the City of Kalamazoo or its employees in that report, and as discussed above, Plaintiffs' claim that Defendants mischaracterized the GMAP Report is discredited by the report itself.

Finally, in Count XXVIIIb, Plaintiffs rely on a theory of disparate impact; however, there is no private right of action to enforce Title VI's disparate-impact regulations. *Alexander v. Sandoval*, 532 U.S. 275, 293 (2001). Instead, Plaintiffs must rely on a theory of intentional discrimination, *id.* at 283, which they have not adequately alleged here. Thus, Plaintiffs do not state a Title VI claim against the City of Kalamazoo or Mayor Anderson.

In short, Plaintiffs do not state a viable claim under Title VI. Thus, the Court will dismiss Counts I and XXVIIIb for failure to state a claim, as well as the portion of Count XXVIII that relies on Title VI.[19]

### B. First Amendment Suppression of Religion, 42 U.S.C. § 1983 (Count II) (Defendants USA, State of Michigan, City of Kalamazoo)

Plaintiffs contend that Defendants' failure to address the air quality issues in Northeast Kalamazoo impaired Plaintiffs' ability to practice their religions—in violation of the First Amendment of the U.S. Constitution and the fourth amendment of the Michigan Constitution—by requiring them to abstain from going outside and from traveling to attend congregational worship.

#### 1. Standing

State Defendants argue that Plaintiffs lack standing to pursue this claim because they do not allege a concrete injury, i.e., facts about their own circumstances that would suggest their rights were impaired. Also, State Defendants contend that Plaintiffs do not allege an injury traceable to State Defendants because Plaintiffs' claim against them does not identify any individual defendants by name.

As discussed above, the Court construes the complaint liberally, drawing reasonable inferences in Plaintiffs' favor. Here, Plaintiffs allege that the air quality in their neighborhood hindered their ability to attend congregational worship services. They allege that they have refrained from attending such worship services because doing so requires them to travel outside and expose themselves to "excessive" amounts of air pollution and particulate matter. (Compl. 88.) Although Plaintiffs do not allege specifics about their religious beliefs, they apparently contend that congregational worship services are part of their religious practices. And they

---

[19] The other aspects of Count XXVIII assert violations of the right to equal protection and the right to substantive due process, which the Court will address below.

apparently contend that all of them are exposed to some form of odors or air pollution that impairs their ability to attend these services.  These allegations of injury are sufficiently concrete for purposes of standing.  And they are fairly traceable to the State of Michigan because Plaintiffs allege that state agencies and officials have not adequately enforced environmental rules or regulations.  Plaintiffs do not name individual officials in the claim itself because Plaintiffs apparently bring this claim against the State of Michigan only.  Thus, the Court rejects State Defendants' argument that Plaintiffs lack standing to assert this claim.

Federal Defendants allude to a standing issue by citing *Grant*, in which the Court held that the plaintiffs in that case lacked standing to pursue a similar First Amendment claim because they did not allege facts to show that the City of Flint's lead-tainted municipal water hindered any particular plaintiff's ability to practice their religion.  Specifically, the plaintiffs did not allege that "any of them were present at religious services in which lead-tainted water was allegedly used[.]" *Grant*, 2023 WL 5016608, at *19.  That case is distinguishable because not all religious practices or group services require the use of water.  By contrast, it is plausible to infer that attendance at a worship service would require travel and therefore exposure to air containing odors or pollution. Thus, it is plausible that all individuals like Plaintiffs, who regularly attend worship services, might have been hindered or prevented from doing so due to the air quality where they live.  Accordingly, the Court is not persuaded that Plaintiffs lack standing.

## 2. United States

The Eleventh Amendment makes the United States immune from Plaintiffs' claims under § 1983 and the Michigan Constitution.  Plaintiffs identify nothing that waives the federal government's immunity for such claims.  Furthermore, § 1983 applies to individuals "acting under color of *state* law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (emphasis added).  In other words, it applies to *state* officials "exercising . . . responsibilities pursuant to state law." *Id.* at 50.  It

generally does not apply to federal officials, let alone the federal government.  Federal officials typically act "under color of *federal* law[.]"  *Strickland ex rel. Strickland v. Shalala*, 123 F.3d 863, 866 (6th Cir. 1997).

Although the Supreme Court has implied a cause of action against federal *officials* for a violation of the Constitution, *see Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), the Supreme Court has not done the same for a cause of action against the federal government.  *See Meyer*, 510 U.S. at 486.  And Plaintiffs fail to identify a cause of action against the United States for a violation of the Michigan Constitution.  Accordingly, the Court will dismiss the United States from this claim.

### 3. State of Michigan

The State of Michigan is immune from suit in federal court for Count II.  The states and their "agencies or departments" are immune from suit in federal courts under the Eleventh Amendment unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1994).  Congress has not expressly abrogated Eleventh Amendment immunity through § 1983, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court.  *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986).

Under *Ex parte Young*, 209 U.S. 123 (1908), there is an exception to Eleventh Amendment sovereign immunity "for claims for *injunctive relief* against individual state *officials* in their official capacities."  *Diaz v. Mich. Dep't of Corrs.*, 703 F.3d 956, 964 (6th Cir. 2013) (emphases added).  But that exception applies to claims against individual officials; it does not apply to a claim against the state itself.  *See Ali v. Simmons*, No. 21-1829, 2023 WL 4085758, at *2 (6th Cir.

Apr. 4, 2023) (affirming dismissal of the Michigan Department of Corrections and noting that Eleventh Amendment immunity protects "[a] state and its agencies . . . regardless of the relief sought"). Thus, Plaintiffs do not state a § 1983 claim against the State of Michigan.

### 4. City of Kalamazoo

The city's alleged failure to improve the air quality of its residents does not give rise to a free exercise claim because that failure impacts city residents without regard to their religion. "[N]ot every burden on the free exercise of religion is unconstitutional." *Dahl v. Bd. of Trs. of W. Mich. Univ.*, 15 F.4th 728, 733 (6th Cir. 2021). Ordinarily, a policy or practice that is "neutral, generally applicable, and 'incidentally burdens religions practices'" does not give rise to a free exercise claim. *See Pleasant View Baptist Church v. Beshear*, 78 F.4th 286, 296 (6th Cir. 2023) (quoting *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990)). Those are the circumstances here. Accordingly, the Court will dismiss Count II.

### C. CAA (Counts III-XII, XXXIV) (Defendants USA, EPA Region 5 Director Shore, Gov. Whitmer, EGLE, EGLE Director Keatley, City of Kalamazoo, Mayor Anderson, Kalamazoo Public Services Director Baker, GPI, Olstad)

Plaintiffs assert several claims under the CAA against almost all Defendants.

### 1. United States

The United States argues that it is entitled to sovereign immunity for all of Plaintiffs' claims under the CAA. It acknowledges that the CAA might permit an action against it under certain citizen-suit provisions in 42 U.S.C. § 7604(a), but it contends that none of those provisions apply here.

The CAA permits an individual to bring suit in one of the following three circumstances: (1) against any person, including the United States, who allegedly violated either "an emission standard or limitation" or "an order issued by the Administrator or a State with respect to such a standard or limitation"; (2) against the EPA Administrator, where the Administrator failed "to

perform any act or duty under this chapter which is not discretionary"; or (3) against any person "who proposes to construct or constructs any new or modified major emitting facility without a permit . . . or who is alleged to have violated . . . any condition of such permit."  42 U.S.C. § 7604(a)(1)-(3).

Plaintiffs do not allege that the United States has violated an emission standard or limitation.  Nor do they allege that the United States has violated a permit concerning the construction of a major emitting facility.  Thus, the first and third circumstances do not apply. Ruling out the first and third options leaves § 7604(a)(2), which waives the EPA's sovereign immunity where the EPA Administrator has failed to perform a nondiscretionary duty.  *See Sierra Club v. Wheeler*, 956 F.3d 612, 616 (D.C. Cir. 2020) (reasoning that the citizen-suit provision in § 7604(a)(2) provides a "conditional waiver of sovereign immunity").  Indeed, Plaintiffs argue in their response briefs that they bring their CAA claims under the latter provision.  (Pls.' Resp. to State Defs.' Mot. to Dismiss 3, ECF No. 93; Pls.' Resp. to City Defs.' Mot. to Dismiss 5-6, ECF No. 63; Pls.' Resp. to GPI Defs.' Mot. to Dismiss 7-8, ECF No. 94.)

At the outset, the Court notes that Plaintiffs have not sued the proper party for their CAA claims.  As indicated above, § 7604(a) permits suit "against the EPA Administrator."  Plaintiffs have not sued the EPA Administrator.  Instead, they have sued the United States, the EPA's Region 5 Administrator, two EPA agents, the State of Michigan, the City of Kalamazoo, GPI, and individuals who are or were employed by the State of Michigan, by the City of Kalamazoo, or by GPI.  None of these parties is the EPA Administrator.  Defendant Shore, the Region 5 Administrator, has a similar title, but she is not the EPA Administrator.  *See* 42 U.S.C. § 7602(a) (defining "Administrator" as "*the* Administrator of the Environmental Protection Agency" (emphasis added)).  Plaintiffs' failure to sue the proper party warrants dismissal of all their CAA claims.

Moreover, Plaintiffs cannot overcome the United States' immunity because Plaintiffs do not identify a failure by the EPA Administrator to perform a nondiscretionary duty. With respect to the CAA claims, the United States is named as a defendant in Counts III, VIII, X, and XI. Thus, the relevant question is whether Counts III, VIII, X, or XI allege a failure to perform a mandatory duty. They do not, for reasons discussed below.

*Count III*. In Count III, Plaintiffs claim that certain Defendants violated their duty in 42 U.S.C. § 7427 to notify Plaintiffs of a deterioration in their air quality, and to "attain levels of air quality mandated to protect public health welfare under the CAA's [National Ambient Air Quality Standards ("NAAQS")] requirements[.]"  (Compl. 91.)  In addition, GPI allegedly exceeded emissions limits for particulate matter and emitted "dangerous amounts" of VOCs without notifying the public. (*Id.*)

Section 7427 requires that "each State [implementation] plan"

contain measures which will be effective to notify the public . . . of instances or areas in which any national ambient air quality standard is exceeded or was exceeded during any portion of the preceding calendar year to advise the public of the health hazards associated with such pollution . . . .

42 U.S.C. § 7427(a). It further provides that the EPA administrator "is authorized to make grants to States to assist in carrying out the requirements of" the foregoing section. 42 U.S.C. § 7427(b). Nothing in this provision mandates action by the EPA Administrator.

*Count VIII*. In Count VIII, Plaintiffs contend that Defendants failed to assess and collect fines under 42 U.S.C. § 7420. Section 7420 provides that "the State or the Administrator *shall* assess and collect a noncompliance penalty" against noncompliant stationary sources of air pollution. 42 U.S.C. § 7420(a)(2)(A) (emphasis added). Plaintiffs interpret this section to impose a mandatory duty on the Administrator to assess and collect fines from GPI for its alleged violations of the CAA.

Before the Administrator can assess and collect fines, however, it must follow an enforcement process that complies with due process, including providing notice to the offending party and giving that party an opportunity to respond.  42 U.S.C. § 7413, which lays out the general procedure and authority for the EPA Administrator to enforce the CAA's air quality and emissions limitations, provides these due process protections.  It also gives the EPA Administrator several different options for enforcing the CAA against violators, and it makes clear that these options are *permissive*, not mandatory.  For example, if the Administrator "finds" that a person is in violation of a state implementation plan or permit, the Administrator "may" issue an order requiring compliance, issue an administrative penalty, or bring a civil action against that person.  42 U.S.C. § 7413(a)(1).  Or, if the Administrator "finds" that a person is in violation of other aspects of the CAA, the Administrator "may" issue an administrative penalty, issue an order requiring compliance, bring a civil action against that person, or request the Attorney General to commence a criminal action.  42 U.S.C. § 7413(a)(3).

The language requiring the Administrator to "find" a violation, as well as the term "may" preceding the various enforcement options given to the Administrator, make clear that enforcement of the CAA is within the discretion of the EPA Administrator.  *See Royster-Clark v. Agribusiness, Inc. v. Johnson*, 391 F. Supp. 2d 21, 29 (D.D.C. 2005) (discussing these provisions and noting that the "EPA has considerable discretion in determining whether to bring an enforcement action following the issuance of [a notice of violation]"); *see also Kentucky ex rel. Hancock v. Ruckelshaus*, 497 F.2d 1172, 1177 (6th Cir. 1974) ("The district court correctly held that it had no power to review the decision of EPA not to commence actions under [42 U.S.C. § 7413] since this was a decision on agency action committed to agency discretion by law." (quotation marks omitted)); *Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (noting that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed

to an agency's absolute discretion"). Accordingly, the EPA's alleged failure to assess and collect fines does not fall within the scope of the waiver of sovereign immunity in 42 U.S.C. § 7604(a)(2).

*Count X.* In Count X, Plaintiffs contend that Defendants did not comply with 42 U.S.C. § 7477 when they failed to prevent the "expansion and ramp-up" at GPI's Northside facility, despite the fact that GPI had allegedly violated its permit several times. (Compl. 104.) The latter section provides as follows:

> The Administrator *shall* . . . take such measures, including issuance of an order, or seeking injunctive relief, *as necessary* to prevent the construction or modification of a major emitting facility which does not conform to the requirements of this part, or which is proposed to be constructed in any area designated pursuant to section 7407(d) of this title as attainment or unclassifiable and which is not subject to an implementation plan which meets the requirements of this part.

42 U.S.C. § 7477 (emphases added).

The Court agrees with the United States that the enforcement duty in this provision is discretionary, not mandatory. In particular, the language requiring the Secretary to take such measures "as necessary" "leaves the determination of the duty's boundaries squarely within the agency's discretion." *Sierra Club v. Jackson*, 724 F. Supp. 2d 33, 40 (D.D.C. 2010). In other words, the EPA Administrator determines what measures are necessary, meaning that its enforcement duties are discretionary, not mandatory. Thus, the United States is immune from this claim.

*Count XI.* In Count XI, Plaintiffs contend that Defendants violated "State Implementation Plan requirements" in 42 U.S.C. § 7471 by failing to promulgate "effective measures to attain national ambient air quality standards (NAAQS) or to effectively warn and protect citizens from the imminent dangers of substantial ambient air deterioration." (Compl. 105-06.) In addition, Defendants allegedly violated "State Implementation Plan requirements" by permitting GPI to

emit VOCs into a "designated superfund site" and by failing to take reasonable measures to "prevent ambient air quality deterioration[.]"  (Compl. 106.)

Section 7471 provides:

In accordance with the policy of section 7401(b)(1) of this title, each applicable implementation plan shall contain emission limitations and such other measures as may be necessary, as determined under regulations promulgated under this part, to prevent significant deterioration of air quality in each region (or portion thereof) designated pursuant to section 7407 of this title as attainment or unclassifiable.

42 U.S.C. § 7471.  The foregoing statutory language does not identify a mandatory duty by the Administrator.  Thus, the citizen-suit waiver of immunity in § 7604(a)(2) does not apply.

In short, to the extent Plaintiffs contend that the EPA (through its Administrator) failed to act in response to GPI's conduct, the CAA did not require it to act.  As discussed above, the EPA's decision about whether to enforce the CAA is discretionary, not mandatory.  Accordingly, the United States is entitled to sovereign immunity for all CAA claims.

### 2. Other Defendants

State Defendants argue that the Court does not have jurisdiction to consider the CAA claims against them because Plaintiffs did not provide them notice at least 60 days before filing suit, as required by 42 U.S.C. § 7604(b).  For citizen suits brought against violators under § 7604(a)(1), the plaintiff must provide notice of the violation 60 days before commencing suit "(i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order[.]"  42 U.S.C. § 7604(b)(1).

Long ago, the Court of Appeals described nearly identical pre-suit notice provisions in other environmental statutes as "jurisdictional prerequisite[s] to maintaining a cause of action[.]" *Bd. of Trs. of Painesville Twp. v. City of Painesville*, 200 F.3d 396, 400 (6th Cir. 1999) (discussing the Clean Water Act).  More recently, it has described such provisions as "mandatory condition[s] precedent to bringing a citizen suit," such that dismissal is "required" if the plaintiff failed to

39

comply.  *S. Side Quarry, LLC v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 28 F.4th 684, 694 (6th Cir. 2022) (quoting *Cooper v. Toledo Area Sanitary Dist.*, 797 F. App'x 920, 923 (6th Cir. 2019)).

Plaintiffs respond that they provided notice to Defendant Shore, the EPA Region 5 Administrator, in May 2023.  And they argue that Defendants were not entitled to pre-suit notice because Plaintiffs filed their complaint under the citizen-suit provision in § 7604(a)(2).  For suits brought under that provision, the plaintiff must provide 60 days' notice to the EPA Administrator only.  42 U.S.C. § 7604(b)(2).

Accepting Plaintiffs at their word, they cannot bring a CAA claim because they did not provide notice to the EPA Administrator as required by § 7604(b)(2).  Notice to Defendant Shore does not suffice because the statute expressly requires notice to the EPA Administrator, not a regional administrator.  *See also* 40 C.F.R. § 54.2(a) (requiring service of notice by certified mail to the Administrator of the EPA in Washington, D.C.).

Plaintiffs argue that the Court should allow their complaint to serve as notice.  The Court cannot do so.  Like the other federal environmental statutes discussed below, the CAA expressly requires notice *before* commencing suit.  That requirement is mandatory; if it is not satisfied, the Court *must* dismiss the claim.  *S. Side Quarry*, 28 F.4th at 694.  Allowing a complaint to serve as notice would defeat the purpose of a pre-suit notice requirement.  Accordingly, the Court will dismiss the CAA claims against the other Defendants.

### 3. CAA Regulations (Counts VI, IX, XII)

To be clear, Plaintiffs' claims in Counts VI, IX, and XII rely on state and federal regulations implemented under the CAA, rather than the CAA itself, such as 40 C.F.R. § 63.4 (requiring owners and operators of stationary sources of emissions to keep certain records), 40 C.F.R. § 65.105 (requiring owners and operators of regulated sources of emissions to repair detected leaks

40

and to keep records of such leaks), and Mich. Admin. Code R. 336.1213(3)(B)(ii) (requiring retention of data obtained from monitoring required by a renewable operating permit). Plaintiffs identify no authority that would allow them to bring suit to enforce these regulations against Defendants. To the extent Plaintiffs rely on the CAA's citizen-suit provision in 42 U.S.C. § 7604(a)(2), that provision permits suit against the EPA Administrator; it does not permit suit against the other Defendants. Moreover, Plaintiffs did not provide the pre-suit notice required by the CAA. Accordingly, the Court will dismiss all CAA claims, including claims based on regulations implemented under the CAA.

### D. CERCLA (Counts XIII-XVI) (Defendants USA, Region 5 Director Shore, EGLE, EGLE Director Keatley, City of Kalamazoo, Kalamazoo Public Services Director Baker, GPI, Olstad)

Counts XIII through XVI assert that various Defendants violated CERCLA.

#### 1. United States

The United States, which is a defendant to Count XIII, argues that it is entitled to sovereign immunity for Plaintiffs' claims under CERCLA. Plaintiffs do not meaningfully respond to this argument. Their brief in response to Federal Defendants' motion contains no mention of CERCLA.

Some sections of CERCLA impose liability on the federal government for a failure to comply with its terms. For example, CERCLA provides that

> [e]ach department, agency, and instrumentality *of the United States* (including the executive, legislative, and judicial branches of government) shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title. Nothing in this section shall be construed to affect the liability of any person or entity under sections 9606 and 9607 of this title.

42 U.S.C. § 9620(a)(1) (emphasis added). In addition, it states:

> State laws concerning removal and remedial action, including State laws regarding enforcement, shall apply to removal and remedial action at facilities *owned or*

41

> operated by a department, agency, or instrumentality of the United States or facilities that are the subject of a deferral under subsection (h)(3)(C) when such facilities are not included on the National Priorities List. The preceding sentence shall not apply to the extent a State law would apply any standard or requirement to such facilities which is more stringent than the standards and requirements applicable to facilities which are not owned or operated by any such department, agency, or instrumentality.

42 U.S.C. § 9620(a)(4) (emphasis added).  However, courts have interpreted these sections as "limiting the waiver of sovereign immunity to cases in which *the government* releases hazardous substances, triggering liability for remediation under section 107, 42 U.S.C. § 9607[.]"  *Gen. Motors Corp. v. Hirschfield Steel Serv. Ctr., Inc.*, 402 F. Supp. 2d 800, 804 (E.D. Mich. 2005); *see Giovanni v. U.S. Dep't of Navy*, 906 F.3d 94, 101 n.4 (3d Cir. 2018) ("Section 120 of CERCLA, which is codified at 42 U.S.C. § 9620, clarifies that the Act applies to federal facilities[.]"). Plaintiffs do not allege that the federal government itself released hazardous substances.

In short, Plaintiffs provide no meaningful basis for overcoming the federal government's sovereign immunity.  Accordingly, the Court will dismiss the United States from Count XIII.

## 2. Defendant Shore

Plaintiffs sue EPA Region 5 Director Shore.  CERCLA's citizen suit provision, 42 U.S.C. § 9659, permits suit against an "officer of the United States . . . where there is an alleged failure . . . of such . . . officer to perform any act or duty under this chapter . . . which is not discretionary with . . . such [] officer."  42 U.S.C. § 9659(a)(2).  Plaintiffs do not allege a failure to perform a nondiscretionary duty by Shore.  For the CERCLA claims, Shore is named as a defendant to Count XIII, which relies upon 40 C.F.R. § 300.125.  The latter designates the National Response Center as the national communications center for "pollution incident reporting" and requires that "[n]otice of an oil discharge or release of a hazardous substance in an amount equal to or greater than the reportable quantity . . . be made immediately" to the "NRC Duty Officer" in Washington, DC.  40 C.F.R. § 300.125(a), (c).  Plaintiffs allege no facts regarding Defendant Shore that would have

triggered a nondiscretionary duty under this provision or that suggests she failed to comply with one. Accordingly, Plaintiffs do not state a CERCLA claim against Shore.

### 3. EGLE

As discussed above, the State of Michigan is immune from suit in federal court under the Eleventh Amendment unless Congress has abrogated the state's immunity or the state has consented to suit. *See Pennhurst*, 465 U.S. at 98-101. That principle applies to the state's "agencies or departments" as well. *Id.* at 100; *see Regents of the Univ. of Calif. v. Doe*, 518 U.S. 425, 429 (1997) (noting that Eleventh Amendment immunity encompasses actions "against state agents and state instrumentalities"). Thus, as an agency or department of the State of Michigan, EGLE can raise the defense of immunity under the Eleventh Amendment.

There is no indication that the State of Michigan has consented to suit, and CERCLA does not abrogate the state's immunity. The applicable citizen-suit provision in CERCLA, 42 U.S.C. § 9659(a), permits suit "against any person" in violation of the statute or its regulations "(including the United States and any other governmental instrumentality or agency, *to the extent permitted by the eleventh amendment to the Constitution*)[.]" 42 U.S.C. § 9659(a)(1). Thus, the provision expressly limits itself to suits permitted by the Eleventh Amendment. It does not purport to abrogate Eleventh Amendment immunity held by the states.

Moreover, Congress did not validly abrogate the states' Eleventh Amendment immunity when it passed CERCLA. To abrogate the states' sovereign immunity under the Eleventh Amendment, Congress must act "pursuant to a valid exercise of power[.]" *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996) (quotation marks omitted). That power is found only in section 5 of the Fourteenth Amendment. *Id.* at 59. When enacting CERCLA, however, Congress relied on the Commerce Clause. *See Burnette v. Carothers*, 192 F.3d 52, 59 (2d Cir. 1999).

Consequently, CERCLA did not validly abrogate state sovereign immunity.  *Id.*  That means EGLE is immune from suit in this Court for all CERCLA claims.

### 4. Other Defendants

Defendants also contend that Plaintiffs did not comply with CERCLA's pre-suit notice requirement.  Before bringing suit under 42 U.S.C. § 9659(a)(1) against a person "alleged to be in violation of any standard, regulation, condition, requirement, or order which has become effective pursuant to this chapter," the plaintiff must first provide notice to "each of the following" at least 60 days before commencing suit:

> (A) The President.
>
> (B) The State in which the alleged violation occurs.
>
> (C) Any alleged violator of the standard, regulation, condition, requirement, or order concerned[.]

42 U.S.C. § 9659(d)(1).

Defendants argue that they never received notice of CERCLA violations before Plaintiffs filed suit.  Plaintiffs do not respond to this issue.  Accordingly, the Court will dismiss all other Defendants from Plaintiffs' CERCLA claims.

### E. TSCA (Count XVII) (Defendants City of Kalamazoo, Baker, GPI, Olstad)

Plaintiffs claim that Defendants violated the TSCA—specifically, 15 U.S.C. § 2614—by disposing or failing to retain "hazardous pollutant material use records" for State inspection, and by failing to report or provide notice of "several chemical waste spills into the Kalamazoo Superfund site." (Compl. 117-18.)

### 1. City Defendants

The TSCA's citizen-suit provision permits suit against "any person . . . who is alleged to be in violation of this chapter or any rule promulgated under section 2603, 2604, or 2605 of this title, or subchapter II or IV, or order issued under section 2603 or 2604 of this title or subchapter

II or IV to restrain such violation[.]"  15 U.S.C. § 2619(a)(1).  City Defendants argue that § 2614 is not mentioned in the foregoing language, so Plaintiffs cannot bring suit under the TSCA for a violation of § 2614.  That argument is not persuasive.  Section 2619 permits a citizen suit for a "violation of *this chapter*," which refers to the TSCA as a whole.  The TSCA is Chapter 53 of Title 15, and § 2614 is part of Chapter 53.  Thus, the citizen-suit provision covers § 2614.

City Defendants further argue that Plaintiffs do not state a claim against them because Plaintiffs do not seek any viable relief from City Defendants.  The TSCA does not permit a citizen suit for damages.  *See Brewer v. Ravan*, 680 F. Supp. 1176, 1183 (M.D. Tenn. 1988) ("Neither the express language nor legislative history of TSCA . . . suggest that civil penalties are available to private plaintiffs in suits brought pursuant to section 2619(a)(1).").  Indeed, § 2619 only allows suit to "restrain" an ongoing violation.  *Id.* at 1184.  In other words, § 2619 permits Plaintiffs to seek prospective injunctive relief only.

In this case, however, Plaintiffs do not seek injunctive relief against City Defendants.  Plaintiffs seek an order "mandating the closure of GPI's [plant] and/or requiring production decreases to levels guaranteed to ensure the public's health[.]"  (Compl. 160.)  But not only would such an injunction be wholly inappropriate for a records retention or reporting violation, it would not require any action by City Defendants.  The Court would issue such an injunction against GPI alone.  Accordingly, Plaintiffs do not state a viable claim for relief against City Defendants.

In addition, City Defendants note that Plaintiffs did not provide them with pre-suit notice, as required by 15 U.S.C. § 2619(b).  That section requires notice "to the Administrator" and "to the person who is alleged to have committed [a] violation" at least 60 days before commencing suit.  15 U.S.C. § 2619(b)(1)(A).  Plaintiffs do not respond to this issue.  For all the foregoing reasons, Plaintiffs do not state a TSCA claim against City Defendants.

### 2. GPI Defendants

GPI Defendants also note that Plaintiffs did not provide them with pre-suit notice, as required by 15 U.S.C. § 2619(b).  Plaintiffs do not respond to this issue.  Accordingly, the Court will dismiss Count XVII in its entirety.

**F. Equal Protection & Substantive Due Process, 42 U.S.C. § 1983 (Counts XXVI, XXVIII, XXIX) (Defendants USA, EPA, EPA Agent Fuoco, State of Michigan, EGLE, EGLE Director Keatley, MDHHS Assessment Manager Keatley, State Senator McCann, City of Kalamazoo, Kalamazoo Pub. Servs. Director Baker, Mayor Anderson, former Mayor Hopewell, former City Commissioner Urban, GPI, Olstad, Paul McCann)**

Counts XXVI, XXVIII, and XXIX assert violations of Plaintiffs' constitutional rights to equal protection and substantive due process against almost all Defendants.

In Count XXVI, Plaintiffs contend that the City of Kalamazoo and GPI violated Plaintiffs' substantive due process right to bodily integrity by "emitt[ing] particulate matter, VOCs, [and] hydrogen sulfide," and by causing "industrial wastewater chemicals to be spilled into the Northeast Kalamazoo community[.]" (Compl. 133.)  And Plaintiffs contend that EGLE violated Plaintiffs' right to equal protection and bodily integrity by "failing to regulate" the City of Kalamazoo and GPI and by collaborating to "conceal the dangers of their excessive emissions by delaying publication of their unnecessary 'health consultation study[.]'" (*Id.*)

In Count XXVIII, Plaintiffs allege that the EPA, EGLE, and the City of Kalamazoo caused "disparate impacts against" Plaintiffs through "discriminatory regulation enforcement[.]" (*Id.* at 136.)  Plaintiffs further allege a "custom of hazardous chemical spills, exceedances, abnormal dispersions, and failure to enforce" Michigan's environmental rules. (*Id.* at 138.)  And Plaintiffs allege a "concerted effort" to "conceal the hazardous nature" of Kalamazoo's air quality by "mischaracterizing the requires of the 2021 EPA GMAP study to hide the presence of dangerous

amounts of VOCs in predominantly Black areas of Kalamazoo," and by failing to report waste and chemical spills.  (*Id.* at 138.)

In Count XXIX, Plaintiffs assert that Defendants United States, the State of Michigan, the City of Kalamazoo, EPA Agent Fuoco, State Senator McCann, EGLE Director Keatley, MDHHS Assessment Manager Keatley, the City of Kalamazoo, Mayor Anderson, former Mayor Hopewell, former City Commissioner Urban, GPI, Olstad, and Paul McCann where "deliberately indifferent" to Plaintiffs' health and safety when they "colluded and collaborated to keep Northeast Kalamazoo's deteriorating ambient air quality and environmental racism issues a secret" and when they made efforts to expand GPI's facility "while being privy to [its] excessive, continuous dispersions of dangerous levels of hydrogen sulfide, particulate matter, several unreported spills, and regulatory circumvention efforts."  (Compl. 141.)

### 1. Immunity

As discussed above with regard to Counts I and II, the United States, the EPA, the State of Michigan, and EGLE are immune from suit for Plaintiffs' claims under § 1983.

### 2. Equal Protection

Plaintiffs cite the Equal Protection Clause in the Fourteenth Amendment, contending that the EPA, EGLE, and the City of Kalamazoo "caused discriminatory impacts" through a "custom of hazardous chemical spills, exceedances, abnormal dispersions, and failure to enforce" Michigan environmental laws.  (Compl. 136-38.)

Plaintiffs fail to state an equal protection claim.  The Equal Protection Clause provides that "no State shall 'deny to any person . . . the equal protection of the laws.'"  U.S. Const. amend. XIV, § 1.  A state practice generally will not require strict scrutiny unless it interferes with a fundamental right or discriminates against a suspect class of individuals.  *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976).  Plaintiffs apparently base their claims on racial discrimination.

Where a suspect class such as race is involved, "'[p]roof of racially discriminatory intent or purpose is required' to show a violation of the Equal Protection Clause." *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)); *accord O'Donnell v. City of Cleveland*, 838 F.3d 718, 730 (6th Cir. 2016) (examining the allegations of a complaint). In other words, Plaintiffs must allege facts from which to plausibly infer that "a state actor intentionally discriminated against [them] because of membership in [the] protected class." *Inner City Contracting, LLC v. Charter Twp. of Northville*, 87 F.4th 743, 758 (6th Cir. 2023) (quoting *Henry v. Metro. Sewer Dist.*, 922 F.2d 332, 341 (6th Cir. 1990)).

Intentional discrimination "can be shown through either direct evidence of discrimination or circumstantial evidence 'which would support an inference of discrimination.'" *Inner City Contracting*, 87 F.4th at 755 (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000)). Where there is no other evidence of discriminatory intent in the pleadings, a plaintiff "must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons[.]" *Andrews v. City of Mentor*, 11 F.4th 462, 473 (6th Cir. 2021); *see Nali v. Ekman*, 355 F. App'x 909, 913 (6th Cir. 2009) (allegation of discriminatory intent based on race must be "accompanied by some evidence that the people [treated differently] were similarly situated and of a different race"); *accord Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 646 F.3d 365, 379 (6th Cir. 2011).

Here, Plaintiffs allege no facts about themselves that would put them into a suspect class. Plaintiffs are a group of almost 50 individuals. Only a few are mentioned by name in the body of the complaint. Even for those few, it is not clear whether they are part of a suspect class. Plaintiffs do allege a history of racial discrimination in the City of Kalamazoo toward Black American residents of Kalamazoo (Compl. 7-16), but Plaintiffs never expressly allege that they are members

of that minority group.  Indeed, in multiple instances, the complaint refers to the area where Plaintiffs live as a "*predominantly* Black American" or "*predominantly* minority" community, which raises the following question: are Plaintiffs asserting claims based on their own characteristics or based on the characteristics of those who live around them?  (Compl. 32, 85-86, 136, 138, 139, 147.)  It is doubtful that Plaintiffs have standing to assert a claim of race discrimination if they are not themselves a part of the group that is the target of that discrimination.

Nevertheless, construing the allegations of the complaint in their favor, Plaintiffs appear to be claiming that they are Black American residents of Kalamazoo.  Even so, their equal protection claims fall short because Plaintiffs do not plausibly allege that Defendants intentionally discriminated against them on account of their race.  In particular, as discussed above with regard to Count II, Plaintiffs do not allege any particular instance where a defendant acting under color of state law treated them differently from a similarly situated class of individuals on account of race.

Plaintiffs rely upon "disparate impacts" as support for their discrimination claims (*see* Compl. 136), but "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Vill. of Arlington Heights*, 429 U.S. at 264-65.  A plaintiff must present other evidence of discrimination, such as the "historical background [for] the decision" or a "legislative or administrative history" that evinces discriminatory *intent*. *Id.* at 266-68.  Plaintiffs have not done so here.  Plaintiffs allege a long history of paper mill operations in Kalamazoo with environmental impacts on the community, including at least 20 years of such operations by GPI (*see* Compl. 14), but none of that history suggests a racial motive for the conduct at issue in the complaint.

Plaintiffs also assert an unsupported "belief" that certain individuals associated with GPI have a racial animus (Compl. 74), but the pertinent issue is whether *the government* violated

49

Plaintiffs' right to equal protection; GPI's motives are largely irrelevant to that question.[20]  And as far as government conduct is concerned, Plaintiffs' discrimination claim boils down to an assertion that Defendants did not enforce or comply with environmental laws and regulations.  (*See, e.g.*, Compl. 136 (asserting "discriminatory regulation enforcement").)  However, the complaint does not allege facts plausibly supporting a claim that any enforcement or compliance decisions were racially motivated.  Indeed, such a claim is particularly tenuous considering that Plaintiffs are complaining about air pollution, emissions, and odors that would impact all residents of their neighborhood without regard to race.  In short, Plaintiffs fail to state an equal protection claim. Consequently, the Court will dismiss the equal protection component of Counts XXVI, XXVIII, and XXIX.

### 3. Substantive Due Process

The other component of Counts XXVI, XXVIII, and XXIX is a claim that Defendants violated Plaintiffs' right to substantive due process.  "The Fourteenth Amendment provides that '[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law.'" *Guertin v. Michigan*, 912 F.3d 907, 917 (6th Cir. 2019) (quoting U.S. Const. amend. XIV, § 1). "Although the Clause provides no guarantee 'of certain minimal levels of safety and security,' it expressly prohibits deprivations by 'the State itself.'"  *Id.* (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)).  "That is, '[i]ts purpose [is] to protect the people from the State, not to ensure that the State protect[] them from each other.'"  *Id.* (quoting *DeShaney*, 489 U.S. at 196).

---

[20] GPI or its employees might be considered "state actors" for purposes of § 1983 if they conspired with state officials to violate Plaintiffs' rights.  *See Am. Postal Workers Union, Loc. 96 v. City of Memphis*, 361 F.3d 898, 905-06 (6th Cir. 2004).  But here, Plaintiffs' allegations of a conspiracy to discriminate against Plaintiffs are wholly conclusory.

The "substantive" component of the due process clause "bar[s] certain government actions regardless of the fairness of the procedures use to implement them'" *Id.* at 918 (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).  It protects fundamental rights and liberties, including the "right to bodily integrity, and the right not to be subjected to arbitrary and capricious government action that 'shocks the conscience and violates the decencies of civilized conduct.'" *Id.* (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998)).  A substantive due process claim has two components:  (1) the deprivation of a constitutionally protected property or liberty interest; and (2) government conduct that "shocks the conscience." *Id.* at 922.

The protected interest identified by Plaintiffs is the right to bodily integrity.  (Compl. 130-31.)  That right is the "right to be free from . . . unjustified intrusions on personal security[.]" *Id.* (quoting *Ingraham v. Wright*, 430 U.S. 651, 673 (1977)).  As a general matter, "individuals possess a constitutional right to be free from forcible intrusions on their bodies against their will, absent a compelling state interest." *Id.* at 919 (quoting *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 506 (6th Cir. 2012)).

Plaintiffs compare their case to the Flint water crisis at issue in *Guertin*.  That case is both instructive and distinguishable.  There, the plaintiffs alleged that government officials created and prolonged a public health crisis in the City of Flint, Michigan.  Some of those officials allegedly made the decision to switch the city's municipal water supply to a new, more corrosive water source (the Flint River), while relying on an outdated water treatment plant and without adding chemicals to the water to counter its corrosivity.  *Guertin*, 912 F.3d at 915.  Due to the inadequate treatment and the lack of corrosion control, the water quality deteriorated and lead began leaching out of the water service lines and into the residents' water.  *Id.*  Within weeks after the switch to the new water source, "some residents' hair began to fall out and their skin developed rashes." *Id.*

51

at 915. Within a year, "there were positive tests for E. coli, a spike in deaths from Legionnaires'
disease, and reports of dangerously high blood-lead levels in Flint children." *Id.*

When concluding that those circumstances could give rise to a claim for deprivation of the
right to bodily integrity, the court in *Guertin* noted two "key" factors: one was the "involuntary
and misleading nature of the intrusions," and the other was a risk of harm that was "grievous" or
life threatening. *Id.* The court analogized its case to *In re Cincinnati Radiation Litigation*, 874 F.
Supp. 796 (S.D. Ohio 1995), in which government officials performed an experiment to investigate
the potential effects of radiation exposure on military personnel by inflicting "massive" doses of
radiation on unsuspecting cancer patients. *Cincinnati Radiation*, 874 F. Supp. at 802-04. The
patients were aware they were receiving radiation for cancer, but they were not told they were part
of an experiment or that they were receiving unusually large doses for reasons unrelated to their
medical treatment. *Id.* at 802. In that case and in *Guertin*, "individuals engaged in voluntary
actions that they believed would sustain life, and instead received substances detrimental to their
health." *Guertin*, 912 F.3d at 921. Also, in both cases, "government officials engaged in conduct
designed to deceive the scope of the bodily invasion" and "grievous harm occurred." *Id.*

The next component of a substantive due process claim requires a plaintiff to show that
"the government's discretionary conduct that deprived [the plaintiff of their protected] interest was
constitutionally repugnant." *Id.* at 922. The Court uses the "shocks the conscience" framework
to determine whether a deprivation of the right to bodily integrity is a substantive due process
violation. *Id.* This standard is somewhat subjective, but its purpose is to "prevent transforming
run-of-the-mill tort claims unto violations of constitutional guarantees." *Id.* at 923.

Plaintiffs apparently argue that the introduction of VOCs and particulate matter into their
breathable air is equivalent to the contamination of the City of Flint's municipal water supply with

52

bacteria and lead.   But there are many ways in which the circumstances in *Guertin* are distinguishable from the facts here.

*Private Action.*   First, unlike in *Guertin*, the party responsible for allegedly introducing almost all the contaminants into Plaintiffs' air is not a government official or government entity. GPI and its employees are private parties, not government actors.  Plaintiffs allege no facts from which to infer that any GPI Defendants would satisfy any of the tests that could make them state actors subject to suit under § 1983.  *See Nugent v. Spectrum Juv. Just. Servs.*, 72 F.4th 135, 140 (6th Cir. 2023) (identifying the "three tests for determining whether a private actor may be treated as a state actor: the public-function test, the state-compulsion test, and the nexus test") (quotation marks omitted).  GPI's reliance on government permits and tax incentives to conduct its business does not transform its conduct into state action.  *See Lansing v. City of Memphis*, 202 F.3d 821, 830 (6th Cir. 2000) (observing that neither "state regulation, even when extensive," nor "public funding," nor "use of public property" is sufficient to turn private conduct into state action for purposes of § 1983).  And to the extent Plaintiffs sue government entities and officials for harm inflicted by GPI, those entities and officials are not liable under § 1983 for GPI's conduct.  *See Gerber v. Herskovitz*, 14 F.4th 500, 511 (6th Cir. 2021) ("[Section] 1983 applies to harm inflicted by government officials, not to harm inflicted by third parties that the [government] fails to prevent."); *DeShaney*, 489 U.S. at 195 ("[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors.").

Plaintiffs contend that GPI Defendants are state actors because they conspired with government officials to violate Plaintiffs' constitutional rights.  It is true that "conspiracies between private and state actors, if adequately alleged, generally suffice to establish state action on the part of the private actors for the purpose of deciding a motion to dismiss." *Rudd v. City of*

*Norton Shores*, 977 F.3d 503, 512 (6th Cir. 2020) (quoting *Revis v. Meldrum*, 489 F.3d 273, 292 (6th Cir. 2007)).   But a complaint "must identify the alleged conspiracy with more than 'vague and conclusory allegations[.]'"   *Id.* at 517 (quoting *Marvaso v. Sanchez*, 971 F.3d 599, 606 (6th Cir. 2020)).   In particular, Plaintiffs must "alleg[e] that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed."   *Leta v. TriHealth, Inc.*, No. 23-3406, 2024 WL 229563, at *3 (6th Cir. Jan. 22, 2024) (quoting *Revis*, 489 F.3d at 290).

Plaintiffs do not satisfy the foregoing pleading requirements.   That is, Plaintiffs do not allege facts from which to infer that GPI Defendants conspired with state actors to violate Plaintiffs' right to substantive due process.   Instead, Plaintiffs allege that various government entities and officials approved permits and tax incentives for GPI's operations, supported GPI's expansion, and failed to ensure that GPI complied with its permits or applicable environmental laws and regulations.   None of that conduct suggests an agreement between GPI Defendants and state actors to deprive Plaintiffs of their right to substantive due process.   At most, it suggests government approval of business operations that allegedly emitted harmful pollutants.   But as explained above, the right to substantive due process does not protect Plaintiffs from harm inflicted by private parties like GPI.   Thus, government support of GPI through permits, tax incentives, or inadequate enforcement of environmental laws does not amount to a constitutional violation, let alone a conspiracy to violate Plaintiffs' constitutional rights.

*Government Action.*   To be sure, Plaintiffs also allege that the KWRP discharged unidentified chemicals and wastewater into the Kalamazoo River and was a source of hydrogen sulfide and formaldehyde emissions.   Unlike GPI, the KWRP is run by city officials, who could be state actors subject to suit under § 1983.   Also, the City of Kalamazoo might be subject to suit under § 1983 in certain circumstances.   *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691

54

(1978) (explaining when a municipality is liable under § 1983).  Nevertheless, even as to the discharges and emissions by the KWRP, this case is distinguishable from *Guertin* because Plaintiffs have not alleged the presence of the two key factors that were necessary to show a violation of the right to bodily integrity in that case:  (1) an involuntary and *misleading* intrusion and (2) grievous harm.

  *Involuntary and Misleading Intrusion.*  There is an involuntary aspect to breathing air containing odors and invisible pollutants, but to find a deprivation of the right to bodily integrity in similar circumstances, the court in *Guertin* emphasized the presence of government "conduct designed to deceive the scope of the bodily invasion."  *Guertin*, 912 F.3d at 921.  In other words, "[m]isleading Flint's residents as to the [city] water's safety—so that they would continue to drink the water and Flint could continue to draw water from the Flint River—is no different than the forced, involuntary invasions of bodily integrity that the Supreme Court has deemed unconstitutional."  *Id.* at 926 (quoting district court opinion).  No such deceptive conduct is adequately alleged in Plaintiffs' complaint.  Plaintiffs do allege the existence of misleading statements in the EPA's GMAP report, but as discussed above, those allegations rest upon a clear misunderstanding of the report itself.  Moreover, so far as the Court can tell, the GMAP report does not contain the critical misstatement alleged by Plaintiffs.  It does not expressly state that VOCs "were not found to be in exceedance of risk levels," as Plaintiffs contend.  And at any rate, Plaintiffs do not state a viable claim under § 1983 against the only defendants involved in making that allegedly misleading statement, i.e., the EPA and its officials.  The EPA is immune from suit and § 1983 does not apply to federal officials.[21]

---

[21] In addition, Plaintiffs do not state a *Bivens* claim against EPA officials Shore, Compher, and Fuoco for alleged constitutional violations.  Plaintiffs sue Shore and Compher in their official capacities only.  Plaintiffs voluntarily dismissed their claims against Fuoco in her individual capacity (Notice of Voluntary Dismissal, ECF No. 64), which leaves their claims against Fuoco in her official capacity.  To the extent Plaintiffs rely on *Bivens*, "a *Bivens* claim may

As other examples of deceptive conduct by government actors, Plaintiffs allege that former City Commissioner Urban stated "untruths" to the City Commission when he "made [it] believe that the EPA and EGLE were efficiently monitoring and regulating GPI for hazardous chemical releases," even though he was aware of "GPI's spills and excessive emissions records." (Compl. 80.)  Urban also allegedly "misled the city commission board" by making it "believe that the community was solely suffering from odor nuisance issues and not personal injuries[.]"  (*Id.*) These allegations are conclusory and vague.  It is not clear what statements Urban made, why his statements were deceptive, or how his misrepresentations played any role in the asserted deprivation of Plaintiffs' constitutional rights.  Plaintiffs do not allege, for instance, that they were aware of Urban's statements or that those statements induced them to continue breathing tainted air without taking precautions.  Also, Urban's statements pertain to emissions by GPI, not by the KWRP.  Urban did not have a constitutional duty to protect Plaintiffs from harm by GPI.

Similarly, Plaintiffs allege that KWRP manager Baker misled the "Kalamazoo commission board" by telling it that "there were no conclusive findings in regards to what was causing the odors and whether or not the odors were simultaneously presenting bodily injury dangers." (Compl. 81.)  Plaintiffs do not indicate what was deceptive in these statements.  Instead, Plaintiffs simply allege that he was aware of "chemical spills" at KWRP's property, as well as "sulfide leaks and excessive emissions," but that he did not report them to the commission.  (*Id.*)  And they allege, without plausible factual support, that he was aware that "formaldehyde was present in North Kalamazoo in exceedance of air minimum quality risk limits and [he] failed to report the cause to proper federal and state authorities."  (*Id.*)  As with the allegations against Urban, the Court cannot discern the deceptive content of Baker's statements or their connection to Plaintiffs' constitutional

---

not be asserted against a federal officer in [her] official capacity[.]"  *Berger v. Pierce*, 933 F.2d 393, 397 (6th Cir. 1991); *accord Marie v. Am. Red Cross*, 771 F.3d 344, 366 (6th Cir. 2014).

claims.  A failure to report air quality issues to the city commission is not equivalent to misleading Plaintiffs or playing an active role in depriving them of their bodily integrity.

Compare the allegedly misleading conduct by Urban and Baker to the deceptive conduct by the defendants in *Guertin*, who purportedly knew that the City of Flint's water was unsafe for the public to drink but "falsely assured the public that [their] water was safe and attempted to refute assertions to the contrary."  *Guertin*, 912 F.3d at 927.  Unlike those defendants, neither Urban nor Baker falsely assured the public that the City of Kalamazoo's air was safe for residents to breathe while knowing that was not the case.

Plaintiffs also allege that former Mayor Hopewell "accepted professional favors and appointments in exchange for concealing [GPI]'s custom of polluting the North-Eastside neighborhoods and the Kalamazoo River." (Compl. 84.)  He also held "secret meetings" with the city commission, in which he "instructed commissioners and community members to conceal the city's pollution issues in order to protect property values, the City's reputation, and the State's relationship with [GPI]." (Compl. 84.)  And he allegedly "used his appointments and positions to further the interest of [GPI] and to extend the concealment of their hazardous pollution incidents and continuous release exceedances."  (*Id.* at 85.)  These allegations are vague and conclusory.  They lack context, and they do not indicate what statements were made, when they occurred, or more generally, what Hopewell actually said or did to further a substantive due process violation, let alone that he did so with the culpability necessary to state a such a claim (see below).

Finally, Plaintiffs allege that the Keatleys "managed" and "delayed" the Health Consultation study, ostensibly for the purpose of helping GPI.  To the extent such actions bear any resemblance to the deceptive conduct in *Guertin*, they are not adequately supported by any facts.  Plaintiffs do not allege any facts describing what the Keatleys did to manage or delay the study.  In other words, the allegations about the Keatleys are simply conclusions.   "[C]onclusory

allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *O'Bryan v. Holy See*, 556 F.3d 361, 376 (6th Cir. 2009) (quoting *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir.2005)).

*Grievous Harm.* The other key factor in *Guertin* was the existence of "grievous" harm to the plaintiffs, including skin rashes, loss of hair, exposure to E. coli, and dangerously high blood-lead levels. *Guertin*, 912 F.3d at 915; *see also Guertin v. Michigan*, No. 16-cv-12412, 2017 WL 2418007, at *11 (E.D. Mich. June 5, 2017) (noting that Flint residents allegedly suffered "hair, skin, digestive, and organ problems; physical pain and suffering; disability; brain and developmental injuries including cognitive deficits; and aggravation of pre-existing conditions" due to consumption of improperly treated lead-contaminated water). In short, "[t]he *Guertin* plaintiffs were deprived of their bodily integrity when government officials forcibly invaded their bodies by misleading them into consuming a *life-threatening* substance." *Waid*, 960 F.3d at 323 (emphasis added). The severity of the harm is relevant because, for government conduct to shock the conscience in these circumstances, there must have been "a substantial risk of *serious* injury" to the plaintiff. *See Guertin*, 912 F.3d at 926 (quoting *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 541 (6th Cir. 2008) (emphasis added)).

As discussed above, almost none of the plaintiffs here allege facts about their individual injuries, let alone facts that would suggest a conscience-shocking deprivation of their liberty by the government. Plaintiff Winfield alleges that her son died of an asthma attack. Winfield herself suffers from unidentified "breathing issues." (Compl. 70.) Plaintiff Jordan alleges that he went into a coma due to an asthma attack. Plaintiff Brandi Crawford alleges a history of unidentified "respiratory" issues. (Compl. 53.) Plaintiff Thomas Crawford alleges unidentified symptoms resulting from exposure to VOCs and hydrogen sulfide (and to lead, which is not relevant for his claim against Defendants). And Michael Chandler allegedly died of cancer.

58

In addition to these specific injuries, it is plausible to infer that all Plaintiffs were exposed to odors, some of which may have been attributable to hydrogen sulfide or formaldehyde emanating from the KWRP.  It is also plausible to infer that the hydrogen sulfide and formaldehyde emissions from the KWRP may have increased Plaintiffs' risk of suffering asthma, aggravated existing breathing problems, or caused irritation of their eyes and nasal tissues.  Nevertheless, uncomfortable odors, irritation, and an increased risk of respiratory issues like asthma and asthma-related events do not rise to the level of serious harm sufficient to state a substantive due process claim stemming from environmental exposures. [22]

Plaintiffs identify a host of other medical problems, ranging in severity from loss of sleep to cancers, but there are no allegations from which to infer that any serious health conditions alleged by Plaintiffs were the result of emissions or discharges from the KWRP.  Plaintiffs simply allege their conditions and imply that Defendants are responsible for them.  Such conclusory assertions are not sufficient to draw a causal connection between government conduct and their injuries.

*Culpability*.  Finally, Plaintiffs have not alleged sufficient facts from which to infer the level of culpability necessary for a substantive due process claim, i.e., government conduct that is "arbitrary in the constitutional sense" because it "shocks the conscience."  *Guertin*, 912 F.3d at 924-25.  In *Guertin*, the Court of Appeals decided that deliberate indifference was the appropriate standard for evaluating culpability, *id.* at 926, and the parties' briefing here focuses on that standard.  (*See, e.g.*, Pls.' Resp. to State Defs.' Mot. to Dismiss 23-24, ECF No. 93.)  This standard is equivalent to "subjective recklessness," which is "a particularly high hurdle[.]"  *Id.* at 926.

---

[22] The Court acknowledges the risk of death and other adverse consequences from an asthma attack, but Plaintiffs have not plausibly alleged that any conduct by government Defendants significantly increased that risk.  Indeed, the complaint suggests that the KWRP has been emitting hydrogen sulfide since 2009, long before any alleged conduct by the individual government Defendants in this case.

Plaintiffs must allege that Defendants "knew of facts from which they could infer a substantial risk of serious harm, that they did infer it, and that they acted with indifference toward the individual's rights." *Id.* (quoting *Range v. Douglas*, 763 F.3d 573, 591 (6th Cir. 2014) (internal quotation marks omitted)). The Court must assess each government Defendant's actions individually, evaluating "their 'subjective awareness of substantial risk of serious injury,' and whether their actions were made 'in furtherance of a countervailing governmental purpose that justified taking that risk.'" *Id.* (quoting *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 541 F.3d 529, 541 (6th Cir. 2008)).

*Guertin* is helpful for sorting conduct that gives rise to a substantive due process claim and conduct that does not. In that case, one set of officials against whom the plaintiffs stated a viable claim consisted of those who were "instrumental in creating the [lead water] crisis." *Id.* These officials created and implemented the plan to switch water sources using "a [water treatment] plant they *knew* was not ready to safely process water, especially in light of the Flint River's known environmental issues and the problems associated with lead exposure." *Id.* (emphasis added). They then "made numerous statements to the public [falsely] proclaiming that the water was safe to drink." *Id.* at 927. A similar set of defendants allegedly authorized Flint's switch to a new water source, knowing that it was "rife with public-health-compromising complications," and when they became aware of the consequences, they "falsely assured the public that the water was safe[.]" *Id.* These actions were sufficient to shock the conscience.

By contrast, the plaintiffs in *Guertin* did *not* state a viable substantive due process claim against officials who were not involved in the decision to change the city's water source, and who did not take any other action to cause or induce the plaintiffs to consume lead-tainted water. *Id.* at 929-30. Two such officials allegedly failed to notify the public about problems with the city's

water, but that conduct did not give rise to a claim because "the Due Process Clause is a limitation only on government action," not government inaction. *Id.* at 930.

Here, Plaintiffs do not allege that any individual government Defendant took any action to create or contribute to the conditions at the KWRP that led to its hydrogen sulfide and formaldehyde emissions, let alone that they did so knowing that such conditions would pose a substantial risk of serious harm to Plaintiffs. Nor do Plaintiffs plausibly allege that any government Defendants falsely assured them that their air was safe to breathe despite knowledge of a substantial risk of serious harm from doing so. Instead, Plaintiffs' complaint largely rests on allegations of inaction or inadequate action by these Defendants, including inadequate investigation and reporting, inadequate repair of the KWRP's leaking junction chamber, inadequate compliance by the KWRP and GPI with environmental rules and regulations, inadequate enforcement of those rules and regulations, and a general failure to adequately address the odors, emissions, and discharges by the KWRP and GPI. Such failures do not give rise to a substantive due process claim. At most, that conduct might amount to negligence, which does not state a constitutional claim. *See id.* at 923, 930 (noting that negligence is "categorically beneath the threshold of constitutional due process") (quoting *Lewis*, 523 U.S. at 849). To hold otherwise would impose an affirmative duty on government officials to maintain "a contaminant-free, healthy environment." *Id.* at 923. But the Constitution does not impose that duty because it does not guarantee a right to live in such an environment. *See id.* at 922. In short, Plaintiffs have not satisfied the high hurdle of alleging government conduct that shocks the conscience. Accordingly, for all the foregoing reasons, Plaintiffs do not state a substantive due process claim.

### G. Conspiracy to Violate Civil Rights, 42 U.S.C. § 1983 (Count XXVII) (All Defendants)

Plaintiffs claim that Defendants conspired to violate their constitutional rights.  As discussed above, Plaintiffs' allegations of such a conspiracy are conclusory and unsupported.  To state such a claim, it is not enough to allege conduct "was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed . . . behavior."  *Iqbal*, 556 U.S. at 680.

Moreover, this claim fails because Plaintiffs have not plausibly alleged a constitutional violation.  Without an underlying constitutional violation, a conspiracy claim fails.  *PB&J Towing Serv. I & II, LLC v. Hines*, No. 20-6170, 2022 WL 390599, at *5 (6th Cir. Feb. 9, 2022);  *Umani v. Mich. Dep't of Corrs.*, 432 F. App'x 453, 462 (6th Cir. 2011).

### H. State Law (Counts XVIII-XXV, XXX-XXXIIIb)

For reasons discussed above, the Court will dismiss all of Plaintiffs' federal claims.  Their remaining claims arise under state law.  The Court must decide, in its discretion, whether to exercise supplemental jurisdiction over these claims.  *See* 28 U.S.C. § 1367(c); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).  In exercising that discretion, the Court looks to "considerations of judicial economy, convenience and fairness to the litigants" and avoids needless decisions of state law.  *Gibbs*, 383 U.S. at 726.  "Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims."  *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir. 2007).

This case is in an early stage.  Judicial economy, convenience, and fairness do not outweigh concerns about needlessly deciding state-law issues.  Accordingly, the Court will dismiss Plaintiffs' remaining claims because the Court declines to exercise supplemental jurisdiction over them.

## VI. CONCLUSION

For the reasons stated above, the Court will deny Plaintiffs' motion for reconsideration and grant Defendants' respective motions to dismiss.  The Court will enter an order and judgment in accordance with this Opinion.


Dated: March 15, 2024                               /s/ Hala Y. Jarbou
                                                    HALA Y. JARBOU
                                                    CHIEF UNITED STATES DISTRICT JUDGE